## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SYSCO CORPORATION, <br><br> Petitioner, <br><br> v. <br><br> GLAZ LLC, POSEN INVESTMENTS LP, and KENOSHA INVESTMENTS LP, <br><br> Respondents. | CASE NUMBER: <br><br> JUDGE: <br><br> MAGISTRATE JUDGE: |

### PETITION TO VACATE ARBITRATION AWARD

Petitioner Sysco Corporation ("Sysco" or "Petitioner"), by and through its undersigned counsel, Cleary Gottlieb Steen & Hamilton LLP and Reed Smith LLP, hereby respectfully petitions this Court to vacate a final arbitral award denominated as a "Temporary Restraining Order" (the "TRO Award") entered on December 14, 2022 by the tribunal in *Glaz LLC, Posen Investments LP, and Kenosha Investments LP v. Sysco Corporation* (LCIA No. 225609), an arbitration seated in New York (the "Arbitration") and conducted pursuant to the London Court of International Arbitration's (the "LCIA") 2014 Rules of Arbitration ("LCIA Rules"). In support of this Petition, Sysco relies upon, and incorporates herein by reference, Sysco's Memorandum of Law in Support of its Petition to Vacate Arbitration Award, the Declaration of Patrick C. Swiber, (Mar. 8, 2023) ("Swiber Decl.") (including the exhibits attached thereto), the Declaration of Barrett G. Flynn (Mar. 8, 2023) ("Flynn Decl."), and the Expert Report of Professor Maya Steinitz, (Mar. 8, 2023) ("Steinitz Report"), which are filed concurrently with this Petition. In further support of this Petition, Petitioner respectfully alleges as follows:

## NATURE OF THE ACTION

1.      Petitioner seeks an order vacating the TRO Award, which, as set forth more fully below and in the accompanying Memorandum of Law, violates well-established public policy and was issued in violation of Petitioner's due process rights.

## PARTIES

2.       Petitioner Sysco is a corporation organized under the laws of Delaware.  Sysco's principal place of business is 1390 Enclave Parkway, Houston, TX 77077.

3.      Respondent Glaz LLC ("Glaz") is a limited liability company ("LLC") organized under the laws of Delaware. Glaz's address is 251 Little Falls Drive, Wilmington, DE 19808. Glaz's only known direct or indirect member is Burford Capital Limited.

4.      Respondent Posen Investments LP ("Posen") is a limited partnership ("LP") organized under the laws of Delaware.  Posen's address is 251 Little Falls Drive, Wilmington, DE 19808.  Posen's only known direct or indirect member is Burford Capital Limited.

5.      Respondent Kenosha Investments, LP ("Kenosha") is an LP organized under the laws of Delaware.  Kenosha's address is 251 Little Falls Drive, Wilmington, DE 19808.  Kenosha's only known direct or indirect partner is Burford Capital Limited.

6.      Upon information and belief, each of Glaz, Posen, and Kenosha (together, the "Respondents" or "Burford") is controlled by Burford Capital Limited, a multi-billion dollar litigation funding firm.  Burford Capital Limited is a corporation registered in Guernsey that is publicly traded on the London Stock Exchange and New York Stock Exchange, and which has its principal place of business in London, England and New York, New York.  Burford Capital Limited is registered with the United States Securities Exchange Commission ("SEC") as a foreign private issuer.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over this action pursuant to both 9 U.S.C. §§ 202-203 and 28 U.S.C. § 1332(a)(2), and has the power to grant the relief requested pursuant to 9 U.S.C. § 10.

8.     This Court has subject matter jurisdiction over this action pursuant to 9 U.S.C. §§ 202-203 because the TRO Award is an arbitral award arising out of a relationship between Petitioner and Burford which is not "entirely between citizens of the United States" and/or "envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states." 9 U.S.C. § 202. Burford Capital Limited—a Guernsey corporation registered with the SEC as a foreign private issuer—is the ultimate owner of all of the Respondents, and negotiated and is the ultimate beneficiary of the CPA which gave rise to the TRO, which thus clearly has a "reasonable relation with one of more foreign states." Respondents have also repeatedly argued that the Arbitration, administered by the LCIA and conducted pursuant to the LCIA Rules, is an international arbitration to which the rules and standards of international practice and foreign law apply, and thus the New York Convention governs enforcement of the TRO "on account of [its] connections with a foreign legal framework." *See Beijing Shougang Mining Inv. Co. v. Mongolia*, 11 F.4th 144, 159 (2d Cir. 2021) (citation omitted). Accordingly, this Court has subject matter jurisdiction over this proceeding pursuant to 9 U.S.C. § 203. *See Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998) (New York Convention "creates original federal subject-matter jurisdiction over any action arising under the Convention").

9.     Independently, diversity jurisdiction appears to exist. Petitioner Sysco is a corporation and a citizen of Delaware and Texas pursuant to 28 U.S.C. § 1332(c)(1). Respondents

Glaz, Posen, and Kenosha are a limited liability company ("LLC") and two limited partnerships ("LP"), respectively, whose citizenship is determined by the citizenship of their partners or members. *See, e.g.*, *Wise v. Wachovia Secs. LLC*, 450 F.3d 265, 267 (7th Cir. 2006) (an LLC takes on the citizenship of each of its members) (Posner, J.); *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 589 (7th Cir. 1991) (stating the same with respect to LPs) (Posner, J.). In the underlying arbitration, the only direct or indirect member or partner disclosed by Respondents is Burford Capital Limited, a Guernsey-registered corporation with its place of business in the United Kingdom and New York. *See* Swiber Decl. Ex. C, Request for Arbitration.

