**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| SYSCO CORPORATION,<br><br>Petitioner,<br><br>v.<br><br>GLAZ LLC, POSEN INVESTMENTS LP, and KENOSHA INVESTMENTS LP,<br><br>Respondents. | CASE NUMBER:<br>JUDGE:<br>MAGISTRATE JUDGE: |

**DECLARATION OF BARRETT G. FLYNN IN SUPPORT OF PETITION TO VACATE ARBITRATION AWARD**

Pursuant to 28 U.S.C. § 1746, Barrett G. Flynn declares as follows:

1. I am an Associate General Counsel, Litigation & Regulatory at Sysco Corporation ("Sysco") and an attorney admitted to practice law in Texas. I have been in my current role since 2019 and have held various in-house counsel roles at Sysco since 2013. I have extensive experience with litigation, including complex, class, and mass litigation, antitrust litigation, and commercial litigation.

2. I supervise Sysco's antitrust litigations against protein suppliers pending in U.S. federal district courts, and have done so since their inception. I also have responsibility for Sysco's relationship with Burford Capital Limited ("Burford") related to Burford's investment in those antitrust claims, and have been Burford's principal point of contact with Sysco.[1]

[1] For purposes of this Declaration, "Burford" refers to Burford Capital Limited and other affiliated entities, including the Respondents in this matter. During the negotiation of the agreements at issue in this dispute, and in all subsequent communications, I always dealt exclusively with persons who I understood to be employed by Burford Capital Limited. I had never heard of the three Respondents until Burford put their names on the agreements we negotiated.

**A. Burford's Investment In Sysco's Antitrust Claims**

3. Sysco and its related companies distribute food and related products to hundreds of thousands of restaurants, healthcare and educational facilities, lodging establishments, and other customers nationwide. Because Sysco does not itself produce all of the products it distributes, Sysco relies on a complex network of suppliers to service its customers. Sysco purchases all of the protein products it distributes—including chicken, pork, beef, and turkey—from more than a dozen different suppliers.

4. The antitrust litigations against protein producers that are at issue in the underlying arbitration (the "Arbitration") began in 2016, with the filing of the *Broilers* class action against chicken producers. *See In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637 (N.D. Ill.) (Durkin, J.). Sysco opted out of the *Broilers* class action in 2018, and since that time it has been litigating its antitrust claims against chicken producers before this Court as a direct action plaintiff in the *Broilers* multi-district litigation. *See Sysco Corp. v. Tyson Foods, et al.*, Case No. 18-cv-700 (N.D. Ill.) (Durkin, J.) ("*Broilers*"). Sysco is also a direct action plaintiff in antitrust litigations against pork and beef producers. *In re Pork Antitrust Litig.*, No. 18-cv-1776 (D. Minn.) ("*Pork*"); *In re Cattle & Beef Antitrust Litig.*, No. 20-cv-1319 (D. Minn.) ("*Beef*" and together with *Broilers* and *Pork*, the "Antitrust Litigations"). The Antitrust Litigations involve some of Sysco's most significant suppliers (as defendants) and customers (as class members or as direct action plaintiffs).

5. In September 2019, Burford approached Sysco through Scott Gant of Boies Schiller Flexner ("Boies Schiller"), Sysco's counsel in the Antitrust Litigations, to propose an investment in Sysco's claims in the *Broilers* litigation. Burford and Sysco negotiated the terms of the proposed investment and, after a due diligence process, the parties executed an agreement through which Burford invested in Sysco's *Broilers* claims in October 2019. Over time, Burford proposed expanding the parties' relationship, and ultimately made additional

investments in Sysco's *Pork* claims in June 2020 and in Sysco's *Beef* and other antitrust claims in December 2020. I refer to the parties' December 2020 agreement as the "CPA." *See* Swiber Decl. Ex. A, CPA.

6. A major concern for Sysco in entering into the relationship with Burford was the possibility of losing control of its antitrust claims. Many of the defendants in the *Broilers*, *Pork*, and *Beef* litigations are among Sysco's most important suppliers upon whom Sysco relies to collectively supply millions of pounds of protein products annually. During my discussions with Burford, I made it clear that Sysco would never agree to any funding arrangement in which Sysco relinquished control of litigations against those key suppliers; the resulting risk to Sysco's business of such loss of absolute control would be far more significant than any financial benefits Burford could offer. I conveyed to Burford that Sysco's senior leadership team had emphasized the critical importance to our business of retaining control over these litigations. Burford repeatedly assured us that Sysco would not be giving up control over its claims by entering into the funding relationship, and the documentation of the deal (including the CPA) affirms in multiple places that Sysco retains that control.

