IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SYSCO CORPORATION,<br><br>    Petitioner,<br><br>    vs.<br><br>GLAZ LLC, POSEN INVESTMENTS LP, and KENOSHA INVESTMENTS LP,<br><br>    Respondents. | CASE NO. 23-CV-1451<br>JUDGE: PACOLD<br>MAGISTRATE JUDGE: FUENTES |

**BRIEF *AMICUS CURIAE* OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA IN SUPPORT OF PETITION TO VACATE THE ARBITRAL AWARD**

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062

Clifford W. Berlow
Adam G. Unikowsky
Grace Wallack
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
(202) 639-6000

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... ii

INTEREST OF AMICUS CURIAE .........................................................................................1

INTRODUCTION .....................................................................................................................2

ARGUMENT .............................................................................................................................3

I.      Vacatur of the Arbitral Award Is Warranted Under the Unusual Facts Of This Case. ...........................................................................................................................3

II.     Third-Party Litigation Funding Poses Several Policy Concerns. ........................................4

      A.     Third-Party Litigation Funding Prevents Clients from Directing the Outcome of Their Cases. ........................................................................................5

      B.     Third-Party Litigation Funding Erodes Client's Right to Conflict-Free Counsel. .........................................................................................................8

      C.     Third Party Litigation Funding Threatens U.S. National Security .........................9

III.    The Tribunal's Interpretation of the Funding Agreement in this Case Raises Every One Of These Concerns. .......................................................................................11

      A.     Burford's Interpretation of its Funding Agreement with Sysco Gives It the Right to Control Settlement. ...........................................................................12

      B.     The Relationship Between Burford and Sysco's Counsel, Boies Schiller, Illustrates the Minefield of Conflicts Created by Third Party Litigation Funding. ........................................................................................13

      C.     Burford's Opaque Ownership Structure Illustrates How Foreign Adversaries Could Manipulate U.S. Litigation Through Third-Party Funding. ........................................................................................14

CONCLUSION ........................................................................................................................15

# TABLE OF AUTHORITIES

**CASES**

*Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562 (6th Cir. 2019) ............................7

*Howell v. Motorola, Inc.*, 633 F.3d 552 (7th Cir. 2011)................................................................12

*Miksis v. Evanston Township High School District #202*, 235 F. Supp. 3d 960 (N.D. Ill. 2017)................................................................................................................................12

*Monee Nursery & Landscaping Co. v. International Union of Operating Engineers, Local 150, AFL-CIO*, 348 F.3d 671 (7th Cir. 2003) ..............................................................2, 3

*Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264 (7th Cir. 1988) ...............................................................................................................................3, 4

*Renard v. Ameriprise Financial Services, Inc.*, 778 F.3d 563 (7th Cir. 2015) ................................4

*Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) ............................................3

*Titan Tire Corp. of Freeport, Inc. v. United Steel, Paper & Forestry, Rubber, Manufacturing, Energy, Allied Industrial & Service Workers International Union*, 734 F.3d 708 (7th Cir. 2013) .......................................................................................4

*Veninga v. Fmali Herb Co.*, No. 97 C 1683, 1997 WL 598143 (N.D. Ill. Sept. 17, 1997) ..........................................................................................................................................12

*Williams v. RI/WFI Acquisition Corp.*, No. 06 C 2103, 2009 WL 383420 (N.D. Ill. Feb. 11, 2009) .........................................................................................................................3

*Wilson v. Sterling Foster & Co.*, No. 98 C 2733, 1998 WL 749065 (N.D. Ill. Oct. 15, 1998) ....................................................................................................................................3

**STATUTES**

9 U.S.C. § 10................................................................................................................................4

9 U.S.C. § 10(a)(4)........................................................................................................................4

9 U.S.C. § 11................................................................................................................................4

Wis. Stat. § 804.01(2)(bg)..............................................................................................................9

**OTHER AUTHORITIES**

ABA Model Rule 1.2 .....................................................................................................................5

ABA Model Rule 1.3 – Comment ..................................................................................................9

D.N.J. L. Civ. R. 7.1.1 ...........................................................................................................1

Notification of Docket Entry, *Barcenas v. Rush University Medical Center*, No. 22-366 (N.D. Ill. Apr. 4, 2022), ECF No. 38 ..........................................................................1