10. While this Court's original subject matter jurisdiction obviates the need for the Court to analyze the additional grounds of diversity jurisdiction, Petitioner has made reasonable, good faith efforts to investigate whether Glaz, Posen, and Kenosha are citizens of either Delaware or Texas. Beginning in early January 2023, Petitioner repeatedly asked Respondents to identify any other members or partners. These requests were ignored by Burford. *See* Swiber Decl. Ex. D, Letter from J. Rosenthal to L. Snodgrass (Jan. 4, 2023); Swiber Decl. Ex. E, Letter from J. Rosenthal to L. Snodgrass and D. Ho (Jan. 11, 2023). After Petitioner advised the arbitral tribunal (the "Tribunal") on February 4, 2023 of its intent to challenge the TRO Award in court, on February 5, 2023, counsel for Respondents asserted conclusorily that "diversity jurisdiction does not exist," but provided no explanation or support for the assertion. *See* Swiber Decl. Ex. F, Letter from L. Snodgrass to J. Rosenthal and L. Bensman (Feb. 5, 2023). One week later, Burford sent Petitioner a threatening "highly confidential" letter asserting that three levels above one of the Respondents, Kenosha, were Texas investors. This confusing "disclosure" did not identify the corporate structure of the entity immediately above Kenosha or its relationship to Kenosha (only calling Kenosha "part of" a Burford fund), did not identify the so-called Texas investor or its nature

(*i.e.*, corporation, individual, LLC, or LP), did not provide any organizational chart that would enable one to ascertain whether Kenosha is a Texas citizen, and did not divulge when Kenosha alleges it became a Texas citizen (such as whether it took on a Texas partner three tiers up the ladder during the pendency of this dispute for the purpose of defeating diversity). Petitioner advised Burford of the opaqueness of its supposed disclosure and the missing information that was necessary for Petitioner to form a basis to believe that diversity was lacking. Swiber Decl. Ex. G, Letter from L. Bensman to L. Snodgrass and D. Ho (Feb. 14, 2023).[1] Despite additional requests by Petitioner—including the reasonable request that Respondents provide Petitioner with the disclosure statement that Respondents would be required to file pursuant to Federal Rule of Civil Procedure 7.1 upon Petitioner's commencement of this action—Burford has declined to provide specific information that would have enabled Petitioner to conduct a complete analysis of the relevant citizenships, consistent with the law.

11. Therefore, as best as Petitioner has been able to ascertain, including in light of Burford's failure to provide adequate disclosure establishing otherwise, because the citizenship of each of Glaz, Posen, and Kenosha is the same as Burford Capital Limited's citizenship, this is an action between citizens of a State and citizens of a foreign state for which diversity jurisdiction exists. *See* 28 U.S.C. § 1332(a)(2).

12. The proposed federal antitrust settlements that the TRO Award enjoins Sysco from executing exceed $75,000, exclusive of interests and costs. *See* 28 U.S.C. § 1332(b).

13. Moreover, Petitioner will imminently file a motion to consolidate this Petition with the related case *Sysco Corp. v. Tyson Foods, et al.*, Case No. 18-cv-700 (N.D. Ill.) ("*Broilers*

---

[1] Petitioner also advised Burford that it believed that other grounds besides diversity exist for federal jurisdiction.

Litigation"), a direct-action complaint pending in this district before the Honorable Thomas M. Durkin as part of the *In re Broiler Chicken Antitrust Litigation*, Case No. 16-cv-08637 (N.D. Ill.), following which Petitioner will seek this Court's exercise of supplemental jurisdiction to the extent necessary.

14.    Venue is proper in the Northern District of Illinois because (i) the underlying Sysco-Burford agreement was negotiated, in part, within this district; (ii) Burford's conduct in connection with the agreement has largely occurred within this district; (iii) a primary subject of that agreement is Burford's investment in Sysco's claims in the *Broilers* Litigation that is proceeding in this district, and those claims are also among the property underlying the agreement; and (iv) the TRO Award enjoins Sysco from settling certain claims in the *Broilers* Litigation. *See* 28 U.S.C. § 1391(b)(2) (noting that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated"); *In re VMS Secs. Litig.*, 21 F.3d 139, 142-44 (7th Cir. 1994) (venue for vacatur of an arbitration award is permissive); *NII Metals Srvs., Inc. v. ICM Steel Corp.*, 514 F. Supp. 164, 166 (N.D. Ill. 1981) (venue proper in the Northern District of Illinois to confirm arbitration award even though issued in New York-seated arbitration). *See also* 9 U.S.C. § 204.

## FACTS

15.    Burford is a multi-billion dollar litigation funding firm that invests in legal claims in return for a share in any recoveries. As discussed below, beginning in 2019, Burford has invested in various of Sysco's antitrust claims pending in the Northern District of Illinois and the District of Minnesota, including the *Broilers* Litigation.

16.    After years of litigating with many of its key suppliers, Sysco has negotiated reasonable settlements with several of them to resolve complex antitrust claims proceedings in

federal court. But Burford is blocking Sysco from executing those settlements and forcing Sysco to continue to litigate against its will. Burford wants to roll the dice on Sysco's claims, hoping that something good will happen in the future that will make them more valuable; it has even sought to improperly influence Sysco's outside counsel in the ongoing antitrust litigations, Boies Schiller Flexner LLP ("Boies Schiller") (who also represents Burford in other claims), to betray its fiduciary duties to Sysco and assist Burford in preventing the settlements. But Burford's contract with Sysco does not give it the right to obstruct the reasonable settlements, and deep-rooted public policy prohibits financial investors from controlling a plaintiff's settlement decision-making. Burford's efforts to block Sysco from controlling its own litigation even led it to initiate a confidential arbitration against Sysco, in which Burford persuaded the Tribunal to issue an *ex parte* TRO Award preventing Sysco from settling, contrary to that public policy and to Sysco's due process rights. Sysco now asks this Court to vacate that TRO Award.

## I.     The Relevant Antitrust Litigations

17.     Sysco is a large U.S. distributor of food and related products to hundreds of thousands of restaurants, healthcare and educational facilities, lodging establishments, and other customers across the United States. *See* Flynn Decl. ¶ 3. Because Sysco does not produce its own protein products, it is a significant purchaser of chicken, beef, pork, and other proteins. *See id.* Not surprisingly, Sysco's commercial relationships with its key suppliers of protein and other products are a foundation of its business. *See id.*

18.     In 2016, an antitrust class action alleging price-fixing was filed in this Court on behalf of food service distributors and others, including Sysco, against more than a dozen chicken suppliers in the United States. *See In re Broiler Chicken Antitrust Litig.*, Case No. 16-cv-08637 (N.D. Ill.) (Durkin, J.). In 2018, Sysco opted out of the class action and filed its own direct-action complaint. *See Sysco Corp. v. Tyson Foods, et al.*, Case No. 18-cv-700 (N.D. Ill.) (Durkin, J.).