**B. The March 2022 CPA Amendment**

7. At times, Sysco was approached by its customers (indirect purchasers of protein products sold by the defendants in the antitrust litigations) with requests that Sysco assign to them portions of its claims corresponding to the portions of Sysco's purchases that were resold to them. Some of these customers asserted a contractual right to receive such assignments. Over time, Sysco made several such assignments.

8. After Burford learned that Sysco had assigned some of its protein claims to its customers, we began discussing a potential restructuring of our deal. Burford sent Sysco a proposal on October 20, 2021 which would have expressly given Burford control to direct and settle the antitrust claims. After internal discussions, Sysco did not accept that proposal,

or modified versions of it, because Sysco's position remained that it could not give up control over its claims. As I informed my contact at Burford, Kelly Daley, Sysco's leadership instructed me to reject this proposal because Sysco did not want to give up control of the litigations.

9. Ultimately, Sysco and Burford entered into Amendment No. 1 to the CPA on March 31, 2022 ("Amendment"). *See* Swiber Decl. Ex. B, Amendment. Through the Amendment, Burford provided additional capital to Sysco and received a greater share of future proceeds (specifically, after payment of counsel's contingency fee, more than [redacted] of the remaining value of any settlement or judgment). Section 7(b) of the Amendment also gave Burford a limited consent right related to settlements of Sysco's claims, while imposing several restrictions on this right. Section 7(b) of the Amendment states that Sysco "shall provide immediate notice by email to [Burford] of any settlement offer made by [Sysco] and shall not accept a settlement offer without [Burford's] prior written consent, which shall not be unreasonably withheld, provided however, that [Burford] shall have no right to exercise control over the independent professional judgment of its Nominated Lawyers and shall not seek to impose a commercially unreasonable result." Swiber Decl. Ex. B, Amendment, § 7(b). This provision gave Burford the right to bring a breach of contract claim against Sysco for damages if it believes this provision has been breached, but left in place Sysco's control over its claims, including their settlement. Section 7(b) of the Amendment is read in conjunction with the other provisions of the CPA that were not superseded by the Amendment and which the Amendment expressly reaffirms, *see id.* § 9, including provisions that state that Sysco "remains in full control of the assertion and resolution of the claims" and that Burford and its affiliates are "passive providers of external capital and have not become owners of, parties in, or parties to the claims." Swiber Decl. Ex. A, CPA at 2.

10. Before Sysco entered into the Amendment, I specifically discussed the limited consent right in Section 7(b) of the Amendment with Ms. Daley, and asked her to confirm that Burford did not have a different understanding of that language from Sysco and in particular, that Burford did not construe that language to give it any right to assert control over any settlement decision. During our conversations, Ms. Daley reassured me that Burford did not consider the limited consent right to give Burford control over settlements, and reaffirmed that Sysco would remain in control of its claims, including settlement of those claims. Sysco took additional comfort from the fact that the Amendment did not remove or alter the provisions in the CPA that affirm Sysco's exclusive control over its claims.

**C. Sysco Negotiates Proposed Settlements and Burford Refuses to Consent**

11. Beginning in late 2021 and into 2022, Sysco engaged in settlement discussions with several antitrust defendants. After multiple rounds of negotiations, including two full-day mediation sessions, Sysco reached two agreements in principle to settle Sysco's claims (the "Proposed Settlements").

12. I relied on Sysco's outside counsel, Mr. Gant, throughout these negotiations. Mr. Gant participated in the mediation sessions personally, and I consulted with him in connection with the negotiations that continued thereafter. Mr. Gant also assisted in the preparation of the draft settlement agreements. Throughout this process, Mr. Gant never advised me that he considered any component of the Proposed Settlements to be too low, or that he would advise Sysco against entering into any of them. In fact, Mr. Gant had earlier advised Sysco of the total estimated value of our claims in the *Broilers* litigation against all defendants; the Proposed Settlements fall within the range that Mr. Gant provided. Mr. Gant never advised Sysco that he no longer considered that range to be reliable, nor did he ever provide a different range.

13. In late August and early September 2022, I participated in discussions with Burford by email and phone regarding the Proposed Settlements. On September 2, Ms. Daley informed me by email that Burford did not consent to the Proposed Settlements and requested another call for the following week. I agreed, and we arranged to speak on September 6 on a call that would include Burford, Mr. Gant, and me.