Notification of Docket Entry, *Baumeister v. Exelon Corp*., No. 21-6505 (N.D. Ill. Mar. 11, 2022), ECF No. 44 ................................................................................................1

William W. Large, *Selling Out: The Dangers of Allowing Nonattorney Investment in Law Firms*, U.S. Chamber of Commerce Institute for Legal Reform (Jan. 2023), https://instituteforlegalreform.com/wp-content/uploads/2023/01/Selling-Out-The-Dangers-of-Allowing-Nonattorney-Investment-in-Law-Firms.pdf........................................................................................................5, 6, 8, 10, 11

Michael E. Leiter & John H. Beisner et al., *A New Threat: The National Security Risk of Third Party Litigation Funding*, U.S. Chamber of Commerce Institute for Legal Reform (Nov. 2022), https://instituteforlegalreform.com/wp-content/uploads/2022/11/TPLF-Briefly-Oct-2022-RBG-FINAL-1.pdf .........................3, 7, 8, 9, 11, 14

Letter from John Kennedy, U.S. Senator, to Merrick Garland, Attorney General and John Roberts (Jan. 6, 2023), https://www.kennedy.senate.gov/public/_cache/files/0/7/077acc52-6622-453b-b9a5-bbecd358e136/32C50A661400A5B670DC1D48B8D75E73.letter-to-ag-garland-cheif-justice-roberts.pdf ................................11

Letter from Christopher Carr, Georgia Attorney General et al., to Merrick Garland, Attorney General et al. (Dec. 22, 2022) https://www.tn.gov/content/dam/tn/attorneygeneral/documents/pr/2022/pr22-55-letter.pdf................................................11

National Counterintelligence and Security Center, *National Counterintelligence Strategy of the United States of America 2020-2022* (Jan. 7, 2020), https://www.icitech.org/post/ncsc-the-national-counterintelligence-strategy-of-the-u-s-2020-2022 ................................................................................................................................11

Office of the Director of National Intelligence, *Annual Threat Assessment of the U.S. Intelligence Community* (Feb. 2022), https://www.dni.gov/files/ODNI/documents/assessments/ATA-2022-Unclassified-Report.pdf ......................................11

Press Release, Burford, *Burford Extends Life of Sovereign Wealth Fund Arrangement and Comments on Fund Management Business* (May 26, 2022), https://www.burfordcapital.com/shareholders/announcements-container/burford-extends-life-of-sovereign-wealth-fund-arrangement-and-comments-on-fund-management-business ...................................................................................10

Standing Order for all Judges of the Northern District of California, Contents of Joint Case Management Statement, https://www.cand.uscourts.gov/wp-content/uploads/judges/Standing_Order_All_Judges_1.17.23.pdf...................................... 9-10

Standing Order Regarding Third-Party Litigation Funding Arrangements,
 https://www.ded.uscourts.gov/sites/ded/files/Standing%20Order%20Regardin
 g%20Third-Party%20Litigation%20Funding.pdf ..................................................................10

## INTEREST OF AMICUS CURIAE

The U.S. Chamber of Commerce is the world's largest business organization. The Chamber represents approximately 300,000 direct members and indirectly represents the interests of more than three million businesses and professional organizations of every size, in every industry sector, from all across the country. An important function of the Chamber is to represent the interests of its members in matters before the courts, Congress, and the Executive Branch. To that end, the Chamber regularly files *amicus curiae* briefs in cases, such as this one, that raise issues of concern to the nation's business community, including briefs in federal district courts. *See, e.g.*, Notification of Docket Entry, *Baumeister v. Exelon Corp.*, No. 21-6505 (N.D. Ill. Mar. 11, 2022), ECF No. 44; Notification of Docket Entry, *Barcenas v. Rush Univ. Med. Ctr.*, No. 22-366 (N.D. Ill. Apr. 4, 2022), ECF No. 38.

The Chamber and its members have a strong interest in this case. The Chamber's members are involved in all manner of business litigation that will be, and has already been, impacted by the increase in third-party litigation funding. As evidenced by this case, third-party litigation funding can undermine the attorney-client relationship and makes settlement of lawsuits more difficult, expensive, and inefficient. It can also pose national-security threats to businesses and the people they employ and serve. Here, the Tribunal has authorized a funding arrangement that gives Burford Capital complete control over Sysco's ability to settle its claims. The Award prevents Sysco from agreeing to the settlement offer it has in hand and is ready to sign, forcing Sysco to instead litigate through trial and appeal against its wishes. If the Tribunal's Award, and the interpretation of the funding agreement on which it rests, is upheld, litigation funders will seek similar control in other cases.