Later that year, a similar antitrust class action was filed against pork producers, and two years later, a similar antitrust class action was filed against beef producers, both in the District of Minnesota. *See In re Pork Antitrust Litig.*, Case No. 0:18-cv-1776 (D. Minn.); *In re Cattle & Beef Antitrust Litig.*, Case No. 0:20-cv-1319 (D. Minn.). Sysco likewise opted out of these class actions and filed its own direct-action complaints. *See Sysco Corp. v. Agri Stats Inc. et al.*, No. 21-cv-1374 (D. Minn.) (the "*Pork* Litigation"); *Sysco Corp. v. Cargill Inc., et al.*, Case No. 22-cv-1750 (D. Minn.) (the "*Beef* Litigation," and together with the *Broilers* Litigation and the *Pork* Litigation, the "Antitrust Litigations"). The Antitrust Litigations involve some of Sysco's most significant suppliers (as defendants) and customers (as members of the class actions or as other direct action plaintiffs). *See* Flynn Decl. ¶ 4.

## II. Burford's Investment In The Antitrust Litigations And The Parties' Capital Provision Agreement

19. In 2019, Sysco's counsel in the Antitrust Litigations, Boies Schiller, approached Sysco with a proposal from Burford, a multi-billion dollar litigation funding firm. *See* Swiber Decl. Ex. H, Email from S. Gant to B. Flynn (Sept. 9, 2019); *see also* Flynn Decl. ¶ 5. Burford wanted to invest in Sysco's opt-out claims in the Antitrust Litigations, and offered to provide Sysco with non-recourse capital in exchange for a share of the proceeds of any future settlements or judgments. *See* Flynn Decl. ¶¶ 3-4.

20. Following negotiations between Sysco and Burford, in October 2019, Sysco and Burford (which designated its wholly-owned affiliates Glaz, Posen, and Kenosha to execute the contract) entered into a Capital Provision Agreement (the "Original CPA"). *See id.* ¶ 5. The Original CPA repeatedly and unambiguously set forth the parties' mutual intent and agreement that Sysco would always retain complete control over its claims in the *Broilers* Litigation, which was a topic of concern for Sysco in entering into the relationship with Burford. *See id.* ¶ 7. For

example, the Original CPA affirmed that "the [Burford affiliates] are each passive providers of external capital," that they have "not become owners of, partners in, or parties to the claims or any part thereof or acquired any rights as to their control or resolution," that Sysco "remains in full control of the assertion and resolution of the claims," that Sysco "shall have day-to-day and overall control over the conduct of, and responsibility for, the Claims" and that "neither the [Burford affiliates] nor their respective Affiliates shall exercise or seek to exercise, any such control over the Claims."

21.     In addition to including such language in its contracts and reassuring Sysco, Burford has also told the public, regulators, the U.S. Securities and Exchange Commission, and its investors that it does not seek to control the claims in which it invests.  For example, at a recent judicial symposium, a Senior Vice President at Burford proclaimed:  "I don't know how to say this more clearly, *we don't control settlement*."  Law & Economics Center, Panel 6: The Evolution of Third-Party Litigation Funding, Sixteenth Annual Judicial Symposium on Civil Justice Issues (Oct. 10, 2022), https://masonlec.org/events/sixteenth-annual-judicial-symposium-on-civil-justice-issues/ (emphasis added).  Similarly, in its 2020 Form 20-F, Burford disclosed that "in our legal finance business [] we are financing a client who *retains decision-making authority in the litigation*."  Burford Capital Form 20-F, 2020 (emphasis added).  *See, e.g.*, Burford, *How we work*, tinyurl.com/3365ensd (last accessed Mar. 7, 2023) (Burford describing itself as "passive capital providers").  Indeed, two months ago (six days after it secretly sought the TRO Award), Burford's CEO Christopher Bogart appeared on *60 Minutes* and told an audience of millions in response to a question about settlement that Burford's "clients are free to run their litigations as they see fit . . . . And we don't interfere with that relationship.  It's not uncommon for them to come and ask for our advice but it's advice.  And the client is free to disregard that advice and take its own

path." Lesley Stahl, "Litigation Funding: A multibillion-dollar industry for investments in lawsuits with little oversight," *60 Minutes* (Dec. 18, 2022), https://www.cbsnews.com/news/litigation-funding-60-minutes-2022-12-18/.

22. Over time, Burford and Sysco expanded the scope of their business deal. *See* Flynn Decl. ¶ 5. The Original CPA was amended in June 2020 as a result of Burford's interest in investing in Sysco's opt-out claims in the Pork Litigation. *See id.* The agreement was further amended in December 2020 to reflect Burford's interest in making an additional investment in Sysco's claims related to its purchase of beef, turkey, and Keurig K-cups products, which took the form of the Second Amended and Restated Capital Provision Agreement (together, with Amendment No. 1 discussed below, the "CPA"), which is the agreement at issue in the Arbitration. *See* Swiber Decl. Ex. A, CPA; *see also* Flynn Decl. ¶ 5.[2]

23. From time to time, Sysco's customers (who are indirect purchasers of the protein products sold by the defendants in the Antitrust Litigations) approached Sysco and asked for an assignment of a share of Sysco's protein claims corresponding to those purchases that were resold to them. *See* Flynn Decl. ¶ 7. Some of these customers asserted a contractual right to receive such assignments. Over time, Sysco accepted several assignment requests. *See id.*[3]

24. Upon learning that Sysco had assigned some of its protein claims to its customers, Burford sought to restructure its deal with Sysco. *See id.* ¶ 8. Instead of accepting a refund of the

---

[2] Burford has asserted confidentiality over its documents and information as part of its strategy of concealing its conduct and business practices from public view. Sysco disagrees that many, if any, of Burford's documents meet this Court's requirements for sealing or redaction, but files them under seal in the first instance to allow Burford the opportunity to appear and seek confidential treatment for its materials.