14. I now understand that before this call on September 6 occurred, Jonathan Molot, Burford's Chief Investment Officer, called Mr. Gant on September 2. I did not know about the call between Mr. Molot and Mr. Gant at the time, as neither Burford nor Mr. Gant informed me of it before or after it took place. Instead, I only learned of this call in January 2023 when Burford produced documents in the Arbitration that included Mr. Molot's summary of the call. *See* Swiber Decl. Ex. J, Email from J. Molot to K. Daley et al. (Sept. 2, 2022), CLAIMANTS_0000112. While I do not purport to be an ethics expert, it is hard to reconcile Burford's descriptions of its conversations with Mr. Gant with Mr. Gant's duties to Sysco as his client.

15. Consistent with Sysco's obligations under the CPA, from time to time I authorized Mr. Gant to provide Burford with information relating to "material developments" in the antitrust litigations. Swiber Decl. Ex. A, CPA § 5.3(b)(iv). The CPA protects Sysco's right not to have to share with Burford information that is subject to attorney-client privilege. *See id.* § 9.4. I never gave Mr. Gant a blanket authorization to share any information whatsoever with Burford, nor did I ever authorize Mr. Gant to share confidential, strategic, or otherwise privileged information with Burford.[2] Because Mr. Gant would periodically confirm with me that I consented to him informing Burford about new litigation developments—and never specifically asked for authorization to discuss privileged matters

---

[2] Sysco executed irrevocable instructions authorizing Mr. Gant to speak with Burford that were explicitly limited to the extent of the CPA, which as noted above, carved out privileged information, among other things.

with Burford—I was confident that Mr. Gant understood the limitations on what he could share with Burford, and believed Mr. Gant was keeping me informed about his relevant communications with Burford. I also trusted that Burford took seriously the covenants it made to Sysco in the CPA when communicating with Mr. Gant, including its commitment under Section 5.2(d) to "do nothing that compromises the professional duties of" Sysco's counsel. *See id.* § 5.2(d). I understand this to encompass, among others, the duty to communicate material developments, provide candid advice, and preserve confidential information.

16. On September 6, 2022, the scheduled call took place, and the participants in addition to myself were Mr. Gant, Ms. Daley, Mr. Molot, and (undisclosed to me on the call) Mark Klein, Burford's General Counsel. While the specific reasons are not relevant to Sysco's present Petition before this Court, I explained in detail on this call why Sysco believes that the Proposed Settlements are commercially reasonable, explained the merits of the settlements from Sysco's perspective, and responded fully to all of Burford's questions.

17. Mr. Molot threatened on this call that Burford would sue Sysco if it entered into any of the Proposed Settlements without Burford's consent. I also recall that Ms. Daley asserted that Burford had the contractual right to prevent Sysco from settling without its consent; I expressed my surprise and strong disagreement.

18. On this call, Mr. Gant also stated his supposed view that one component of the Proposed Settlements was too low. As noted above, Mr. Gant had never expressed that view to me in advance of that call, including in the many months we worked together on the Proposed Settlements, and I was shocked to hear him express that view for the first time with Burford on the line. Even in our preparatory discussion before the September 6 call with Burford, Mr. Gant did not state this view.

19. The following day, September 7, I received a letter from Derek Ho of Kellogg, Hansen, Todd, Figel & Frederick PLLC ("Kellogg Hansen"), Burford's counsel in the Arbitration, demanding unconditional assurances that Sysco would not execute the Proposed Settlements without Burford's consent, among other things; I informed Mr. Ho on September 8 that Sysco had retained Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") to represent Sysco with respect to the matter, and asked him to communicate with them going forward. I understand that Cleary Gottlieb made itself available to speak with Mr. Ho the following afternoon. During that night (and before speaking with Cleary Gottlieb the next day as offered), Burford initiated the Arbitration.

20. I understand that Mr. Gant represents Burford both directly and indirectly (as counsel for parties Burford has funded) in the Antitrust Litigations. In early 2021, after the execution of the CPA, I became aware that Mr. Gant represented Burford directly in the *Broilers* litigation [REDACTED] [REDACTED]. Mr. Gant has never fully disclosed to Sysco the full extent of his work, or Boies Schiller's work, for Burford. Sysco has not waived, and does not waive, any conflicts resulting from Mr. Gant's representation of Burford in any substantially related matters, his relationship with Burford, or Boies Schiller's relationship with Burford.

21. On February 23, 2023, Sysco discharged Boies Schiller for cause. As of the date of this Declaration, Sysco has not been able to secure replacement counsel of its choice, in part because Burford has not consented to the financial terms of their engagement, and also because Burford's assertion of a veto right over Sysco's ability to settle its antitrust claims creates intractable concerns for our desired counsel.