## INTRODUCTION

The Court should grant Sysco's petition to vacate the award. Although the court's power to vacate an arbitration award is "extremely limited," *Monee Nursery & Landscaping Co. v. Int'l Union of Operating Engineers, Loc. 150, AFL-CIO*, 348 F.3d 671, 675 (7th Cir. 2003), the grounds for vacatur are nevertheless present here. The Tribunal's decision gives Burford Capital, a third-party litigation funder, an essentially unrestricted right to control the outcome of the litigation that it has invested in. Emboldened by the Tribunal's Award, Burford has demanded that Sysco withdraw the stay motions it has filed in the underlying antitrust litigations and initiate an entirely new lawsuit against a number of Sysco's key suppliers. Amended Petition ¶ 70. Burford should not be allowed to force Sysco to litigate indefinitely, potentially damaging Sysco's business relationships and subjecting Sysco and the courts to costly litigation that no party wishes to pursue.

This case illustrates the serious problems that third-party litigation funding can cause. First, third-party litigation funders often have different interests than the parties in the case, and this divergence of interests naturally incentivizes funders to take control of litigation in order to maximize the return on their investment. Here, Burford has done just that through the Tribunal's Award, which blocks Sysco from settling its claims in the antitrust litigation despite Sysco's readiness to do so. Second, the lack of transparency and regulation of third-party litigation funding creates a conflict-of-interest minefield. Litigation funders are repeat players who may invest in a whole portfolio of cases with law firms or across industries. As lawyers and law firms develop more significant relationships with funders than they have with any individual client, the lawyer's ability to provide clients candid and unconflicted advice will be strained. Finally, litigation funding agreements are generally kept secret. This poses serious national security risks, as foreign companies or governments could fund litigation in order to exploit commercial disputes between

2

U.S. companies or gain access to proprietary information through discovery.

The litigation funding market is already worth billions and is growing rapidly, and experts estimate that annual investment could reach $31 billion by 2028.[2] As the market expands, the problems illustrated by this case will only become more severe. The Court should grant Sysco's petition to vacate the Tribunal's Award and prevent Burford from taking over this litigation against the parties' wishes.

**ARGUMENT**

**I.     Vacatur of the Arbitral Award Is Warranted Under the Unusual Facts of This Case.**

The Federal Arbitration Act ("FAA") establishes a national policy favoring arbitration. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987). As a corollary to this federal policy, judicial review of arbitral awards "is extremely limited." *Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264, 267 (7th Cir. 1988) (quotation marks omitted); *see also Monee Nursery*, 348 F.3d at 675. This narrow standard reflects the fact that arbitration is not a system of "'junior varsity trial courts,'" where arbitral decisions are routinely subject to review in federal courts, "but instead is a contractual agreement by the parties to settle their disputes in a nonjudicial forum." *Williams v. RI/WFI Acquisition Corp.*, No. 06 C 2103, 2009 WL 383420, at *2 (N.D. Ill. Feb. 11, 2009). Thus, a "limited standard of review is necessary to preserve arbitration's 'benefits of reduced delay and expense.'" *Wilson v. Sterling Foster & Co.*, No. 98 C 2733, 1998 WL 749065, at *2 (N.D. Ill. Oct. 15, 1998). If courts were routinely permitted to review the merits of arbitration awards, arbitration would become "merely an added preliminary

---

[2] Michael E. Leiter & John H. Beisner et al., *A New Threat: The National Security Risk of Third Party Litigation Funding*, U.S. Chamber of Commerce Institute for Legal Reform at 4 (Nov. 2022), https://instituteforlegalreform.com/wp-content/uploads/2022/11/TPLF-Briefly-Oct-2022-RBG-FINAL-1.pdf ("*A New Threat*").

3

step to judicial resolution rather than a true alternative." *Moseley*, 849 F.2d at 267 (quotation marks omitted).