[3] Had Sysco not assigned claims to customers asserting contractual rights to receive them, Sysco may have incurred litigation risk. In fact, one of the customers to which Sysco made assignments, Sodexo, Inc., has sued another large food product distributor, US Foods, Inc., for its failure to assign claims. *See Sodexo, Inc. v. US Foods, Inc*, No. 23-cv-71-PJM (D. Md.).

portion of its investment corresponding to the assigned claims, or rebalancing the deal terms in another way, Burford seized the opportunity to demand for itself nearly the entire economic benefit of any future recovery in Sysco's Antitrust Litigations—per the restructured deal, ███ of the value of any settlement or judgment will be divided between Burford and Boies Schiller. *See id.* ¶ 9. Concerned that its confiscation of nearly all future recoveries could misalign Burford's and Sysco's incentives, Burford also demanded greater rights relating to settlement, specifically a limited consent right that was subject to three express restrictions: (i) Burford could not unreasonably withhold consent; (ii) Burford could not seek to impose a commercially unreasonable result; and (iii) Burford could not interfere with Sysco's outside counsel. *See id.*[4] Sysco was willing to consider such a limited consent right (and the possibility that it could owe damages if Sysco were ever found to have breached the agreement), but Sysco was adamant that it would not agree to give Burford any control over settlement, and sought reassurances from Burford that it was not proposing to take any such control. *See id.* ¶¶ 10, 12. Burford expressly affirmed to Sysco that Sysco would remain in complete control of its claims and of the settlement of those claims. *See id.* ¶ 10.

25. On March 31, 2022, Sysco and Burford executed Amendment No. 1 (the "Amendment"), which supplemented and revised certain terms of the CPA (which otherwise remains in force). *See* Swiber Decl. Ex. B, Amendment; *see also* Flynn Decl. ¶ 9. Among other things, the Amendment provided Burford with the limited consent right described above. *See* Flynn Decl. ¶ 9. The Amendment affirmed that apart from the provisions that it specifically

---

[4] Burford's negotiated consent right offered Burford a potential path to sue Sysco for monetary damages if Sysco settled any claims without Burford's consent (subject to Burford's ability to establish that it complied with each of the three restrictions). It is an open question as to whether the threat of monetary damages is violative of public policy given its coercive nature, but the TRO Award does not concern this issue, and thus it is not a subject of this Petition.

supplemented or revised, all other provisions of the CPA "remain[ed] in full force and effect," including Burford's agreement that "the Capital Providers are each passive providers of external capital," and that Burford has "not become owners of, partners in, or parties to the claims or any part thereof or acquired any rights as to their control or resolution."   Swiber Decl. Ex. B, Amendment ¶ 9.  Moreover, the Amendment expressly reaffirmed the covenants contained in the CPA, including Burford's covenant that it "shall not be entitled to control or direct the conduct of the Claims, or to require settlement thereof," that Sysco "shall have day-to-day and overall control over the conduct of, and responsibility for, the Claims and neither the [Burford affiliates] nor their respective Affiliates shall exercise, or seek to exercise, any such control over the Claims," that Burford "shall do nothing that compromises the professional duties of" Sysco's counsel, and that Burford "shall act in good faith in all of its dealings with" Sysco.  *See id.*

26.     Burford and Sysco's outside counsel, Scott Gant of Boies Schiller, have a broad economic relationship, as Mr. Gant also represents Burford both directly and indirectly in the Antitrust Litigations.  *See* Flynn Decl. ¶ 20.  As of early 2021, Mr. Gant has represented Burford directly in the *In re Broiler Chicken Antitrust Litigation*, Case No. 16-cv-08637 (N.D. Ill.), as counsel to ███████████████████████████████████████

███████████████.  *See id.*  Mr. Gant took on this relationship after the signing of the CPA between Burford and Sysco; while this representation was disclosed to Sysco, the full extent of Mr. Gant's work for Burford has never been disclosed to Sysco.  *See id.*[5]  Boies Schiller is also representing at least one other protein antitrust plaintiff in whose claim Burford invested.  *See id.* Sysco has not waived any conflicts resulting from Mr. Gant's representation of Burford in

---

[5] Mr. Gant has appeared at Burford marketing events.  *See e.g.*, Burford Capital, *Quantifying risk: Unlocking the value of pending antitrust claims* (Sept. 15, 2020), https://www.burfordcapital.com/media-room/media-room-container/webcast-quantifying-risk-unlocking-the-value-of-pending-antitrust-claims/.

substantially related matters, his relationship with Burford, or Boies Schiller's relationship with Burford, and neither Mr. Gant nor Boies Schiller had sought such a conflict waiver from Sysco. *See id.*

### III. Sysco's Pursuit Of Key Settlements In The Antitrust Litigations

27.     Over the course of 2022, Sysco engaged in settlement discussions with several of its suppliers who are defendants in the Antitrust Litigations. *See id.* ¶ 11. After months of arms' length mediations, negotiations (both between outside counsel and between in-house counsel to the parties), discussions, and exchanges of offers and counter-offers, in late August 2022, Sysco succeeded in securing desirable settlement offers from certain suppliers, including in the *Broilers* Litigation (the "Proposed Settlements"). *See id.*

28.     Sysco kept Burford informed as settlement negotiations progressed and explained why it believed the Proposed Settlements were reasonable, including that they had the support of Sysco's outside counsel. *See id.* ¶ 13. Sysco relied on its outside counsel at Boies Schiller throughout the settlement negotiations: Mr. Gant participated in multiple mediation sessions, consulted regularly with Sysco's in-house counsel on settlement strategy, and assisted in preparing settlement documentation. *See id.* ¶ 12. Mr. Gant had advised Sysco of a range of estimated value of its entire *Broilers* Litigation, and the *Broilers* Litigation components of the Proposed Settlements alone are within that range. *See id.* Not once did Mr. Gant ever advise Sysco that he no longer considered that advised range to be reasonable or provide Sysco with a new assessment. *See id.* Critically, neither Mr. Gant nor anyone at Boies Schiller ever advised Sysco that they considered the Proposed Settlements to be too low. *See id.*

29.     On September 2, 2022, Burford advised Sysco that it objected to the Proposed Settlements, and the parties agreed to discuss the matter further on a three-way call among Burford, Sysco and Boies Schiller that they agreed would take place on September 6, 2022. *See id.* ¶ 13.