### D. Burford Repeatedly Seeks Injunctive Relief, and The Tribunal Issues An *Ex Parte* TRO Award

22. Along with its September 9, 2022 Request for Arbitration, Burford concurrently filed an Application for an Emergency Arbitrator which requested a preliminary injunction enjoining Sysco from executing the Proposed Settlements (the "First Application"). Following the constitution of the Tribunal in the Arbitration, on October 8, 2022, Burford withdrew the First Application and filed a second application seeking to enjoin Sysco from executing the Proposed Settlements (the "Second Application"). The Second Application was accompanied by a witness statement from [REDACTED], with whom I had never met or dealt, as well as by one expert report. Two business days after filing the Second Application, Burford told the Tribunal it wishes to hold the Second Application in abeyance. Throughout this period while the Second Application was held in abeyance, Sysco repeatedly asked Burford for more information supporting their assertions that the settlements were too low; Burford refused to provide any information. Also throughout this period, Sysco continued to document the settlement agreements with the settling defendants, and provided Burford with continued updates on the status of the Proposed Settlements. I understand Cleary Gottlieb provided Burford's counsel with drafts of the settlement agreements in early December 2022, after obtaining permission from the settling defendants for Sysco to share these confidential drafts with Burford. The material terms in these drafts were the same as those I had disclosed to Burford in our communications in August and September 2022.

23. On December 7, 2022, the Tribunal in the Arbitration held a Case Management Conference at which the parties discussed procedures and a potential timetable for the Arbitration; the parties agreed that the Arbitration would take more than a year to resolve on the merits.

24. On December 12, 2022, Burford filed its third application seeking an injunction in the Arbitration (the "Third Application"), which also requested a temporary

restraining order ("TRO") immediately enjoining Sysco from executing the Proposed Settlements.

25. On December 14, 2022, the Tribunal in the Arbitration issued an award entering the TRO without receiving any substantive response from Sysco in opposition (the "TRO Award"). The TRO Award ordered Sysco not to enter either of the Proposed Settlements, and therefore to date the TRO Award continues to prevent us from entering into these Proposed Settlements which would otherwise resolve our antitrust claims against certain defendants.

26. Following the entry of the TRO Award, the Tribunal ordered further briefing and held a hearing on Burford's request for a preliminary injunction on February 6 and 7, 2023. At the end of the hearing, the Tribunal stated that they would try to rule quickly, but more than a full month later, no decision has been issued.

27. The TRO Award imposes significant commercial burdens on Sysco and prevents Sysco from settling cases with its key suppliers. The antitrust defendants with whom Sysco proposed to settle currently supply Sysco with large quantities of products that are essential to Sysco's business, and all are important to Sysco's growth strategies moving forward. The potential damage to Sysco's efforts to grow relationships with key suppliers that may occur if Sysco is forced to continue aggressive litigation against them is undeniable, and Sysco is rightfully concerned that suppliers may be skeptical of working with Sysco due to threats of ongoing litigation.

28. I do not believe that the Proposed Settlements will remain available indefinitely, nor for the substantial length of time necessary to adjudicate the claims in the Arbitration. In my experience with litigation and settlements, settling parties are generally anxious to finalize settlements once an agreement is reached on terms, are not content to continue litigating indefinitely, and are generally not tolerant of long delays. If Sysco

continues to be restrained from settling, especially if the restraint were to continue until after the courts in the antitrust litigations make further decisions in those cases (for example, on pending motions to dismiss and motions for summary judgment in *Broilers*), I believe that the defendants would simply withdraw their settlement offers.

29. In fact, certain defendants have already expressed frustration over the delay in executing the Proposed Settlements that has already resulted from the TRO Award, and threatened that they were not willing to wait past February to see if the TRO Award will be lifted by the Tribunal. Although that has not yet occurred, the antitrust defendants will not hold their settlement offer open indefinitely, nor will they commit to hold the offer open in the face of any significant developments in the antitrust litigations.

30. Just last week, another defendant in the Antitrust Litigations approached Sysco about settlement. Because Sysco is currently prohibited from disclosing that Burford has claimed a veto right over Sysco's ability to settle its claims or that Sysco is presently enjoined from executing any settlement agreements, Sysco is unable to engage with that defendant or even explain why it cannot meaningfully do so.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Phoenix, Arizona on March 8, 2023

[signature]

Barrett G. Flynn