Nevertheless, the FAA provides for limited circumstances in which a court may vacate an award. *See* 9 U.S.C. §§ 10, 11. Such grounds include "where the arbitrators exceeded their powers," *id.* § 10(a)(4), such as where "the arbitrator deliberately disregards what he knows to be the law," *Renard v. Ameriprise Fin. Servs., Inc.*, 778 F.3d 563, 567 (7th Cir. 2015) (quotation marks omitted), or where the arbitrator's interpretation of the contract violates explicit, "well defined and dominant" public policy. *Titan Tire Corp. of Freeport, Inc. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 734 F.3d 708, 716 (7th Cir. 2013) (quoting *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 766 (1983)).

Although vacatur of arbitration awards should be extraordinarily rare, it is warranted in this instance. The Tribunal's injunction is preventing Sysco from entering into ready-to-sign settlement agreements and forcing Sysco to take its claims—unwillingly—through trial and appeal, no matter the injurious effect on the rest of Sysco's business relationships or impact on the courts. The Tribunal's interpretation of Burford's litigation funding agreement with Sysco gives litigation funders the right to force parties to go to trial in the hopes of achieving windfall judgments, even when the parties would rather settle. Although arbitrators have broad authority to resolve disputes, they lack the authority to manipulate ongoing federal court proceedings by forcing parties to continue to litigate against their will in this manner. Federal courts, not arbitrators, manage federal court litigation. For the reasons explained in the petition, this is the highly unusual case where "the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4).

**II.    Third-Party Litigation Funding Poses Several Policy Concerns.**

Third-party litigation funding is troubling in several respects. First, it may transfer control over litigation from the client to the funder, to the detriment of plaintiffs, defendants, and the

4

courts.  Second, it impedes the attorney-client relationship by creating conflicts for lawyers who have dual loyalties.  Third, it threatens national security by potentially allowing anonymous foreign interests to control U.S. litigation to achieve their strategic goals.

### A. Third-Party Litigation Funding Prevents Clients from Directing the Outcome of Their Cases.

The core problem with allowing third parties to take a stake in the outcome of legal proceedings is that the funder's goal of maximizing profit displaces the lawyer's independent judgment.[3]  Given the divergent interests of funders and lawyers, a funder with a stake in a lawsuit will "naturally" seek "to control the lawsuit and, as a result, the lawyers being funded by that third party will be controlled by that third party, sometimes to the detriment of the actual party in interest."[4]

Plaintiffs often seek to recover as much money as possible in litigation, but not always.  A party may also pursue litigation to obtain non-monetary relief, achieve a policy or procedural change, advance a point of law, or simply to see justice done.  A party's decision regarding how to pursue the matter—or whether to pursue the matter at all—may be driven by such nonpecuniary motives.  Lawyers have a duty to abide by the client's decisions concerning the objectives of the representation.[5]  Yet, the presence of a third-party litigation funder exerts enormous pressure on attorneys to act in the funder's interest and obtain the highest financial award possible.

Another example of when the client's and the funder's interests may diverge is during settlement discussions.  Because funders seek to maximize the return on their investment, when

---

[3] *See* William W. Large, *Selling Out: The Dangers of Allowing Nonattorney Investment in Law Firms*, U.S. Chamber of Commerce Institute for Legal Reform at 32 (Jan. 2023), https://institute forlegalreform.com/wp-content/uploads/2023/01/Selling-Out-The-Dangers-of-Allowing-Nonattorney-Investment-in-Law-Firms.pdf ("*Selling Out*").
[4] *Id.* at 33 (quotation marks omitted).
[5] *See* ABA Model Rule 1.2.

5

faced with a settlement offer, the funder may prefer to risk going to trial on the hopes of achieving a substantial, but unlikely verdict.[6] The client might prefer to resolve the claim early and for a sum certain, rather than risk the time and hassle of pursuing a claim with an uncertain outcome. Indeed, aside from the risk of losing, the client bears all the additional burden of litigation—time spent participating in discovery and other aspects of the litigation process, possible breakdown of business relationships, and potentially negative press coverage—while the funder risks nothing but the loss of its investment. It is not surprising, given the misalignment of incentives, that an executive of a prominent litigation funding company acknowledges that litigation funding "make[s] it harder and more expensive to settle cases," presumably because the funders prefer to take cases to trial more often than the parties otherwise would.[7]

Making matters worse, although lawyers are required to avoid (and disclose) conflicts of interest, litigation funders have no such obligation. Funders may invest in multiple claims, including on both sides of a legal issue, without the client's knowledge. A funder may therefore insist on a client taking a legal position in one case that may harm that client's interests so as to maximize revenue for its portfolio of cases, or delay settlement in one case to increase the funder's settlement leverage in other cases. Clients may be forced to weaken their legal positions—or even intentionally throw cases—because someone else is pulling the purse strings.