13

But Burford was not content to wait for the September 6 call, and so later on September 2, Burford's Chief Investment Officer ("CIO") ███████████████████████████ ████████████████████████████, Swiber Decl. Ex. I, Email from J. Molot to K. Daley et al. (Sept. 2, 2022), CLAIMANTS_0000106, and then called Mr. Gant directly (without inviting or even informing Sysco).  *See* Flynn Decl. ¶ 14.

30.     Significantly, neither Mr. Gant nor Burford ever informed Sysco about the September 2 call, either before or after it took place.  *See id.*  Sysco only learned about the call when Burford was compelled to produce documents during the Arbitration; that production, made in January 2023, included Burford's internal summary of the call that had taken place four months earlier.  *See id.*

31.     As noted above, in addition to representing Sysco in the Antitrust Litigations, Boies Schiller is also counsel to a Burford affiliate that is pursuing claims in the Antitrust Litigations that it acquired as a result of a bankruptcy assignment.  *See id.* ¶ 20.

32.     According to Burford's summary of the call—which was initiated by Burford at a time when it was actively contemplating asserting claims against Mr. Gant's client, Sysco— Burford's CIO ████████████████████████████████████ ████████████.  *See* Swiber Decl. Ex. J, Email from J. Molot to K. Daley et al. (Sept. 2, 2022), CLAIMANTS_0000112.  According to the summary, Mr. Gant ████████████████████ ██████████████████████████████████████████████████████.  *See id.*[6]  Per Burford's summary of the call, Mr. Gant then suggested ████████████████████ ████████████████████████████████████████████

---

[6] Burford's summary of the call inexplicably states ████████████████████████ ████████████████████████.  As noted above, Sysco involved, relied on, and consulted with Boies Schiller throughout the settlement process.

███████████████████████████████████. *See id.* Burford's

summary of the call next states ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. *See id.* (Whatever Mr. Gant may have said to

Burford ████████████████████████████████████████████████████████

████████████████████████, Mr. Gant said nothing to Sysco on any of those topics, and did not

inform Sysco that he had discussed those topics with Burford.)[7]

33.     As noted, Sysco's attorneys at Boies Schiller never disclosed the September 2 call

to Sysco, neither that it took place nor what was discussed. *See* Flynn Decl. ¶ 14. Based on what

Mr. Gant *had* discussed with Sysco—including Mr. Gant's prior advice concerning a reasonable

range of settlement values—Sysco believed that Boies Schiller supported the Proposed Settlements

and expected Mr. Gant to advocate for them on the scheduled September 6 call among Sysco,

Burford, and Mr. Gant. *See id.* ¶ 18. Even in preparatory discussions with Sysco before the

September 6 call with Burford, Mr. Gant gave Sysco no warning of the ambush that was to come.

*See id.*

34.     On the September 6 call, Sysco was shocked to hear Mr. Gant express the view that

the Proposed Settlements (specifically, the value offered for the *Broilers* Litigation claim) were

too low, a view Boies Schiller had never previously expressed to Sysco. *See id.* Boies Schiller

did not offer any view as to the Proposed Settlements in their entirety. *See id.* The September 6

---

[7] Out of an abundance of caution, among the documents submitted under Sysco's Motion to Seal is
Burford's email memorializing its conversation with Mr. Gant (because it was produced by Burford in the
Arbitration). However, Sysco resoundingly rejects any suggestion by Burford that Sysco should not have
the complete right to use and disclose a summary of a conversation with Sysco's own counsel, or that
such summary simply rises to the level of commercial sensitivity necessary to justify confidential
treatment.

call ended without the parties reaching agreement on how to proceed with respect to the Proposed

Settlement, and with an explicit threat by Burford to sue Sysco for economic losses if it entered

into the Proposed Settlements without Burford's consent. *See id.* ¶¶ 16-17.

35. If Burford's summary is accurate, the secret September 2 conversation between

Sysco's outside counsel and Burford, ███████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████, raises serious concerns

about whether Boies Schiller violated its ethical obligations and fiduciary duties to Sysco,

including its duties to communicate material developments, provide candid advice, and preserve

confidential information, as well as its duty to reasonably consult with the client about the means

by which the client's objectives can be accomplished. This conduct also raises concerns about

whether Boies Schiller violated its duty to provide unconflicted advice and to perform services

without representing differing interests, and its fiduciary duties of loyalty and confidentiality.

Applicable ethical rules are also implicated to the extent that Burford exercised control over the

judgment of Sysco's counsel with respect to settlement and confidentiality in order to further its

own financial interest in obtaining a large return on its investment, prioritizing its greed over

Sysco's rights and interests as the plaintiff.