Although litigation funders claim that their "practice" is not to interfere with the management of the cases they invest in, Amended Petition ¶ 23, contrary examples abound. In this case, for example, the parties' original funding agreement includes a "nuclear option" that allows Burford to seize complete control over Sysco's claims (including by hiring and firing

---

[6] *Selling Out*, at 36.
[7] *Id.*

6

Sysco's counsel). Amended Petition ¶ 71. Another Burford funding agreement "provided control to the Funders" by giving it the opportunity to approve of plaintiffs' choice of counsel.[8] The execution of engagement agreements between the claimants and Burford's preferred law firm—a firm with "close ties" to Burford—was a "condition precedent to the funding."[9]

Other litigation funders enter into similarly abusive arrangements. In *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562 (6th Cir. 2019), the court held that a litigation funding agreement between Boling (the litigant) and Prospect Funding (the funder) was invalid as against public policy because it "effectively gave Prospect substantial control over the litigation." *Id.* at 579. Among other things, the agreements "limited Boling's right to change attorneys without Prospect's consent, otherwise Boling would be required to repay Prospect immediately." *Id.* at 580. It also gave Prospect the "right to examine" case files and even "Boling's medical records." *Id.* at 579 n.13. Similarly, in *White Lilly, LLC v. Balestriere PLLC*, a litigation funder "affirmatively asserted that it had the right to exercise control over litigation in which it had acquired an interest."[10] The funder alleged that "its funding agreement required that specified counsel," which had an "existing relationship" with the funder," "serve as one of the plaintiff's counsel in the funded lawsuit."[11] The funding agreement also required that the litigant "obtain prior approval for expenses in excess of $5,000."[12] Remarkably, the funder alleged that it had been "assured that the 'proposed litigation' would settle 'quickly'"[13]—an allegation illustrating how funders perceive themselves as holding the right to control settlement decisions. Finally, in

---

[8] *A New Threat*, at 6 (quotation marks and alteration omitted).
[9] *Id.*
[10] *A New Threat*, at 7.
[11] *Id*.
[12] *Id.*
[13] *Id.*

7

*Gbarabe v. Chevron Corp.*, the funding agreement required the plaintiff to use funder-nominated lawyers and obtain funder approval before engaging co-counsel or expert witnesses.[14] The funding agreement also required that counsel "give reasonable notice of and permit the funder, where reasonably practicable, to attend as an observer at internal meetings . . . and send an observer to any mediation or hearing related to the Claim."[15] As these examples show, funders will seek to influence the strategic decisions of the litigants they have funded, whether by controlling selection of counsel, experts, or even attending mediations.

### B. Third-Party Litigation Funding Erodes Clients' Right to Conflict-Free Counsel.

Third-party litigation funding also erodes the client's right to non-conflicted counsel and threatens the confidentiality of lawyer-client relationships. When the nonlawyer "share[s] in the fee, there is no way to assure that the 'twin pillars of confidentiality and conflicts of interest are observed by the nonlawyer.'"[16]

In recent years, litigation finance firms have expanded their practice from providing third-party financing to individual plaintiffs to providing the financing directly to law firms.[17] Under this approach, the funders are "repeat players,"[18] investing in a portfolio of cases rather than a single lawsuit. As law firms develop more significant relationships with funders than with any individual client, lawyers' ability to zealously represent their clients may be diminished. For example, the more investment a funder has in a law firm's cases or overall operations, the more likely it is that the attorneys will succumb—whether consciously or subconsciously—to the

---

[14] *Id.* at 8.
[15] *Id.* (quotation marks omitted)
[16] *Selling Out*, at 18 (quotation marks omitted).
[17] *A New Threat*, at 4.
[18] *Id.* at 9 (citation omitted).