36. Sysco discharged Boies Schiller on February 23, 2023. *See id.* ¶ 21. As of the date

of this Petition, Sysco has not been able to secure the replacement counsel of its choice, in part

because Burford's assertion of a veto right over Sysco's ability to settle its antitrust claims presents

an obstacle for counsel already involved in the Antitrust Litigations (which Sysco prefers because

of the efficiencies and the ease with which such counsel can get up to speed at this stage), and in

part because Burford has asserted a contractual right to refuse, and has to date refused, to consent to the fee arrangement proposed by Sysco's preferred replacement counsel. *See id.*

## IV.     The Initiation Of The LCIA Arbitration And Burford's Repeated Applications For Injunctive Relief

37.     After the September 6 call, Burford's outside litigation counsel demanded that Sysco provide unconditional assurances that Sysco would not execute the Proposed Settlements without Burford's consent irrespective of the three restrictions that limit Burford's rights. *See id.* ¶ 19.  Sysco did not provide such assurances (to which Burford had no contractual right), but quickly engaged counsel and agreed to a call among outside counsel for the afternoon of Friday, September 9, 2022.  *See id.*  However, hours before that call was scheduled to occur, Burford instead initiated the Arbitration by submitting a Request for Arbitration to the LCIA, and concurrently filed an Application for an Emergency Arbitrator which requested a preliminary injunction enjoining Sysco from executing the Proposed Settlements (the "First Application").  *See id.*  Neither the Request for Arbitration nor the First Application disclosed Burford's secret call on September 2 with Sysco's counsel at Boies Schiller, let alone cited that as a reason why Burford withheld consent.  *See id.* ¶ 22.  The principal basis that Burford asserted for objecting to the Proposed Settlements was Burford's purported awareness that other opt-out plaintiffs had settled on more favorable terms.  *See id.*

38.     Following the constitution of the Tribunal, on October 8, 2022, Burford withdrew the First Application and filed a second application seeking to enjoin Sysco from executing the Proposed Settlements (the "Second Application").  *See id.*  The Second Application was supported by a single fact witness (who lacked any percipient knowledge) and a single expert report.  *See id.*  The Second Application likewise concealed Burford's secret call on September 2 with Boies Schiller, and did not cite Boies Schiller's statements as a reason why Burford withheld consent.

Two business days after it was filed, Burford advised the Tribunal that it wished to hold the Second Application in abeyance. *See id.*

39. Throughout this period, Sysco made clear to Burford that it considered Burford's refusal to consent to the Proposed Settlements to be unreasonable and advised Burford that it was working to finalize definitive documentation. *See id.* Sysco repeatedly urged Burford to provide it with information supporting Burford's assertion that the settlement values were too low; Burford consistently refused to do so. *See id.* In early November 2022, Sysco advised Burford that it had near-final documentation to share with respect to certain of the Proposed Settlements and sought Burford's consent to seek permission from the settling defendants for Sysco to share these confidential documents with Burford. Burford refused. On December 2, 2022, after working through the confidentiality issues with the settling defendants (with no help from Burford), Sysco provided draft documentation to Burford for its review. *See id.* The material terms reflected in the draft were those that Sysco had disclosed to Burford in August and September 2022. *See id.*

## V. The Tribunal Grants Burford An *Ex Parte* TRO Award

40. On December 7, 2022, the Tribunal held a Case Management Conference at which the parties discussed procedures and a potential timetable for the Arbitration, including how to manage document discovery, when Burford would file its first substantive written submission in the form of a Statement of Claim, and all of the subsequent steps in the Arbitration, including the time required to reach a final merits hearing (both parties were in agreement that this would take more than a year). *See id.* ¶ 23.

41. Five days later, on December 12, 2022, Burford filed a third application seeking an injunction (the "Third Application"). *See id.* ¶ 24. The Third Application did not offer any new testimonial or expert evidence; it relied upon the single witness statement (from the non-percipient witness) and single expert report from Burford's Second Application. It requested (i) a temporary

18

restraining order immediately enjoining Sysco from executing the Proposed Settlements without Burford's consent; and (ii) a preliminary injunction barring Sysco from settling any of its claims in the Antitrust Litigations without Burford's consent. *See id.* Despite having sat on its alleged rights for more than three months, Burford requested that the Tribunal issue the temporary restraining order on an *ex parte* basis, "without waiting for a response from Sysco." Swiber Decl. Ex. K, Email from D. Ho to Tribunal (Dec. 12, 2022) at 11:01AM. As with all of Burford's prior submissions, the Third Application concealed Burford's secret call on September 2 with Boies Schiller, and did not cite it as a reason why Burford withheld consent.

42.     Burford's principal (indeed, nearly exclusive) argument in support of the Third Application was that other opt-out plaintiffs had achieved higher settlements from one of the settling defendants, which Burford presented in an anonymized, unverifiable manner while claiming that confidentiality obligations prevented more full disclosure.[8]

43.     A few minutes after receiving the Third Application, counsel for Sysco wrote to the Tribunal, stating that "[w]e will obviously not have a substantive response today or anytime soon to a new Application we have not yet even read, but we will respond very briefly by letter today to Claimants' request that this Tribunal enter a Temporary Restraining Order on an *ex parte* basis without waiting for a complete response from Respondent." Swiber Decl. Ex. K, Email from J. Rosenthal to Tribunal (Dec. 12, 2022) at 11:21AM.

44.     Hours later, Sysco submitted a brief letter to the Tribunal along with a cover email making clear that Sysco was only "responding *procedurally* with respect to Burford's request for

---

[8] Although Burford made vague references to its purported knowledge of other plaintiffs' settlement terms in its Request for Arbitration, it was not until the Third Application that Burford provided such pseudo-statistical information about the other settlements. Burford has *never* disclosed sufficient information about these alleged settlements to allow Sysco to determine whether they are actually comparable to the Proposed Settlements.

a TRO." Swiber Decl. Ex. K, Email from J. Rosenthal to Tribunal (Dec. 13, 2022) at 12:06AM (emphasis added). Given that it had only hours to prepare it, Sysco's letter merely set forth a procedural objection to the Third Application as untimely given that Burford had slept on its alleged rights for more than three months, declining to pursue two prior applications for injunctive relief despite knowing that Sysco was finalizing settlement documentation. Sysco reiterated that its letter was not a substantive submission on the merits (which Sysco obviously had not had sufficient time to prepare) and proposed a schedule for the Tribunal's consideration of the Third Application. *See* Swiber Decl. Ex. L, Letter from J. Rosenthal and L. Bensman to Tribunal (Dec. 13, 2022) at 1-5. The letter noted that entering a TRO on the basis of Burford's Third Application without providing Sysco the opportunity to respond would "be manifestly unfair and prejudicial to Sysco." *Id.* at 5. It would also violate the LCIA Rules. *See* LCIA Rules, Art. 25.1, https://www.lcia.org/Dispute_Resolution_Services/lcia-arbitration-rules-2020.aspx (last accessed Mar. 7, 2023) (empowering Tribunals to order interim measures only "upon the application of any party, *after giving all other parties a reasonable opportunity to respond to such an application*") (emphasis added).