8

financial incentive to subordinate the needs of individual clients in favor of the interests of the investor. "In short, the closer the relationship between funders and law firms becomes, 'funders' interests will probably exert more pull than those of the clients.'"[19] This dynamic can also occur even if the funder has only client-side agreements if those clients are represented by the same law firm. By expanding the funder and lawyers' financial relationship, third-party litigation funding dilutes lawyers' ability to zealously represent their clients[20] and creates a minefield of conflicts of interest.

In addition, the presence of a third-party funder may erode the confidentiality of lawyer-client communications. Third-party funding agreements often have requirements that lawyers share information and case developments with the funder. While lawyers have a duty to keep client information confidential, doing so may become increasingly difficult as funders seek to control day-to-day operations of a case. This concern is heightened when the investor in the litigation is a foreign company or sovereign wealth fund that may have an interest in obtaining sensitive business information from U.S. companies, particularly in sensitive industries.

### C. Third Party Litigation Funding Threatens U.S. National Security.

The litigation funding market lacks transparency. Investors in many cases remain shielded from public view. Courts are generally unaware of litigation funding arrangements, even though their use has increased substantially, because third-party litigation funding agreements need not be disclosed in almost all jurisdictions and are rarely revealed to the courts or the parties.[21]

---

[19] *Id.* (quotation marks omitted)
[20] ABA Model Rule 1.3 – Comment ("A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.").
[21] *A New Threat*, at 5. A handful of courts (in Wisconsin, the District of New Jersey, the District of Delaware, and the Northern District of California) have adopted third-party litigation funding disclosure requirements. *See, e.g.*, Wis. Stat. § 804.01(2)(bg) (2018); D.N.J. L. Civ. R. 7.1.1; Standing Order for all Judges of the Northern District of California, Contents of Joint Case

Accordingly, foreign individuals, companies, and sovereign wealth funds, which are state-owned investment funds comprised of money generated by various governments, can invest in litigation without disclosing their involvement to the parties or the courts. As one commenter has noted, "hedge funds, private equity and sovereign wealth funds are piling billions into the outcome of high stakes court cases at a faster rate than ever before."[22] Indeed, Burford has not been shy about its relationships with sovereign wealth funds, publicly touting its relationship with a sovereign wealth fund strategic partner.[23]

Allowing foreign governments to invest surreptitiously in American lawsuits could allow those governments to exert significant influence over the American legal system. Foreign governments could encourage and exploit commercial disputes to advance their own interests. Moreover, foreign financing risks overburdening U.S. courts with frivolous and vexatious lawsuits because a foreign government or company may be perfectly willing to fund an unsuccessful lawsuit—and refuse to settle—in order to obtain some other benefit, such as advancing its strategic interest or gaining access to sensitive information.

A leading expert on third-party litigation funding recently warned that "China's Sovereign Wealth Fund [could] fund[] a suit against an American company in a sensitive industry such as

---

Management Statement, § 18, https://www.cand.uscourts.gov/wp-content/uploads/judges/Standing_Order_All_Judges_1.17.23.pdf. In addition, Chief Judge Colm F. Connolly of the District of Delaware recently issued a standing order requiring "[a] brief description of the nature of the financial interest" held by any non-party investor in the matters before him. Standing Order Regarding Third-Party Litigation Funding Arrangements, § 1(c), https://www.ded.uscourts.gov/sites/ded/files/Standing%20Order%20Regarding%20Third-Party%20Litigation%20Funding.pdf. Besides the requirements in these courts, third-party litigation funders are not, at present, required to disclose their participation in litigation.

[22] *Selling Out*, at 42.

[23] Press Release, Burford, *Burford Extends Life of Sovereign Wealth Fund Arrangement and Comments on Fund Management Business* (May 26, 2022), https://www.burfordcapital.com/shareholders/announcements-container/burford-extends-life-of-sovereign-wealth-fund-arrangement-and-comments-on-fund-management-business.

military technology" and, in the process, "obtain[] highly confidential documents containing proprietary information . . . from the American defendant-corporation."[24] A foreign adversary could also use litigation funding to exploit commercial disputes between U.S. companies in order to advance its domestic industries.[25] In addition, a foreign government could fund litigation in an attempt to influence domestic U.S. politics. The National Counterintelligence and Security Center has warned that "Russia and China operate globally, use all instruments of national power to target the United States, and have a broad range of sophisticated intelligence capabilities."[26] There is no reason to think that adversarial foreign governments would stop short of exploiting litigation financing in order to advance their strategic national interests.