45. The next day, Burford responded by email to Sysco's procedural objections, immediately after which the Tribunal explicitly directed the parties not to make any further submissions. Swiber Decl. Ex. M, Email from Tribunal to Parties (Dec. 13, 2022).

46. On the following day, December 14, 2022, without ever affording Sysco any opportunity to submit a substantive opposition to the Third Application (but, to the contrary, having directed Sysco not to do so), the Tribunal issued the TRO Award, granting Burford's requested restraining order and enjoining Sysco from executing agreements reflecting the Proposed Settlements. Swiber Decl. Ex. N, TRO Award (Dec. 14, 2022); *see also* Flynn Decl. ¶

25.   The sole reason offered by the Tribunal for the TRO Award was a desire to prevent the Third Application from being mooted (notwithstanding that the only reason it had not been fully briefed and even decided by that point was Burford's decision not to pursue its two prior applications going back more than three months).  Swiber Decl. Ex. N, TRO Award (Dec. 14, 2022).  In the TRO Award, the Tribunal directed Sysco that "[a]bsent [Sysco's] identification of 'compelling business reasons' for it to enter into the proposed settlement agreement before the preliminary injunction application to be heard, the Tribunal therefore directs [Sysco] not to enter into the proposed settlement agreement at this time."  *Id.*  The Tribunal further noted that Sysco could choose to submit a written brief by December 22, 2022, or appear orally before the Tribunal on that date, "to show reasons why the TRO should be lifted."  *Id.*  The Tribunal directed Sysco to notify Burford of the contents of its submission or intended oral pleading by noon on December 21, 2022.

47.   Sysco devoted the next week to preparing an oral presentation opposing the TRO Award in anticipation of the December 22, 2022 hearing.

48.   After Sysco served Burford with an outline of the arguments it intended to present at the hearing the following day (as directed by the Tribunal), on the evening of December 21, 2022, the Tribunal notified Petitioner and Burford via email that the "purpose of the hearing . . . is not an opposition to the granting of the TRO; it is the Respondent's application to lift the TRO in advance of the PI full briefing."  Swiber Decl. Ex. O, Email from Tribunal (Dec. 21, 2022).  The Tribunal also directed that Sysco would be limited to making arguments "on the basis of the record on which the TRO was granted."  *Id.* at 2.  The "record on which the TRO was granted" consisted solely of documentary, testimonial and expert evidence put forth by Burford in its Third Application.

49. By granting the TRO Award *ex parte* and then barring Sysco from presenting any evidence whatsoever (whether through documents or fact or expert testimony), the Tribunal deprived Sysco of its right to be heard on the TRO Award.

50. Prohibited from submitting *any* meaningful opposition, shortly thereafter, Sysco thus withdrew its request for the December 22 oral hearing.

51. With the TRO Award in place, the Tribunal offered Sysco two options with respect to consideration of Burford's request for a preliminary injunction. Sysco could have a hearing on January 9, 2023 provided Sysco submitted its opposition by December 23, 2022 (the day after the TRO Award hearing had been scheduled to take place) or a hearing on February 7, 2023 with Sysco's opposition being due on January 16, 2023 (later extended by a day due to the holiday). Given the practical impossibility of submitting its opposition by December 23 (indeed, Sysco had not even yet had time to identify, let alone retain, all of its experts), Sysco was forced to select the February 7, 2023 hearing date, which required it to live with the *ex parte* TRO Award for nearly two months.

## VI. Burford Sandbags Sysco With A New Injunction Application Under The Guise Of A Reply

52. On January 17, 2023, Sysco submitted its opposition to the Third Application ("Sysco's Opposition"). On January 24, 2023—just 13 days before the hearing—Burford submitted an 88-page Reply supported by testimony from two new fact witnesses (including, for the first time, testimony from persons with first-hand knowledge) and three new experts.[9] The substance of Burford's Reply differed dramatically from the Third Application, including because,

---

[9] Two of Burford's new experts testified at the February hearing. One admitted he had been contacted by Burford in November (long before the Third Application was filed), and the other in December. In fact, the "November" expert had actually been contacted at least as early as October (according to October communications between him and Sysco's arbitration counsel).

for the first time, Burford asserted that views expressed by Mr. Gant of Boies Schiller were a principal reason it had decided to withhold consent to the Proposed Settlements.[10]

53.     The effect of Burford's tactical decision to hold back the bulk of its evidence and argument for its Reply submission was to deprive Sysco of a fair opportunity to respond; Sysco was left with one short week to prepare and submit its Rejoinder, and only six more days to prepare for the February hearing.  While Burford likewise had only one week for its Reply, because it was essentially an entirely new application that Burford had held back previously, it had been working on it for months prior to its submission.[11]

## VII.    Sysco Remains Subject To The TRO Award

54.     The Tribunal held an evidentiary hearing on the Third Application on February 6 and 7, 2023.  Prior to the hearing, Sysco wrote to advise the Tribunal that it faced a three-month statutory deadline (March 14) to seek to vacate the TRO Award, *see* Federal Arbitration Act, 9 U.S.C. § 12; presumably cognizant of that deadline, as well as of the burden placed on Sysco by the lengthy TRO (which, in judicial proceedings, usually cannot remain in effect for more than a period of days), the Tribunal advised the parties at the conclusion of the hearing that it was determined to act as quickly as possible and would promptly advise the parties as to when it would rule.  After hearing nothing further from the Tribunal for more than three weeks, Sysco wrote to the Tribunal last Thursday to remind it of the impending March 14 deadline for its challenge to the TRO Award (by which date service must be complete, which therefore requires this challenge to be filed no later than March 8 in order to allow time for the issuance of a summons and then

---

[10] As noted above, Sysco did not even learn of Burford's communications with Mr. Gant until Burford produced its call summary several weeks before its Reply.