### III. The Tribunal's Interpretation of the Funding Agreement in this Case Raises Every One Of These Concerns.

This case illustrates every concern described above. First, the interpretation of the funding agreement advanced by Burford and accepted by the Tribunal gives Burford complete control over whether Sysco may settle its claims in the antitrust litigation, despite the fact that Burford is *not* the party in interest and has *not* been assigned Sysco's claims. Second, Burford's relationship with

---

[24] *A New Threat*, at 14 (quotation marks omitted); National Counterintelligence and Security Center, *National Counterintelligence Strategy of the United States of America 2020-2022*, at 1 (Jan. 7, 2020), https://www.icitech.org/post/ncsc-the-national-counterintelligence-strategy-of-the-u-s-2020-2022; *see also* Office of the Director of National Intelligence, *Annual Threat Assessment of the U.S. Intelligence Community*, at 6-7 (Feb. 2022), https://www.dni.gov/files/ODNI/documents/assessments/ATA-2022-Unclassified-Report.pdf. In addition, Senator John Kelly and a group of state attorneys general have separately written letters to the Justice Department raising concern about the growing national security threat posed by foreign investment in litigation funding. *See* Letter from John Kennedy, U.S. Senator, to Merrick Garland, Attorney General and John Roberts (Jan. 6, 2023), https://www.kennedy.senate.gov/public/_cache/files/0/7/077acc52-6622-453b-b9a5-bbecd358e136/32C50A661400A5B670DC1D48B8D75E73.letter-to-ag-garland-cheif-justice-roberts.pdf; Letter from Christopher Carr, Georgia Attorney General et al., to Merrick Garland, Attorney General et al. (Dec. 22, 2022), https://www.tn.gov/content/dam/tn/attorneygeneral/documents/pr/2022/pr22-55-letter.pdf.
[25] *Selling Out*, at 2.
[26] *A New Threat*, at 10.

11

Sysco's former counsel highlights the conflict of interest challenges that third-party litigation funding poses, even for sophisticated parties. Finally, the respondents in this action—a group of investment firms controlled by Burford—have not been transparent about whether any have other partners, investors, or corporate parents that would defeat diversity jurisdiction. This lack of transparency obfuscates any foreign ownership or influence that could be present.

### A. Burford's Interpretation of its Funding Agreement with Sysco Gives It the Right to Control Settlement.

There is a strong federal policy in favor of voluntary resolution of disputes. *Miksis v. Evanston Twp. High Sch. Dist. #202*, 235 F. Supp. 3d 960, 987 (N.D. Ill. 2017); *see also Howell v. Motorola, Inc.*, 633 F.3d 552, 561 (7th Cir. 2011) (recognizing the "importance of the federal policy in favor of voluntary settlement of claims"). Moreover, it is the *client* that is supposed to control the decision to settle, not the lawyer or funder. *See Veninga v. Fmali Herb Co.*, No. 97 C 1683, 1997 WL 598143, at *3 (N.D. Ill. Sept. 17, 1997) ("[I]f a lawyer attempts to draw a contract where the clients are prevented from settling their own suit, the contract is void as against public policy." (citing Ill. R. Prof'l Conduct 1.2(a))). As highlighted above, the possibility that a litigation funder could control the decision to settle a case instead of the client frustrates this policy, because litigation funders would often prefer to proceed to trial, even against the client's wishes.

That is exactly the situation here. Sysco and the defendants want to settle their dispute, and they negotiated arms' length settlements to that end. Amended Petition ¶ 18. However, because the settlement amount was apparently unsatisfactory to Burford, Burford sought, and received, the Award from the Tribunal, which blocks Sysco from entering into the proposed settlement agreements and forces Sysco to continue litigating its claims when it otherwise would not do so. Amended Petition ¶¶ 31, 40, 65. The Tribunal's Award is, essentially, forcing Sysco to continue to litigate a case against its will—an outcome that imposes unnecessary burdens on

12

both sides of the litigation, not to mention the courts.

### B. The Relationship Between Burford and Sysco's Counsel, Boies Schiller, Illustrates the Minefield of Conflicts Created by Third Party Litigation Funding.