[11] ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████.

service) and asked whether the Tribunal could commit to issuing a ruling before that deadline passed and Sysco's right would be forfeited. The Tribunal responded and expressed its expectation that a decision would be forthcoming by March 17, nearly a month and a half after the injunction hearing concluded (and after the expiration of Sysco's statutory deadline to file this Petition).

55.     Section 29(b) of the parties' CPA makes clear that any award of injunctive relief shall be considered a "final award" for purposed of judicial challenge or confirmation, and Sysco has a clear right to seek to vacate the TRO Award in court. Sysco made every effort to obtain relief from the TRO Award from the Tribunal, and hoped that the Tribunal would dissolve the TRO Award promptly following the February hearing (and specifically advised the Tribunal of the looming statutory deadline). Now, after having lived for months with an abridgement of its rights, and tolerating the risk that the settlement offers it wishes to accept will be withdrawn (a risk that grows with each day given the continuing progress in the Antitrust Litigations, developments in which may materially change settlement dynamics), Sysco can wait no longer without forfeiting its right to challenge the TRO Award altogether. *See* Flynn Decl. ¶¶ 27-30.[12] Of course, if the Tribunal grants the Third Application and enters injunctive relief before this Court acts, Sysco anticipates that it would amend this Petition accordingly. Conversely, if the Tribunal denies the Third Application, Sysco will seek confirmation of such award. Thus, in all anticipated circumstances, this Petition will proceed in one form or another.

---

[12] In fact, certain defendants have threatened that they are not willing to keep their settlement offers on the table beyond February 2023 while waiting for the TRO to be lifted by the Tribunal. *See* Flynn Decl. ¶ 29. Moreover, just last week, another defendant in the Antitrust Litigations approached Sysco about settlement. *See id.* ¶ 30. Because Sysco is currently prohibited from disclosing that Burford has claimed a veto right over Sysco's ability to settle its claims and that Sysco is presently enjoined from executing any settlement agreements, Sysco is unable to engage with that defendant or even explain why it cannot meaningfully do so. Meanwhile, the other plaintiffs (including Sysco's competitors) may well be proceeding to negotiate settlements with this defendant (one of Sysco's suppliers).

## VIII. The TRO Award Violates Public Policy And Due Process

56.     The TRO Award violates several of the most fundamental public policies underlying our judicial system, including party control over litigation and settlement.  As set forth in more detail in Sysco's accompanying Memorandum of Law and the Declaration of Maya Steinitz, and in the words of Burford's own ethics consultant, Professor Anthony Sebok, a "funding agreement that allows a funder to take control of settlement" would be "seen as against public policy in *every state*."[13]  Arbitral awards that violate public policy may not be enforced.  Barring relief from this Court, unless the Tribunal dissolves the TRO Award itself or Burford relents, Sysco will be compelled against its will to take the Antitrust Litigations all the way to trial and jury verdict (and appeal).  And Sysco will be forced to do so without its preferred counsel given that the firm it seeks to retain is unable to accept Sysco's engagement so long as Burford is able to block any settlements it negotiates and recommends to its prospective client.

57.     The TRO Award was also issued in violation of Sysco's due process rights.  As noted above in Section V *supra*, Burford requested a TRO in its Third Application on December 12, 2022, after more than three months of delay before Burford decided to file the Third Application (having failed to follow through on the First Application submitted on September, 9, 2022 and withdrawing its Second Application on October 9, 2022, only two days after submitting it).  Just two days later, on December 14, 2022, the Tribunal granted Burford's third request for a TRO, without receiving any substantive response from Sysco.  Sysco was therefore subject to the *ex parte* TRO Award for *over a month* without any ability to submit a substantive response and, in total, the TRO Award has been in effect for nearly three months, during which time Sysco has

---

[13] Anthony J. Sebok, *The Rules of Professional Responsibility and Legal Finance: A Status Update*, Cardozo Legal Studies Research Paper No. 671, WAKE FOREST L. REV. (forthcoming, 2022), https://ssrn.com/abstract=4065918 (emphasis added).

been prevented from settling its claims, and the favorable settlement terms it negotiated may be lost. Thus, the due process violations caused by the TRO Award constitutes an additional, independent basis for vacatur.

## **CONCLUSION**

58. One of the largest plaintiffs in the Antitrust Litigations, Sysco has execution-ready settlement agreements resolving its dispute with major defendants, but the TRO Award prevents it from signing those agreements. Instead, for nearly three months, Sysco has been forced to litigate against its will against key suppliers who have offered fair and reasonable settlement payments to Sysco, all the while risking adverse court rulings, the decline of the value of Sysco's claims, and harm to important business relationships. Until Sysco is freed from this restraint and permitted to control its own lawsuits, it risks adverse decisions that could cause the withdrawal of the proposed settlements, and this Court is forced to continue to preside over and adjudicate disputes that neither plaintiff nor defendant wish to pursue. And Sysco remains unable to negotiate new settlements with other defendants, such as the one who reached out to Sysco last week to explore an amicable resolution.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner respectfully petitions this Court pursuant to 9 U.S.C. § 10 to:

1. Vacate the TRO Award; and

2. Award Petitioner such further relief as the Court may deem just and proper.


Dated: March 8, 2023

Respectfully submitted,


By: /s/ *William S. Weltman*_____

William Weltman
REED SMITH LLP
10 S. Wacker Drive, Suite 4000
Chicago, Illinois 60606
(312) 207-1000

-and-

Jeffrey A. Rosenthal (*pro hac vice* forthcoming)
Lina Bensman (*pro hac vice pending* forthcoming)
CLEARY GOTTLIEB STEEN &
   HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000 (Telephone)
(212) 225-3999 (Facsimile)
jrosenthal@cgsh.com
lbensman@cgsh.com

Christopher P. Moore (*pro hac vice* forthcoming)
CLEARY GOTTLIEB STEEN &
   HAMILTON LLP
2 London Wall Place
London EC2Y 5AU
United Kingdom
+ 44 20 7614 2200 (Telephone)
cmoore@cgsh.com


*Attorneys for Petitioner Sysco Corporation*