An additional concern with third-party litigation funding is the erosion of a client's ability to obtain conflict-free counsel and maintain confidentiality. This challenge is illustrated perfectly by Burford's larger relationship with Boies Schiller. As Sysco explains, Sysco's former outside counsel, Scott Gant of Boies Schiller, has a "broad economic relationship" with Burford, "as Mr. Gant also represents Burford both directly and indirectly in the Antitrust Litigations." Amended Petition ¶ 28. Boies Schiller is also representing at least one other plaintiff in the antitrust litigations in whose claim Burford has also invested. *Id.* Indeed, the full extent of Mr. Gant's work with Burford has never been disclosed to Sysco. *Id.*

This kind of broad financial relationship between funder and client carries risks, especially when the relationship between the funder and the client breaks down, as it did here. As illustrated by Petitioner, after Burford advised Sysco that it objected to the proposed settlements, Burford called Sysco's counsel—without notifying or informing Sysco—to discuss the settlement proposal and the possibility that Burford would have to sue Sysco for breach of the funding agreement. *Id.* ¶ 32. According to Burford's summary of the call, Mr. Gant advised Burford to reject the proposed settlements and suggested that Burford may have a claim against Sysco, despite Mr. Gant's duty to represent Sysco's interests, not Burford's. Mr. Gant never disclosed the call to Sysco, and Sysco did not learn about the call until Burford produced documents during the arbitration months later. *Id.* ¶¶ 32, 34. As Petitioner argues, the call "raises serious concerns about whether Boies Schiller violated its ethical obligations and fiduciary duties to Sysco," including duties to provide candid and unconflicted advice, preserve confidential information, and perform services without representing different interests. *Id.* ¶ 38.

13

### C. Burford's Opaque Ownership Structure Illustrates How Foreign Adversaries Could Manipulate U.S. Litigation Through Third-Party Funding.

As described above, national security experts are increasingly concerned that foreign companies or governments could exploit third-party litigation funding to advance their strategic interests. A particular challenge in this sphere is the lack of transparency for litigation funding: there is no requirement, in most U.S. courts, that a party disclose whether a suit is funded by a third party.

Burford's own corporate structure illustrates the point. The respondents in this case are Glaz LLC, Posen Investments LP, and Kenosha Investments, LP, all of which have Burford Capital as their only direct or indirect partner and all of which are controlled by Burford. Amended Petition ¶¶ 3-6. Sysco "has made reasonable, good faith efforts to investigate whether Glaz, Pozen, and Kenosha are citizens of either Delaware or Texas," and "repeatedly asked [r]espondents to identify any other members or partners" in order to determine whether diversity jurisdiction exists. *Id.* ¶ 12. Burford later sent Sysco a letter asserting that, "three levels above one of the Respondents, Kenosha," the member or partner was a Texas citizen. *Id.* Burford did not identify the Texas investor (or even disclose whether the investor was a corporation, individual, or another partnership), nor did it identify any other investors in the other respondents or Burford itself. *Id.*

As this situation illustrates, the ownership and structure of litigation funding firms is extremely opaque. Not only do "most judges have no idea whether [third-party litigation funding] is at play in litigation they are overseeing,"[27] courts might have no idea who the funder really is. Foreign governments and sovereign wealth funds can take advantage of this lack of transparency to invest in litigation that suits their strategic interests while remaining anonymous.

---

[27] *A New Threat*, at 5.

14

\*   \*   \*

This case illustrates how litigation funding creates conflicts of interests, interferes with attorney-client relationships, and allows opaque interests to control litigation. The Court should vacate the arbitration award and allow Sysco to make its own litigation decisions.

## CONCLUSION

For the foregoing reasons, the Court should grant Sysco's petition and vacate the Tribunal's Award.

Dated: March 27, 2023

Respectfully submitted,

Jennifer B. Dickey
Jordan L. Von Bokern
U.S. Chamber Litigation Center
1615 H Street, NW
Washington, DC 20062

/s/ Clifford W. Berlow
Clifford W. Berlow
Adam G. Unikowsky
Grace Wallack
Jenner & Block LLP
1099 New York Avenue, NW Suite 900
Washington, DC 20001-4412
Telephone: +1 202 639 6000
Facsimile: +1 202 639 6066

*Counsel for Amicus Curiae the Chamber of Commerce of the United States of America*