# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| SYSCO CORPORATION, | Case No. 1:23-cv-01451 |
| *Petitioner*, | Judge: Martha M. Pacold |
| v. | Magistrate Judge: Gabriel A. Fuentes |
| GLAZ LLC, POSEN INVESTMENTS LP, and KENOSHA INVESTMENTS LP, |  |
| *Respondents.* |  |

## **RESPONDENTS' MOTION FOR PROTECTIVE ORDER**

Pursuant to the Court's Order to Show Cause, ECF No. 11, Respondents Glaz LLC, Posen Investments LP, and Kenosha Investments LP (collectively "Respondents") respectfully request a protective order to permit redaction of the parties' confidential information. Respondents have prepared redacted versions of the Second Amended Capital Provision Agreement ("CPA") and the Amendment to the CPA, which are appended to this motion as Exhibits 1 and 2, respectively.[1]  The proposed redactions protect highly confidential information regarding the specific structure of the parties' financing arrangement.  Respondents have proposed similar redactions to their Request for Arbitration ("RFA"), appended here as Exhibit 3, which Sysco filed under seal in this Court along with the CPA and Amendment.  Sysco filed

---

[1] The appropriate scope of confidentiality in this case, arising out a dispute between the parties to the CPA, is distinct from the issue of whether a non-party to the CPA may obtain discovery of any terms of litigation finance agreements, which implicates the attorney work product doctrine among other protections.  *See, e.g., In re Dealer Mgmt. Sys. Antitrust Litig.*, Case No. 18-cv-00864, ECF No. 1113 (N.D. Ill. Aug. 17, 2020); *Viamedia, Inc. v. Comcast Corp.*, 2017 WL 2834535 (N.D. Ill. June 30, 2017); *In re Int'l Oil Trading Co.*, 548 B.R. 825 (Bankr. S.D. Fla. 2016); *Charge Injection Techs., Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 1540520 (Del. Super. Ct. Mar. 31, 2015); *Devon IT, Inc. v. IBM Corp.*, 2012 WL 4748160 (E.D. Pa. Sept. 27, 2012).  The redactions proposed here thus should not be viewed as reflecting the scope of appropriate disclosure in other circumstances.

another document under a seal – a letter it filed before the Tribunal in the arbitration – which contains references to the settlements that should also be redacted.  Inexplicably, Sysco did not propose any redactions to this document (its own letter), and instead asserted its general "disagree[ment] that many, if any, of these documents meet this Court's requirements for sealing or redaction."  ECF No. 7, ¶ 2.  Respondents assume this was an oversight on Sysco's part and so have proposed redactions to this document, which is appended here as Exhibit 4.  Apart from these documents, Respondents agree with the redactions that Sysco has proposed to the remaining documents, *see id.* ¶ 2 n.1, and have made corresponding redactions to the exhibits appended to this motion.  These additional redactions appropriately protect the terms of the disputed settlements and the identities of the settling defendants.[2]

## BACKGROUND[3]

Sysco commenced this litigation on March 8, 2023, when it filed a petition to vacate a TRO entered by a New York-seated arbitration panel.  *See* ECF No. 1.  At the same time, Sysco filed several redacted documents and moved to file six other documents under seal, including the CPA (Exhibit A), the Amendment to the CPA (Exhibit B), the RFA (Exhibit C), two highly confidential emails that Respondents produced in the arbitration pursuant to a confidentiality order (Exhibits I and J), and a letter Sysco sent to the Tribunal (Exhibit L).  *See* ECF No. 7, ¶ 4.

In a footnote, Sysco purported to justify some its redactions, asserting that redaction of "the names of the defendants with whom it seeks to settle and details of the proposed settlements" was necessary "to protect the confidentiality of the settlement process."  *Id.* ¶ 2 n.1.

---

[2] It remains Sysco's responsibility, however, to alert the Court whether it disagrees with any of the proposed redactions to its own document.

[3] Respondents refer the Court to its previous filings for a summary of the parties' dispute and the run-up to this litigation.  *See* ECF No. 26, at 3-6; ECF No. 27, at 2-9.

But Sysco did not formally move the Court for a protective order.  Instead, Sysco requested leave to file under seal "until such time as [Respondents are] able to appear and seek continued sealing."  *Id*. at 3.  Sysco did not explain why Respondents should be put to the burden of defending Sysco's redactions.  Sysco further recognized, as it pertained to Exhibits I and J, that "the arbitral tribunal has directed that [documents produced in the arbitration] be filed under seal."  *Id*. ¶ 2.  The Court granted Sysco's motion to seal and ordered Respondents "to show cause to justify continued sealing of these documents."  ECF No. 11.

Respondents moved for a 30-day extension to the Court's show-cause order, which the Court granted over Sysco's objection.  *See* ECF No. 34.  With this motion, Respondents have proposed redacted versions of Sysco's Exhibits A, B, C, and L, which are appended to this motion as Exhibits 1, 2, 3, and 4, respectively.[4]  Further, Respondents request that the Court sustain Sysco's redactions of the terms of the disputed settlements and the identities of the settling defendants in the remaining documents.

## ARGUMENT

The Court should grant Respondents' motion for a protective order.  Sealing or redaction is appropriate for "a trade secret or other confidential research, development, or commercial information."  Fed. R. Civ. P. 26(c)(1)(G); *see also United States v. Foster*, 564 F.3d 852, 853

---

[4] After the Tribunal vacated the TRO and entered the preliminary injunction, Sysco filed its so-called "Amended Petition to Vacate Arbitration Award," ECF No. 18, and, notwithstanding the Court's order, unilaterally unsealed two documents that Respondents had produced in the arbitration, *see* ECF Nos. 19-1, 19-2 (Exhibits I and J).  Sysco offered no justification for its breach of the sealing order.  Rather, it charged (incorrectly) that an employee for Respondents' investment manager made "multiple public (mis)statements expressly about" the subject matter of these documents.  ECF No. 18, ¶ 35 n.10.  Sysco never has identified any improper public statements, much less explained why it could violate this Court's order based on displeasure with media coverage of this dispute (which it invited).  Respondents requested that Sysco remedy this obvious breach and refile the documents under seal.  Sysco refused.

(7th Cir. 2009) (sealing appropriate for information that "meet[s] the definition of trade secrets or other categories of bona fide long-term confidentiality").  The proponent of sealing or redaction must demonstrate "good cause."  *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999).  This District permits redactions for "highly confidential commercial information," *FTC v. OSF Healthcare Sys.*, 2012 WL 1144620, at *3 (N.D. Ill. Apr. 5, 2012) (collecting cases), and information "whose economic value depends on its secrecy," *Baxter Int'l, Inc. v. Abbott Lab'ys*, 297 F.3d 544, 547 (7th Cir. 2002).  Redactions are particularly appropriate where, as here, much of the redacted information does not bear on the parties' dispute.  *See id.* at 548.  Respondents' proposed redactions readily satisfy Rule 26.

## I.     The economic terms of the parties' deal should remain confidential.

The CPA (Exhibit A) and the Amendment to the CPA (Exhibit B) contain sensitive economics terms that should remain under seal.  Likewise, the RFA (Exhibit C) contains commercial information derived from those documents.  Redactions are appropriate to protect the "structure of the deal" and "the terms of the deal," which constitute "highly confidential information" regardless whether the "purchase price" or total financing amount is public.  *Lynk Labs, Inc. v. Juno Lighting LLC*, 2016 WL 6135711, at *3 (N.D. Ill. Oct. 21, 2016).  Here, Respondents propose to redact the structure of the parties' financing arrangement as reflected in the CPA, Amendment, and RFA, *see* Exs. 1-3, including Respondents' financing commitment for each of Sysco's food antitrust claims, and the terms describing the structure and application of the "waterfall" governing the distribution of proceeds from those claims.  Respondents and Sysco expressly agreed that these terms were confidential.  *See* Ex. 1, at 1; *see also Lynk Labs*, 2016 WL 6135711, at *3 (sustaining redactions because that redacted terms were "protected by a confidentiality agreement between [the parties]").

4

Disclosure of these terms would cause competitive harm to Respondents. *See*, *e.g.*, *Maui Jim, Inc. v. SmartBuy Guru Enterprises*, 2017 WL 5895143, at *3 (N.D. Ill. Nov. 27, 2017) (Rule 26(c) protects "proprietary information that provides the business entity with a financial or competitive advan[tage] when it is kept secret and results in financial or competitive harm when it is released to the public") (citation omitted). Public access to Respondents' financing commitment for each of Sysco's claims – apart from the aggregate financing commitment across all claims – would provide competitors and parties to the food antitrust litigations insight into how Respondents view the relative strengths and weaknesses of the underlying antitrust cases. Defendants in those cases could exploit this information to negotiate lower settlements, contrary to plaintiffs' (and thus Respondents') interests. Similarly, disclosure of Respondents' waterfall structure would give litigation-funding rivals access to Respondents' proprietary financing strategies and distribution formulas. Such disclosure would threaten Respondents' ability to outperform competitors when assessing and structuring litigation-financing opportunities.

Further, Sysco has challenged the Tribunal's award on two limited grounds: that Respondents' negotiated, prior-consent right to any settlement interferes with judicial proceedings and violates public policy. *See*, *e.g.*, ECF No. 20, at 4-5. The economic terms of the agreements are not central to either argument. The "strong presumption of public disclosure applies only to the materials that formed the basis of the parties' dispute and the district court's resolution," not to information that "contribute[s] little to the resolution of the case." *Baxter Int'l*, 297 F.3d at 548. Respondents do not propose to redact any information regarding their limited consent right, including the relevant provisions of the CPA or Amendment. *See Citizens*, 178 F.3d at 945 ("[A] document that contains trade secrets may also contain material that is not a trade secret, in which case all that would be required to protect a party's interest in trade secrecy

would be redaction of portions of the document."). Whatever relevance the precise terms of the parties' economic arrangement have to Sysco's petition are outweighed by the competitive harm of disclosure. Thus, the selected redactions to information that "contributes little" strike the appropriate balance between public access and protection of Respondents' confidential commercial information. *Baxter Int'l*, 297 F.3d at 548.

## II. The identities of the settling parties and the terms of the proposed settlements should remain confidential.

The RFA (Exhibit C) and Sysco's letter to the Tribunal (Exhibit L) contain references to the terms of the disputed settlements and the identities of settling defendants. Respondents have proposed redactions to that information, *see* Exs. 3-4, which are necessary to protect "the strong public policy favoring confidentiality of settlement agreements," *Ratchford v. AEG Ventures, LLC.*, 2019 WL 10248702, at *2 (N.D. Ill. Aug. 6, 2019); *Centillion Data Sys., Inc. v. Ameritech Corp.*, 193 F.R.D. 550, 553 (S.D. Ind. 1999) ("Because confidentiality of settlement agreements is a primary inducement to parties to settle cases, courts require a strong countervailing interest to breach that confidentiality."). As the parties agree, disclosing the terms of the proposed settlements and the identities of the settling defendants would materially inhibit the prospects for settlement going forward. *See* ECF No. 7, ¶ 2 n.1. Parties are less likely to settle on advantageous terms when they know their settlements will be made public. And disclosing the settlements at issue in this case, which are severely undervalued, would threaten to deflate potential settlements in the future. A protective order is thus appropriate to preserve the settlement process.

## CONCLUSION

Respondents respectfully request that the Court grant the motion for a protective order and (1) permit Respondents to file Exhibits 1, 2, 3, and 4 in redacted form; and (2) sustain the remaining redactions proposed by Sysco.[5]  *See* ECF No. 7, ¶ 4.

 Dated:  April 28, 2023

Respectfully submitted,

By:  */s/ Richard Prendergast*
Richard Prendergast
Michael Layden
CROKE FAIRCHILD DUARTE & BERES
191 N. Wacker Dr., 31st Floor
Chicago, IL 60606
(312) 641-0881 (Telephone)
rprendergast@crokefairchild.com
mlayden@crokefairchild.com

Derek T. Ho (*pro hac vice*)
KELLOGG, HANSEN, TODD, FIGEL
   & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, D.C.  20036
(202) 326-7900 (Telephone)
dho@kellogghansen.com

Elizabeth Snodgrass (*pro hac vice
   forthcoming*)
THREE CROWNS LLP
Washington Harbour
3000 K Street, N.W., Suite 101
Washington, D.C.  20007
(202) 540-9492 (Telephone)
liz.snodgrass@threecrownsllp.com

*Attorneys for Respondents Glaz LLC, Posen
Investments LP, and Kenosha Investments LP*

---

[5] To the extent the economic terms of the parties' agreements or confidential settlement information is referenced in redacted form in other public filings on the Court's docket, including those filed by Sysco, that information should remain redacted for the reasons given here.

**CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2023, I caused a true and correct copy of the foregoing document to be filed electronically. Notice of the filing will be sent to all counsel of record by operation of the Court's electronic filing system.

Dated: April 28, 2023

By: */s/ Richard Prendergast*
*Attorney for Respondents*

# Exhibit 1

*Execution Copy*

**PRIVATE & CONFIDENTIAL**

**ATTORNEY WORK PRODUCT**

**SUBJECT TO CONFIDENTIALITY AGREEMENT**

**PROTECTED FROM DISCLOSURE BY APPLICABLE PRIVILEGES**

**This document contains protected attorney work product and discloses through its structure and terms the mental impressions of counsel.  Access to this document is restricted by confidentiality agreement and professional privilege.**

**Dated as of December 22, 2020**

==========================================

**Second Amended and Restated
Capital Provision Agreement**

==========================================

**between**

**The Counterparty named in Annex I hereto**

**and**

**The Capital Providers, as defined in the introductory paragraph hereof**

# CONTENTS

**SECTION**                                                                                    **PAGE**

1.     Definitions....................................................................................................... 2
2.     Capital Provision Obligations and Capital Providers' Entitlement ...................... 2
       2.1     Capital Amounts .................................................................................... 2
       2.2     Capital Providers' Entitlement............................................................... 3
3.     Payment Obligations of the Counterparty............................................................ 7
       3.1     Payments................................................................................................ 7
       3.2     Proceeds to Payment Agent, etc............................................................. 7
4.     Payments Generally ........................................................................................... 8
       4.1     Place and Account for Payment ............................................................. 8
       4.2     Interest on Overdue Amounts ................................................................ 8
       4.3     Waiver of Right of Set-Off .................................................................... 8
5.     Covenants........................................................................................................... 9
       5.1     Covenants of Each Party ....................................................................... 9
       5.2     Covenants of the Capital Providers........................................................ 9
       5.3     Covenants of the Counterparty ............................................................ 10
6.     Representations and Warranties......................................................................... 13
       6.1     Representations and Warranties of Each Party..................................... 13
       6.2     Representations and Warranties of the Capital Providers...................... 14
       6.3     Representations and Warranties of the Counterparty ............................ 15
7.     Material Non-Public Information ....................................................................... 17
8.     Confidentiality ................................................................................................. 17
       8.1     Exclusive Ownership of Information by Disclosing Party ...................... 17
       8.2     Non-Disclosure of Information............................................................. 18
       8.3     Confidentiality Procedures................................................................... 19
       8.4     Judicial and Official Disclosure Requests ............................................ 19
9.     Legal Privilege ................................................................................................. 20
       9.1     Common Interest Privilege Applies....................................................... 20
       9.2     Information Subject to Privilege Protection .......................................... 20

9.3     Information Subject to Work Product Protection ...................................... 20

9.4     No Obligation to Provide Privileged Information .................................. 21

10.     Indemnification of the Capital Providers ................................................ 21

11.     Exculpation; Reinstatement .................................................................... 21

12.     Remedy Events ......................................................................................... 22

12.1    Failure to Pay or Deliver ......................................................... 22

12.2    Breach or Repudiation ............................................................. 23

12.3    Misrepresentation ..................................................................... 23

12.4    Bankruptcy ................................................................................ 23

12.5    Reorganization Without Assumption ...................................... 23

13.     Remedies .................................................................................................. 24

13.1    Available Remedies Generally ................................................ 24

13.2    Remedies Cumulative ............................................................... 24

13.3    Cure Periods .............................................................................. 24

14.     Enforcement of Claim Resolution .......................................................... 25

15.     Termination by the Counterparty ............................................................ 25

16.     Limitations on Transfer, Successors and Assigns; Third Party
        Beneficiaries ............................................................................................ 25

17.     Tax Withholding ...................................................................................... 26

18.     Anti-Corruption; Data Protection ........................................................... 26

19.     Notices ..................................................................................................... 28

19.1    Effectiveness of Notices .......................................................... 28

19.2    Change of Details ..................................................................... 28

20.     Amendments ............................................................................................. 28

21.     Entire Agreement ..................................................................................... 28

22.     Counterparts ............................................................................................. 29

23.     Survival of Obligations ........................................................................... 29

24.     No Waiver ................................................................................................. 29

25.     Severability .............................................................................................. 29

26.     Expenses ................................................................................................... 29

27.     Relationship of Parties ............................................................................ 30

28.     Governing Law ......................................................................................... 30

29.    Dispute Resolution ............................................................................... 30

30.    Administrative and Collateral Agent ................................................... 33

31.    Rules of Construction .......................................................................... 34

SECOND AMENDED AND RESTATED CAPITAL PROVISION AGREEMENT, dated as of December 22, 2020 ("*Agreement*"), between SYSCO CORPORATION, an entity organized or formed under the laws of the jurisdiction identified in Annex I (the "*Counterparty*"), on the one hand, and each of ROSLINDALE LLC, a limited liability company formed under the laws of the State of Delaware ("*Capital Provider No. 1*"), POSEN INVESTMENTS LP, a limited partnership formed under the laws of the State of Delaware ("*Capital Provider No. 2*"), and KENOSHA INVESTMENTS LP, a limited partnership formed under the laws of the State of Delaware ("*Capital Provider No. 3*", Capital Provider Nos. 1, 2 and 3, severally but not jointly, each a "*Capital Provider*" and collectively, the "*Capital Providers*"), on the other hand.

WHEREAS, the Counterparty, before interacting with the Capital Providers in regard to the matters described herein and without any influence from the Capital Providers, decided to pursue the Claims, as defined in Exhibit A and identified on Annex II to this Agreement;

WHEREAS, the Counterparty has consulted with and sought advice from an Affiliate of the Capital Providers about the Counterparty's ability to obtain external capital based on the potential future value of the Claims;

WHEREAS, the Counterparty has provided or may provide confidential materials protected by the attorney-client privilege and/or the attorney work product doctrine, or other existing law protecting such materials from disclosure, to the Capital Providers and their Affiliates, subject to a non-disclosure and common interest agreement and in reliance on the common interest privilege, the work product doctrine, and other existing law protecting such materials from disclosure;

WHEREAS, the Capital Providers or their Affiliates have conducted research and analysis and communicated views and opinions both internally and to the Counterparty, all in reliance on that same common interest privilege, work product doctrine, and other existing law protecting such research, analysis and communications from disclosure;

WHEREAS, the Capital Providers and the Counterparty entered into that certain Capital Provision Agreement, dated as of October 15, 2019 (the "*Original Agreement*"), to provide for financing in connection with the Counterparty's legal claims relating to its purchases of broiler chickens (collectively, as more specifically described on Annex II, the "*Chickens Claim*");

WHEREAS, the Capital Providers and the Counterparty revised the Original Agreement by entering into that certain Amended and Restated Capital Provision Agreement, dated as of June 9, 2020 (the "*First Amended Agreement*"), to provide for additional financing in connection with the Counterparty's legal claims relating to its purchases of pork products (collectively, as more specifically described on Annex II, the "*Pork Claim*");

WHEREAS, the Capital Providers and the Counterparty now wish to expand their financing arrangement to include legal claims of the Counterparty relating to its purchases of beef products, ███████, and ████████████████ (collectively, as each set of claims is more specifically described on Annex II, the "***Beef Claim***", "████ ██" and "█████████", respectively);

WHEREAS, the parties wish to amend and restate the First Amended Agreement to accomplish the foregoing;

WHEREAS, the Capital Providers are each passive providers of external capital and have not become owners of, partners in, or parties to the claims or any part thereof or acquired any rights as to their control or resolution; consequently, while the Capital Providers will receive certain information with respect to the Claims and consult with the Counterparty thereon, the Counterparty remains in full control of the assertion and resolution of the claims; and

WHEREAS, the parties are sophisticated and are entering into this Agreement freely and entirely of their own volition following independent legal advice from experienced counsel, and do not believe that this Agreement or the transactions it contemplates are inconsistent with any relevant law or public policy.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## 1.   DEFINITIONS

Certain capitalized terms used herein have the meanings assigned thereto in Exhibit A. Capitalized terms used but not otherwise defined in Exhibit A have the respective meanings assigned to such terms elsewhere in this Agreement.

## 2.   CAPITAL PROVISION OBLIGATIONS AND CAPITAL PROVIDERS' ENTITLEMENT

### 2.1   Capital Amounts

The Capital Providers have provided and shall provide capital to the Counterparty as set forth below.

(a)   Capital Amounts:

(i)   *Chickens Claim.*  Pursuant to the Original Agreement, the Capital Providers provided to the Counterparty ████████████████ ██████████ in respect of the Chickens Claim on October 15, 2019.

(ii)   *Pork Claim*.  Pursuant to the First Amended Agreement, the Capital Providers provided to the Counterparty ████████████

 in respect of the Pork Claim on June 12, 2020.

(iii)  *New Claims*.  Pursuant to this Agreement, the Capital Providers shall provide to the Counterparty up to ████████████████████ in respect of the New Claims, as follows:

(A)  ████████████ (the "***Initial New Investment Amount***") within 15 Business Days of the execution and delivery of this Agreement (the "***Initial New Investment Payment Date***"), and

(B)  a maximum of ██████████, in periodic installments (each, an "***Additional Payment***") of ██████████ each, in accordance with clause (iv) of this Section 2.1(a), to be used solely for the payment of reasonable Claim Costs (as defined in Section 5.3(b)) incurred by the Counterparty in connection with the Claims other than the Chickens Claim.

(iv)  *Manner of Provision of Additional Payments*.  Each Additional Payment shall be made within 15 Business Days of the Capital Providers' receipt of a written request from the Counterparty stating that the remaining balance of previously provided Additional Payments is less than ██████ (provided that the first such request shall require no such statement). The Counterparty shall hold all Additional Payments in a segregated account dedicated to paying fees and expenses of the Claims (other than the Chickens Claim).

(b)  <u>Allocation of Funding</u>.  All Capital Amounts shall be provided by the Capital Providers in accordance with the following allocation:

(i)  Capital Provider No. 1: ██████
(ii)  Capital Provider No. 2: ██████
(iii)  Capital Provider No. 3: ██████

(c)  <u>Transaction Costs</u>.  To cover their closing and other costs, the Capital Providers retained ██████ of the Capital Amounts provided under the Original Agreement and ██████ of the Capital Amounts provided under the First Amended Agreement. The Capital Providers shall retain an additional ██████ from the Initial New Investment Amount to cover their closing and other costs in connection with this Agreement. All such amounts shall be deemed included in the Capital Amounts for all purposes under this Agreement.

## 2.2  Capital Providers' Entitlement

In consideration of their agreement to provide the Capital Amounts, the Capital Providers shall be entitled to receive the amounts set forth below.

(a)  <u>Generally</u>.

    (i)  *Amount of Capital Providers' Entitlement*.  The "***Capital Providers' Entitlement***" is equal to the sum of the following:



    (ii)

    (iii)

(b)  <u>Chickens Waterfall</u>. All Proceeds of the Chickens Claim ("***Chickens Proceeds***") shall be distributed as follows:





(c)    <u>Pork Waterfall</u>.  All Proceeds of the Pork Claim ("***Pork Proceeds***") shall be distributed as follows:





(d)   New Claims Waterfall.  All Proceeds of the Beef Claim, the ▮▮▮▮▮▮▮, and the ▮▮▮▮▮▮▮ ("*New Claim Proceeds*") shall be distributed as follows:

(e)   Hypothetical Illustration.  Annex III sets forth certain hypothetical scenarios, for illustration purposes only, demonstrating the application of the waterfalls set forth in clauses (b), (c), and (d) of this Section 2.2.

(f)   Allocation of Entitlement Among Capital Providers.  Capital Provider No. 1, Capital Provider No. 2, and Capital Provider No. 3 shall each be entitled to a pro rata portion of the Capital Providers' Entitlement based on the respective Capital Amounts provided by each of them.

**3.** **PAYMENT OBLIGATIONS OF THE COUNTERPARTY**

**3.1** **Payments**

(a) *Non-Recourse Agreement.* The Capital Amounts are provided to the Counterparty on a non-recourse basis, and the Capital Providers' Entitlement is exclusively derived from, computed on the basis of, and paid from Proceeds. If there are no Proceeds, the Counterparty shall not have any obligation to pay the Capital Providers' Entitlement (including any repayment of Capital Amounts provided).

(b) *Notice.* If at any time Proceeds arise, the Counterparty shall immediately notify the Capital Providers of the amount of such Proceeds and the Claim to which such Proceeds relate.

(c) *Due Date for Payment of Entitlement.* Except as otherwise set forth in Section 3.2(a)(ii), within three (3) Business Days of the Counterparty's (or the Payment Agent's) receipt of any Proceeds, the Counterparty (or the Payment Agent) shall pay such Proceeds to the Capital Providers in accordance with Section 2.2 until the Capital Providers' Entitlement has been paid in full. Such payment obligation shall be absolute and unconditional and shall not under any circumstances (including a dispute about the payment) be delayed, suspended, or avoided. The only basis for not making such payment directly to the Capital Providers in accordance with the timeframe set forth in this clause (c) shall be pursuant to Section 29(c) or 3.2(a)(ii).

(d) *Circumstances of All Payment Obligations.* The Counterparty shall be obligated to make a payment to the Capital Providers hereunder only upon (i) the receipt of Proceeds, (ii) an award of Proceeds that, due to a set-off for counterclaims or any other reason, does not result in a receivable from the applicable Adverse Party but is a positive amount pursuant to clause (v) of the definition of "Proceeds" herein (also deemed a "receipt" by the Counterparty of Proceeds hereunder), or (iii) a payment obligation having arisen under Section 4.2, 10, 11(c), 13 or 25(b).

**3.2** **Proceeds to Payment Agent, etc.**

(a) *Payment and Delivery of Proceeds.*

  (i) Prior to any payment or delivery of Proceeds, if such Proceeds shall be delivered in cash or by check or other instrument, then the Counterparty shall direct the payor to pay or deliver such Proceeds not to the Counterparty but rather directly to the Payment Agent (with proper endorsements if by check or other instrument).

  (ii) If all or a portion of Proceeds consist of property other than cash, then the Capital Providers shall be entitled to receive, at their option, either (A) an immediate payment in cash of the full portion of the Capital Providers' Entitlement due at the time such Proceeds are received, calculated based on

the present value of any non-cash Proceeds or (B) an undivided interest in any such non-cash Proceeds in the amount of the full portion of the Capital Providers' Entitlement due at the time such Proceeds are received, whereupon the Counterparty shall (A) diligently take any and all such actions as are necessary to receive and monetize such property in a commercially reasonable manner at prevailing market rates, that has been approved by the Capital Providers in their sole discretion, and (B) cause the prompt payment of the applicable portion of the Capital Providers' Entitlement from the cash realized from such monetization in accordance with this Agreement.

(b)     *Proceeds Held in Trust, etc.*  If, notwithstanding Section 3.2(a), any Proceeds are instead received by the Counterparty or a third party other than the Payment Agent on the Counterparty's behalf, the Counterparty shall, or shall direct such third party to, (i) hold such Proceeds in trust for the benefit of the Capital Providers consistent with Section 2.2; (ii) segregate such Proceeds from all other funds and property; and (iii) forthwith pay or deliver such Proceeds to the Payment Agent in accordance with clauses (i) and (ii) of Section 3.2(a).

## 4.    PAYMENTS GENERALLY

### 4.1    Place and Account for Payment

Each payment to a party required under this Agreement shall be made (<u>a</u>) to the payment account for such party (or the Payment Agent, as the case may be) specified on <u>Annex II</u> or in the Escrow Agreement, as applicable; (<u>b</u>) in the currency specified in Section 2; (<u>c</u>) on the due date for value on that date in the place where such account is located; (<u>d</u>) unless otherwise agreed in writing, by wire transfer of freely transferable and immediately available funds; and (<u>e</u>) otherwise in the manner customary for payments in the specified currency.

### 4.2    Interest on Overdue Amounts

If the Counterparty defaults in the performance of any payment obligation under this Agreement, the Counterparty shall on demand pay interest (before as well as after judgment, if applicable) at the Default Rate on the overdue amount to the Capital Providers for the period from (and including) the original due date for payment to (but excluding) the date of actual payment.

### 4.3    Waiver of Right of Set-Off

Each amount that the Counterparty is obligated to pay under this Agreement shall be paid without set-off, deduction, or counterclaim.

5. **COVENANTS**

**5.1 Covenants of Each Party**

The Counterparty, on the one hand, and each Capital Provider, on the other hand, agree that, so long as such party has or may have any obligation to the other under this Agreement or any other Transaction Document:

(a) it shall preserve and maintain its corporate existence, except to the extent that the failure to do so would not have a Material Adverse Effect;

(b) it shall use all reasonable efforts to maintain in full force and effect all consents, approvals, actions, authorizations, exceptions, notices, filings, and registrations of or with any Governmental Authority that are required to be obtained by it with respect to this Agreement or any other Transaction Document and shall use all reasonable efforts to obtain any that may become necessary in the future; and

(c) it shall comply with all applicable laws and orders of any Governmental Authority to which it may be subject if failure to so comply could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

**5.2 Covenants of the Capital Providers**

With respect to the Claims, each Capital Provider agrees with the Counterparty that:

(a) such Capital Provider and its respective Affiliates are not, and shall not by virtue of entering into this Agreement or any other Transaction Document become, a party to the Claims;

(b) without limiting the obligations of the Counterparty under Section 5.3(b) or the rights granted to the Capital Providers under Section 13.1(b), such Capital Provider shall not be entitled to control or direct the conduct of the Claims, or to require settlement thereof;

(c) the Counterparty shall have day-to-day and overall control over the conduct of, and responsibility for, the Claims and neither the Capital Providers nor their respective Affiliates shall exercise, or seek to exercise, any such control over the Claims;

(d) such Capital Provider and its respective Affiliates shall do nothing that compromises the professional duties of any of the Nominated Lawyers;

(e) such Capital Provider and its respective Affiliates shall act in good faith in all of its dealings with the Counterparty and shall comply diligently with this Agreement.

**5.3    Covenants of the Counterparty**

The Counterparty agrees with the Capital Providers that, so long as the Counterparty has or may have any obligation under this Agreement or any other Transaction Document:

(a)    subject to Section 17 of this Agreement, the Capital Amounts shall be used solely for the purchase of merchandise and services; and without limiting the generality of the foregoing, Additional Amounts shall be used as specified in Section 2.1(a)(iii)(B);

(b)    with respect to each Claim, the Counterparty:

    (i)    shall use all commercially reasonable efforts to: (<u>A</u>) pursue such Claim and all of the Counterparty's legal and equitable rights arising in connection with such Claim; (<u>B</u>) bring about the reasonable monetization of such Claim through a Claim Resolution; and (<u>C</u>) collect and enforce any settlement, final judgment or award;

    (ii)    shall, at its own expense (taking into account the Capital Amounts) and in a timely manner: (<u>A</u>) retain and remunerate the applicable Nominated Lawyers to prosecute such Claim vigorously in a commercially reasonable manner in order to bring about the reasonable monetization of such Claim through a Claim Resolution; (<u>B</u>) subject to the Engagement Agreement, cooperate with such Nominated Lawyers in all matters pertaining to such Claim (including providing documents and information, appearing and causing others within the Counterparty's power to appear for examinations and hearings), including promptly authorizing and discharging all fees, expenses, and other payment obligations necessarily or reasonably recommended or incurred in association with pursuing such Claim to a Claim Resolution; (<u>C</u>) take all actions necessary or appropriate to collect and enforce any settlement, final judgment or award (the costs and expenses of doing all of the foregoing described in clauses (A) – (C), "***Claim Costs***"); and (<u>D</u>) actively manage the incurrence of Claim Costs with the goal of achieving a Claim Resolution, and the collection and enforcement thereof, efficiently and cost-effectively;

    (iii)    subject to Section 9.4, shall itself, or cause the applicable Nominated Lawyers to, within the five (5) Business Days preceding the end of each calendar month, (<u>A</u>) provide the Capital Providers with a report containing the information described on <u>Exhibit B</u> (each, a "***Monthly Report***") and (<u>B</u>) with respect to items (1) and (2) thereon, provide a copy to the Nominated Lawyers unless such items were prepared by the Nominated Lawyers;

    (iv)    subject to Section 9.4, shall itself, and cause the applicable Nominated Lawyers to, (<u>A</u>) keep the Capital Providers fully and promptly apprised of each material development in relation to such Claim and (<u>B</u>) respond fully

and promptly to any request by the Capital Providers, their Affiliates, or Representatives for any information regarding such Claim;

(v) shall provide immediate notice by email to the Capital Providers of any settlement offer made by the Adverse Party and shall in good faith give the Capital Providers an opportunity to discuss such settlement offer prior to the Counterparty accepting or rejecting it, provided however, that the Capital Providers (and their respective Affiliates) shall have no right to exercise control over the independent professional judgment of the Counterparty and its Nominated Lawyers and shall not seek to coerce the Counterparty and its Nominated Lawyers with respect to settlement;

(vi) shall provide immediate notice by email to the Capital Providers of a Claim Resolution or any receipt of any Proceeds, or of any event that is expected to generate a Claim Resolution or the receipt of any Proceeds;

(vii) shall not do anything to prejudice any benefits, rights or causes of action sought or advanced in connection with, or the general pursuit of, such Claim;

(viii) other than with the prior written consent of the Capital Providers, shall not dispose of, transfer, encumber or assign, nor otherwise create, incur, assume, or permit to exist any Adverse Claim with respect to, all or any portion of such Claim (or any interest therein) or any Proceeds thereof (or any right to such Proceeds);

(ix) shall not set off or agree to set off any amounts against such Claim;

(x) shall not, prior to a Claim Resolution with respect to all Claims, agree to settle or otherwise resolve any separate action, claim, suit, or arbitration brought by or against any Adverse Party or any of the Adverse Party's Affiliates in a manner that would impact the Counterparty's performance of its covenants in clauses (i) or (ii) of this Section 5.3(b), a potential Claim Resolution of one or more Claims, and/or the Capital Providers' Entitlement; and

(xi) shall at its sole cost maintain in place the effective, enforceable Escrow Agreement.

(c) Within two (2) Business Days after the Counterparty knows or has reason to believe that any of the following has occurred or is likely to occur, the Counterparty shall deliver to the Capital Providers a notice describing the same in reasonable detail and, together with such notice or as soon thereafter as possible, a description of any action that the Counterparty has taken or proposes to take with respect thereto:

(i) any Potential Remedy Event or Remedy Event;

(ii) any action, suit, or proceeding of the kind described in Section 6.3(b) has been or shall be brought; or

(iii) a material failure by the Counterparty, or any Nominated Lawyers on the Counterparty's behalf, to pay when due any undisputed amounts owing to any litigation services providers (e.g., experts) retained in connection with a Claim (after giving effect to any applicable notice requirement or grace period).

(d)   The Counterparty shall not, without the Capital Providers' prior written consent (which consent shall not unreasonably be withheld), directly or indirectly, permit any amendments to the economic terms or scope of representation set forth in any Engagement Agreement.

(e)   If the Nominated Lawyers in respect of any Claim cease to act as the Counterparty's legal counsel for such Claim for any reason (including the Counterparty's decision to replace such Nominated Lawyers, which decision the Counterparty is free to make at any time), or the Counterparty needs to retain new legal counsel for a Claim outside the scope of the Engagement Agreement(s) with such Nominated Lawyers, then the Counterparty shall, subject to the Capital Providers' prior written consent (with respect to which the Capital Providers shall be free to apply their own experience and subjective judgment, but which consent shall not unreasonably be withheld), appoint successor attorneys or new attorneys to act as its counsel who have a similar level of quality and reputation as such Nominated Lawyers.  The Counterparty shall not grant successor attorneys or any new attorneys economic compensation associated with a Claim that, standing alone or when considered together with any economic compensation to which current Nominated Lawyers would remain entitled, is superior to the compensation set forth in the Engagement Agreement(s) with such current Nominated Lawyers without the Capital Providers' prior written consent, which shall not be unreasonably withheld or delayed.  The Counterparty will promptly deliver to the Capital Providers a copy of any Engagement Agreement with any successor or new attorney.  If such successor attorney or any new attorney, as applicable, are appointed, all references to "Nominated Lawyers" in respect of the applicable Claim will be deemed to refer to and include such successor, replacement or additional counsel.

(f)   The Counterparty shall retain Nominated Lawyers for each New Claim on an hourly fee basis unless the Capital Providers have given their consent in writing to an alternative fee arrangement.  Prior to appointing Nominated Lawyers for each of the New Claims, the Counterparty shall consult with the Capital Providers in good faith and obtain the Capital Providers' prior written consent (with respect to which the Capital Providers shall be free to apply their own experience and subjective judgment, but which consent shall not unreasonably be withheld). Upon retaining counsel for such Claims, (i) the Counterparty will promptly deliver to the Capital Providers a copy of the applicable Engagement Agreement and (ii) all references to "Nominated Lawyers" hereunder will be deemed to refer to such

counsel with respect to the applicable Claim.

(g) 

(h) The Counterparty shall ensure that, at all times, all payment obligations of the Counterparty under this Agreement shall rank in right of payment at least *pari passu* with all unsecured, unsubordinated indebtedness of the Counterparty.

(i) The Counterparty has, and reasonably expects to continue to have, sufficient assets available to it with which to discharge such Claim Costs as may be necessary to comply with its covenants under this Agreement, including those set forth in Section 5.3(b)(ii), in the event the Additional Amounts are exhausted.

## 6. REPRESENTATIONS AND WARRANTIES

### 6.1 Representations and Warranties of Each Party

On each Representation Date, the Counterparty, on the one hand, and each Capital Provider, on the other hand, represents and warrants to the other as follows:

(a) It (i) is duly organized or formed and validly existing under the laws of the jurisdiction of its organization or formation and, if relevant under such laws, in good standing, (ii) is qualified to do business in each jurisdiction in which the nature of its business so requires, and (iii) has not filed any certificates of dissolution or liquidation, or any certificates of domestication, transfer or continuance in any jurisdiction.

(b) It has the power to execute this Agreement and the other Transaction Documents to which it is a party, to deliver this Agreement and the other Transaction Documents it is required by this Agreement to deliver, and to perform its obligations under this Agreement and the other Transaction Documents; and, to the extent necessary, it has taken all necessary action to authorize such execution, delivery and performance.

(c) Such execution, delivery and performance do not and shall not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other Governmental Authority applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its

assets (including, with respect to the Counterparty, the Engagement Agreement(s) and any provisions therein).

(d) All consents, approvals, actions, authorizations, exceptions, notices, filings, and registrations that are required to have been obtained by it with respect to this Agreement or any other Transaction Document have been obtained and are in full force and effect, and all conditions of any such consents, approvals, actions, authorizations, exceptions, notices, filings and registrations have been complied with.

(e) This Agreement and the other Transaction Documents constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganization or similar laws and to general equitable principles).

(f) It is acting for its own account, and it has made its own independent decisions to enter into this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, and as to whether this Agreement and the other Transaction Documents and such transactions are appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.

(g) No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Agreement or any other Transaction Document, or any of the transactions contemplated hereby or thereby.

(h) No party has given any investment advice or rendered any opinion to the other party as to whether entering into this Agreement in exchange for the rights received is prudent.

(i) It is capable of assessing the merits of and understanding (on its own behalf or through independent professional legal advice), and understands and accepts, the terms, conditions and risks of this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby.

(j) The Parties' representations to one another shall remain true, correct, and complete at all times during the term of this Agreement.

**6.2     Representations and Warranties of the Capital Providers**

(a) On the Representation Date coinciding with the date of this Agreement, the Capital Providers each represent and warrant to the Counterparty, on behalf of themselves and their Affiliates, as follows:

    (i)   They have received sufficient information concerning the Claims to make

an informed decision regarding the transactions contemplated with respect to the Claims under this Agreement, and have had the opportunity to access, and have accessed, due diligence information and to make related inquiries regarding the Claims. On the basis of such information and diligence as they have deemed appropriate in their independent judgment, they have independently and without reliance on the Counterparty, either for information (other than the covenants, representations, and warranties contained herein) or investment advice, made their own analysis and decision to enter into this Agreement.

(ii) They are sophisticated investors and have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of entering into this Agreement; (i) bearing the risks of an investment in the Claims; (ii) making an informed investment decision regarding their investment in the Claims; and (iii) analyzing and protecting their own interests in deciding whether to enter into the transactions contemplated under this Agreement.

(b) On each Representation Date (except as otherwise specifically provided below), the Capital Providers each represent and warrant to the Counterparty, on behalf of themselves and their Affiliates, as follows:

(i) They have been represented by such legal and tax counsel and any other advisors selected by them as they found necessary to consult concerning the transactions contemplated under this Agreement and to review and evaluate the tax, economic, and other ramifications of same.

(ii) They have been advised and understand that their participation in the transactions contemplated under this Agreement involve a high degree of risk. They have the ability to bear the economic risk of entering into this Agreement, and at the present time and for an indefinite period of time can afford a complete loss of their investment in the Claims.

## 6.3    Representations and Warranties of the Counterparty

On each Representation Date (except as otherwise specifically provided below), the Counterparty represents and warrants to the Capital Providers as follows:

(a) No Remedy Event or Potential Remedy Event has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any other Transaction Document.

(b) No litigation or other proceedings before any court or other Governmental Authority, official, tribunal, or arbitrator that could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect, have been

commenced by or against the Counterparty or, to the best of the Counterparty's knowledge, are threatened against, the Counterparty, any other Person.

(c) It is not insolvent, is not in the zone of insolvency, is able to pay its debts when due, and has no insolvency proceedings threatened or outstanding against it.

(d) It is not materially overdue in the filing of any Tax return nor overdue in the payment of any material amount in respect of Tax.

(e) As of the date of this Agreement, it has entered into the Engagement Agreements in respect of each Claim as described on <u>Annex II</u>. True and complete copies of all Engagement Agreements have been provided to the Capital Providers.

(f) With respect to each Claim:

   (i) it is the sole legal and beneficial owner of, has good title to, and possesses sole control of, such Claim, free and clear of any Adverse Claim;

   (ii) (A) as of the date of this Agreement, it has not received any payments in connection with such Claim, and (B) any payments in connection with such Claim received after the date of this Agreement have been disclosed to the Capital Providers in accordance herewith;

   (iii) it has full power and authority to bring such Claim and has obtained all necessary corporate and other authorizations to do so;

   (iv) it has not disposed of, transferred, encumbered, or assigned all or any portion of such Claim (or any interest therein) or any Proceeds thereof, whether by way of security, subrogation, assignment to an insurer, or otherwise;

   (v) it has not set off or agreed to set off any amounts against such Claim, and there exist no rights of set-off or similar rights against the Counterparty that could permit any set-off of or counterclaim against such Claim;

   (vi) (<u>A</u>) it has not taken any steps or executed any documents which could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect; (<u>B</u>) it has disclosed to the Capital Providers in accordance with its reporting obligations hereunder any instances in which anyone else has done or purported to do so; and (<u>C</u>) it has disclosed to the Capital Providers in accordance with its reporting obligations hereunder any asserted or unasserted claim, lien, or judgment against it which could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect; and

   (vii) subject to Section 9, it has disclosed to the Capital Providers all information (in any and all media) in the knowledge, possession, or control of the

Counterparty or any of its Representatives that is or is likely to be material to the Capital Providers' assessment of such Claim (including the enforcement and collection of any related settlement, award, or judgment); any and all such information has been provided to the Capital Providers in its true, complete, and correct form and is, to the knowledge of the Counterparty, accurate; the Counterparty believes (and does not have, and has not been informed by any of its Representatives of, any belief to the contrary) that such Claim is meritorious; and the Counterparty has not been advised by the applicable Nominated Lawyers or any other legal counsel or litigation funder that the Claim is unlikely to succeed.

(g)    It is not relying on any communication (written or oral) of any Capital Provider or any of their respective Affiliates as legal advice or as a recommendation to enter into this Agreement or any other Transaction Document, or any of the transactions contemplated hereby or thereby, it being understood that information and explanations related to the terms and conditions of this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, shall not be considered legal advice or as such a recommendation.

(h)    Based on the Counterparty's review of its corporate governance documents and policies, and after consultation with its legal counsel, the Counterparty has determined that the execution, delivery and performance of this Agreement and the Transaction Documents is authorized without any specific corporate action or authorization.

## 7.    MATERIAL NON-PUBLIC INFORMATION

The Counterparty acknowledges that it may from time to time be in possession of material non-public information relating to the Capital Providers and their Affiliates, their business, prospects, financial condition, results of operations, and strategy, including information about each Claim and its progress and prospects; and the Counterparty shall not, and shall direct its Representatives not to, disclose such information or trade (or encourage others to trade) securities of the Capital Providers or their Affiliates, to the extent publicly traded, on the basis of such material non-public information.

## 8.    CONFIDENTIALITY

## 8.1    Exclusive Ownership of Information by Disclosing Party

Each recipient of Confidential Information hereunder (the "***Recipient***") agrees that all Confidential Information provided to it is and shall remain at all times the exclusive property of and owned by the other party (the "***Disclosing Party***"), or any of its Affiliates or contract counterparties, as the case may be; and that the Recipient's use or awareness of such Confidential Information shall create no rights, at law or in equity, in the Recipient in or to such information, or any aspect or embodiment thereof. Neither the execution of this Agreement or any other Transaction Document, nor the furnishing of any Confidential

Information hereunder, shall be construed as granting, whether expressly or by implication, estoppel or otherwise, any license to distribute or title to any patent, trademark, copyright, service mark, business and trade secret or other proprietary right, title or interest in or to such Confidential Information, or to use such Confidential Information for any purpose other than as specified in this Agreement or any other Transaction Document, or to constitute a waiver of any attorney-client privilege or work product protection.

**8.2    Non-Disclosure of Information**

(a)    Other than pursuant to Section 8.4, the Recipient shall not for any reason (i) disclose, reveal, report, publish, transfer or make available, directly or indirectly, to any Person other than its Representatives authorized pursuant to Section 8.3, nor use for any purpose other than the fulfillment or enforcement of its obligations hereunder (collectively, "***Disclose***"), any Confidential Information provided to it by the Disclosing Party until the later of (A) the seventh (7th) anniversary of the date of this Agreement or (B) the second (2nd) anniversary of a Claim Resolution of all Claims to which such Confidential Information relates; nor (ii) in perpetuity Disclose any Protected Material provided to it by the Disclosing Party.

(b)    To the extent the Counterparty provides the Capital Providers or any of their Affiliates with any material that is subject to the Agreed Confidentiality Order, the Capital Providers and their Affiliates agree to abide by the terms of such Agreed Confidentiality Order. The decision to provide the Capital Providers or any of their Affiliates with material that is subject to the Agreed Confidentiality Order shall be at the sole discretion of the Counterparty and the applicable Nominated Lawyers unless and until the Capital Providers or their designated agent(s) execute Attachment A to the Agreed Confidentiality Order pursuant to paragraph 6(b)(6) thereof, which they shall be entitled to do at their sole discretion.

(c)    Moreover, notwithstanding any other provision of this Agreement, at no time shall the Recipient knowingly disclose any Confidential Information or Protected Material to any Adverse Party or any other adversary, potential adversary, or conduit to an adversary of the Counterparty, and the Recipient shall treat such materials in a manner that does not substantially increase the likelihood that any of the foregoing shall come into possession of it.

(d)    No press release or other announcement concerning the existence of this Agreement, the parties to this Agreement, or the funding provided under this Agreement shall be made by any party without the prior written consent of the other party; provided however, that (i) the Capital Providers shall have the limited right to, at any time, describe the general nature of the funding provided under this Agreement on their or their Affiliates' websites or in filings and disclosures required by law, so long as such description does not identify the Counterparty or make express reference to a Claim; and (ii) the Counterparty shall be free, at any time, to disclose such information regarding the nature, terms and existence of this Agreement and the other Transaction Documents as the Counterparty, in its sole

discretion, determines it is required to disclose under the federal securities laws of the United States, provided that the Counterparty has provided the Capital Providers or its Affiliates a copy of such disclosure sufficiently in advance of the time such disclosure will be included in any report to be filed or furnished with the Securities and Exchange Commission such that the Capital Providers may consult with the Counterparty with respect thereto prior to the filing or furnishing of such report.

**8.3    Confidentiality Procedures**

The Recipient shall ensure that the Confidential Information it receives is not divulged or disclosed to any Person except its Representatives who have a "need to know" such information. The Recipient shall procure its Representatives' compliance with this Section 8 and shall be responsible for its or its Representatives' failure to so comply.

**8.4    Judicial and Official Disclosure Requests**

(a)    If a Recipient receives a request, including in any judicial, arbitral, or administrative proceeding or by any Governmental Authority, to disclose any Confidential Information, then such Recipient shall, before complying with such request if legally permitted, promptly provide written notice of such request, including a copy of such request, to the Disclosing Party, sufficiently in advance so that the Disclosing Party may contest the requested disclosure.  If, upon such notice, the Disclosing Party elects to contest the requested disclosure (all such contests being at the Disclosing Party's expense and under its control; <u>provided</u> that the Disclosing Party shall consult with the Recipient about such contests), to the extent legally permitted the Recipient shall not disclose any Confidential Information until such time as a final, non-appealable, or non-stayed order has been entered compelling such disclosure, and the Recipient shall cooperate with the Disclosing Party in its contest.

(b)    If any such request for the disclosure of Confidential Information seeks disclosure of this Agreement, any other Transaction Document, any terms hereof or thereof, the identities of the Capital Providers or the Counterparty, or any communications between the Counterparty and the Capital Providers, then the Recipient shall (i) notify the other parties immediately; (ii) object to such disclosure on all applicable bases, including work product doctrine, common interest privilege, and relevance, as applicable; and (iii) cooperate in good faith with the other parties regarding the management of such objections.

(c)    Should the Disclosing Party not contest the requested disclosure, the Recipient shall not have any obligation to do so; the Recipient may, however, contest the requested disclosure even if the Disclosing Party elects not to do so.

(d)    Notwithstanding anything herein to the contrary, the obligations of the Recipient in connection with requests for the disclosure of Confidential Information described

in this Section 8.4 shall not apply with respect to requests made by a regulatory or self-regulatory body having jurisdiction over the Recipient when such disclosures are required by law as a matter of general or routine examinations in which no specific request is made for Confidential Information relating to the Disclosing Party or the Claim(s).

## 9. LEGAL PRIVILEGE

### 9.1 Common Interest Privilege Applies

The parties agree that the Counterparty, the Capital Providers, and the Capital Providers' Affiliates have a "common legal interest" in each Claim and its successful prosecution, this Agreement, the other Transaction Documents, and any discussion, evaluation and negotiation and other communications and exchanges of information relating thereto. The parties further agree that in providing to the Capital Providers or the Capital Providers' Affiliates any documents or information about any Claim, the Counterparty does not intend to waive any applicable Privilege or protection that may attach to the documents or information.

### 9.2 Information Subject to Privilege Protection

Notwithstanding any contrary provision of this Agreement, the parties agree that any Protected Material shall at all times remain subject to all applicable Privileges, it being the express intent of the parties and their Affiliates to preserve intact to the fullest extent applicable, and not to waive, by virtue of this Agreement or otherwise, in whole or in part, any and all Privileges to which Protected Material, or any part of it, is, may be or may in the future become subject. It is the good faith belief of the Disclosing Party that Privileges, including the common interest privilege, attach to the Protected Material and disclosure of Protected Material is made in reliance on that good faith belief.

### 9.3 Information Subject to Work Product Protection

The parties agree that without limiting the foregoing, any materials prepared in anticipation of litigation by or for the Counterparty, the Capital Providers, any of their respective Affiliates, or any of their respective Representatives shall remain subject to work product protection. The Capital Providers and their Affiliates shall be considered "representatives" of the Counterparty given that the Counterparty requested assistance and advice from them regarding the plausibility of the Counterparty's obtaining external capital to finance its legal claims. Moreover, the parties agree that information shared between the Counterparty and the Capital Providers is shared pursuant to a common interest and non-disclosure agreement (as set forth herein), and the exchange of such information does not increase the risk of disclosure, inadvertent or otherwise, to any Adverse Party or any other adversary and does not lessen or waive the protection secured under work product doctrine. Disclosure of work product is made in reliance on that good faith belief.

### 9.4 No Obligation to Provide Privileged Information

Notwithstanding other provisions of this Agreement, the Counterparty is not obliged to provide to the Capital Providers any information that is subject to attorney-client privilege; provided that if the Counterparty withholds from the Capital Providers information otherwise required by this Agreement on the basis of attorney-client privilege, any other Privilege, or any similar doctrine of confidentiality, it shall provide prompt notice thereof to the Capital Providers.

### 10. INDEMNIFICATION OF THE CAPITAL PROVIDERS

(a)  The Counterparty agrees to indemnify, defend and hold each Capital Provider and its Representatives ("***Indemnitees***") free and harmless from and against any and all losses, costs, charges, damages, and expenses (including reasonable attorneys' fees and costs of experts and advisors) (collectively, "***Losses***") that may be imposed on, incurred by or asserted against any Indemnitee in any matter relating to any Transaction Document, Claim, or actual or prospective investigation, litigation or other proceeding relating to a Transaction Document or Claim; provided that (i) any Losses arising from the gross negligence or willful misconduct of a Capital Provider or any of its Representatives, as determined by a court of competent jurisdiction in a final non-appealable judgment or order, shall be excluded from the foregoing indemnification and (ii) if a Capital Provider suffers any loss of its investment due to insufficient Proceeds, such loss shall not constitute indemnified Losses hereunder unless (and only to the extent that) such insufficiency was caused by a material breach of this Agreement caused by the Counterparty.

(b)  Any amounts owed as a result of the indemnification obligations set forth in this Section 10 are independent of the Counterparty's obligation to pay the Capital Providers' Entitlement.  Any Indemnitee who receives notice of a claim for which it shall seek indemnification hereunder shall promptly notify the party from which the Indemnitee shall seek indemnification (the "***Indemnifying Party***") of such claim in writing.  The Indemnifying Party shall have the right to assume the defense of such action at its cost with counsel reasonably satisfactory to the Indemnitee, but shall not have the right to settle or compromise any claim or action without the written consent of the Indemnitee.  The Indemnitee shall have the right to participate in such defense with its own counsel at its cost.  Any failure by the Indemnitee to give prompt notice of a claim hereunder shall not relieve the Indemnifying Party of its indemnification obligation except to the extent the Indemnifying Party is actually prejudiced by such failure.

### 11. EXCULPATION; REINSTATEMENT

(a)  Other than its obligations to provide the Capital Amounts to the Counterparty, no Capital Provider shall have any obligation to fund any fees, expenses, or other sums in relation to any Claim, and all such fees, expenses, or other sums shall be the sole responsibility of the Counterparty.  Without limiting the generality of the foregoing,

no Capital Provider shall have any obligation to pay any sums awarded against, or penalties incurred by, the Counterparty, including any costs orders, awards, interest, damages, expenses, or penalties against the Counterparty, nor to fund any legal fees or any other costs whatsoever incurred as a result of defending any counterclaim brought against the Counterparty in relation to any Claim or defending any enforcement or other proceedings against the Counterparty.

(b)     The liability of each Capital Provider under this Agreement and the other Transaction Documents (and the transactions contemplated hereby and thereby) in relation to any Claim is equal to the aggregate of all Capital Amounts committed by such Capital Provider in relation to such Claim, except in the event of any fraud of such Capital Provider or reckless activity of such Capital Provider amounting to fraud. This limitation of liability is absolute and applies to liability for (without limitation) breach of contract, negligence and gross negligence, and for any damages that may constitute compensatory damages, lost profit, expenses, costs, losses or charges, or consequential, exemplary or punitive damages or otherwise. This limitation of liability extends to each Capital Provider and its Representatives.

(c)     To the extent any payment received by the Capital Providers, or obligation incurred by the Counterparty pursuant to any of the Transaction Documents, is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid in whole or in part by the Capital Providers or paid over to a trustee, receiver or any other entity, whether under any bankruptcy law, insolvency, fraudulent transfer law or otherwise (any such payment or obligation being hereinafter referred to as a "***Challenged Item***"), then the obligations of the Counterparty pursuant to this Agreement with respect to such Challenged Item shall (i) be fully reinstated and revived, as the case may be, notwithstanding such payment or incurrence, and (ii) to the extent of each such Challenged Item, remain effective and continue in full force and effect as if said Challenged Item had not occurred or been made. The Counterparty shall indemnify each Capital Provider on demand for all reasonable third party costs and expenses (including the reasonable fees and disbursements of outside counsel) incurred by such Capital Provider in connection with such rescission or revival, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer, or similar payment.

## 12.     REMEDY EVENTS

The occurrence at any time with respect to the Counterparty of any of the following events constitutes a "***Remedy Event***":

### 12.1     Failure to Pay or Deliver

The Counterparty fails to make, when and where due, any payment owing to a Capital Provider hereunder.

## 12.2    Breach or Repudiation

Other than the obligations referenced in Section 12.1, which is governed by such section, the Counterparty fails to comply with or perform any of its obligations in accordance with this Agreement or any other Transaction Document if (a) such failure, if remediable, is not remedied within (subject to Section 13.3) ten (10) Business Days after written notice thereof is given to the Counterparty and (b) (i) such failure could reasonably be expected to have a Material Adverse Effect; or (ii) the Counterparty or any of its Representatives disaffirms, disclaims, repudiates, or rejects in writing, in whole or in part, or challenges the validity of, this Agreement or any other Transaction Document.

## 12.3    Misrepresentation

A representation by the Counterparty in this Agreement or any other Transaction Document proves to have been incorrect or misleading in any material respect when made or deemed to have been made.

## 12.4    Bankruptcy

Any of the following occurs with respect to the Counterparty: (a) the voluntary or involuntary commencement of a case or proceeding by or against it under any applicable bankruptcy, insolvency or similar law affecting creditors' rights now or hereafter in effect, or any other procedure under any law of any jurisdiction having a similar or analogous nature or effect, and such case, proceeding or procedure is not dismissed or otherwise terminated within sixty (60) days of its commencement; or entry of a decree or order by a court of competent jurisdiction, appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or similar official having powers over it or all or a substantial part of its property; (b) the inability or failure generally, or admission in writing of its inability, to pay its debts as they become due; (c) dissolution (other than pursuant to a consolidation, amalgamation or merger); or (d) the adoption of any resolution or other authorization, or the taking of any action in furtherance of, or indicating its consent or intent to consent to, approve of, or acquiesce in, any of the foregoing by its board of directors (or similar governing body) or any committee thereof or by its equityholders entitled to vote on and authorize the same.

## 12.5    Reorganization Without Assumption

The Counterparty consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganizes, reincorporates, reconstitutes or divides into or as, another entity (or other entities) and as a direct or indirect result of such consolidation, amalgamation, merger, transfer, reorganization, reincorporation, reconstitution or division, either (a) no single resulting, surviving or transferee entity (a "Counterparty Successor") has assumed all the obligations of the Counterparty under this Agreement and/or the other Transaction Documents; or (b) the assets against which the Capital Amounts have been committed are no longer held by such a Counterparty Successor.

13.    **REMEDIES**

**13.1    Available Remedies Generally**

If at any time a Remedy Event has occurred with respect to one or more Claims, the Capital Providers shall be entitled to (except as otherwise provided in this Section 13) exercise one or more of the following remedies (in each case without thereby relieving the Counterparty of any of its obligations under Section 3):

(a)    with respect to those Claim(s) to which the Remedy Event relates, the Capital Providers may take any and all actions on behalf of the Counterparty that the Capital Providers may deem necessary or advisable in order to prosecute the Claim(s) to bring about the monetization thereof through a Claim Resolution and to collect and enforce any settlement, final judgment or award; and, in connection therewith, the Counterparty hereby (i) irrevocably appoints Capital Provider No. 1 as the Counterparty's attorney-in-fact, with full authority in the place and stead of the Counterparty and in the name of the Counterparty or otherwise, from time to time following the date such Remedy Event occurred, in Capital Provider No. 1's discretion, to take any such actions to the extent consistent with the Counterparty's interests in the Claim, including to settle or compromise the Claim or to appoint new Nominated Lawyers, and (ii) agrees to, and to cause its Affiliates and its and their Representatives to, cooperate fully with the Capital Providers and counsel in all matters pertaining to the Claim(s), including producing necessary documents, submitting to examination for the preparation of written statements and subscribing to the same under oath if required, consulting with counsel and its designees as they require for purposes of prosecuting such Claim(s) and enforcing any award, and appearing at any hearings in connection with such statements or such Claim(s) generally; and

(b)    subject to the provisions of Section 29, the Capital Providers may pursue all other legal and equitable remedies available to the Capital Providers under applicable law in connection with the enforcement of its rights under this Agreement and the other Transaction Documents.

**13.2    Remedies Cumulative**

Except as provided otherwise in this Agreement, the rights, powers, remedies and privileges provided in this Agreement and the other Transaction Documents are cumulative; may be exercised singularly, concurrently, or successively at the Capital Providers' option; and may be exercised or enforced without constituting a bar to the exercise or enforcement of any other such rights, powers, remedies and privileges.

**13.3    Cure Periods**

If the failure to cure a Remedy Event described in Section 12.2 within a period of time shorter than ten (10) Business Days would be reasonably likely to result in an adverse effect

on a Claim or the value or collectability thereof due to exigencies of the litigation or arbitration process, the Capital Providers may by notice to the Counterparty shorten the cure period to the extent necessary to avoid or minimize such likelihood.

## 14. ENFORCEMENT OF CLAIM RESOLUTION

If, for any reason other than the bankruptcy or liquidation of an Adverse Party, or the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or similar official having powers over it or all or a substantial part of an Adverse Party's property, by the date that is one-hundred-eighty (180) days after the date of any Claim Resolution, any portion of a judgment, award, or settlement payment owing to the Counterparty as a result thereof remains unsatisfied, the Capital Providers shall, at their option and upon notice to the Counterparty, be entitled to engage judgment enforcement professionals of their own choosing (including those affiliated with the Capital Providers) to pursue enforcement of the same. In the event the Capital Providers elect to do so, (a) they shall pay their designated judgment enforcement professionals their reasonable and customary fees and expenses, (b) any and all costs incurred by the Capital Providers in such regard shall constitute Capital Amounts in respect of the Claim to which such enforcement activities relate, and (c) in consideration of their provision of such Capital Amounts, the Capital Providers' Entitlement shall be increased by an amount equivalent to such additional Capital Amounts plus a rate of return on such additional Capital Amounts equal to the highest effective rate of return applicable to any Capital Amounts set forth in Section 2.

## 15. TERMINATION BY THE COUNTERPARTY

The Counterparty shall have the right, but not the obligation, to terminate the Counterparty's obligations under this Agreement upon ten (10) Business Days' written notice to the Capital Providers from and after the Capital Providers' failure to pay the full Initial New Investment Amount by the Initial New Investment Payment Date, provided that such failure is continuing at the end of the ten (10) Business-Day period. In the event of such termination by the Counterparty, this Agreement shall be deemed null and void, provided however that the First Amended Agreement shall remain in full force and effect. In the event the Capital Providers have made a partial payment of the Initial New Investment Amount (and/or any Additional Payment), the Counterparty shall return such partial payment to the applicable Capital Provider(s) before the Counterparty exercises its termination rights hereunder.

## 16. LIMITATIONS ON TRANSFER, SUCCESSORS AND ASSIGNS; THIRD PARTY BENEFICIARIES

(a)     Neither this Agreement nor any other Transaction Document, nor any right or obligation in or under this Agreement or any other Transaction Document, may be transferred (whether by way of security or otherwise) or delegated by the Counterparty without the prior written consent of the Capital Providers, except that upon written notice to the Capital Providers, the Counterparty may (without

prejudice to any other right or remedy of the Capital Providers under Section 12 or 13) make a transfer of all (but not less than all) of its rights and obligations under this Agreement and the other Transaction Documents pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity other than an Adverse Party or an Affiliate of an Adverse Party, provided that such transfer would not cause a Material Adverse Effect. Each Capital Provider may assign its rights and obligations under this Agreement and the other Transaction Documents, in whole or in part, to another Person without the consent of the Counterparty. Any purported transfer that is not in compliance with this provision shall be void.

(b)     This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(c)     No Person other than the parties hereto (and the Indemnitees and any permitted transferee hereunder) shall have any rights under this Agreement.

## 17.    TAX WITHHOLDING

The Counterparty shall make all payments under or in connection with this Agreement without any deduction or withholding for or on account of any Tax, save only as may be required by applicable law. If any such deduction or withholding is required by law to be made, the Counterparty shall (a) promptly notify the applicable Capital Providers upon becoming aware that it must make such a deduction or withholding; (b) pay to the relevant authorities (within the time allowed) the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by the Counterparty to the applicable Capital Providers under clause (d) of this Section 16); (c) promptly provide an official receipt (or a certified copy or such other evidence reasonably acceptable to the applicable Capital Providers) evidencing the relevant withholding and payment to such authorities; and (d) pay to the applicable Capital Providers such additional amounts as are necessary to ensure that (after making any such withholdings or deductions) the net amount actually received by such Capital Providers in respect of the payment due from the Counterparty equals the amount which such Capital Providers would have received if no such withholdings or deductions had been required.

## 18.    ANTI-CORRUPTION; DATA PROTECTION

(a)     The Counterparty acknowledges that the Capital Providers seek to comply with all applicable anti-money laundering, sanctions, anti-corruption, and anti-bribery laws and regulations (collectively, "***Anti-Corruption Rules***"). In furtherance of these efforts, the Counterparty represents and warrants as follows:

    (i)     it is not the target of any economic or financial sanctions with respect to the United States Government (including the U.S. Department of Treasury Office of Foreign Assets Control), the United Nations Security Council or the European Union; and

(ii)    neither it nor any of its Affiliates, nor to its knowledge anyone acting on its behalf, has at any time:

    (A)    violated, or engaged in any activity, practice or conduct which would violate, any applicable Anti-Corruption Rule;

    (B)    used funds or assets for any unlawful contribution, gift, entertainment or other unlawful expense, or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment; or

    (C)    directly, or indirectly through its agents, Representatives or any other Person authorized to act on its behalf, offered, promised, paid, given, or authorized the payment or giving of money or anything else of value to any government official or other Person while knowing or having reason to believe that some portion or all of the payment or thing of value will be offered, promised, or given, directly or indirectly, to a government official or another Person for the purpose of influencing any act or decision of such government official or such Person in his/her or its official capacity, including a decision to do or omit to do any act in violation of his/her or its lawful duties or proper performance of functions or inducing such government official or such Person to use his/her or its influence or position with any Government Authority or other Person to influence any act or decision,

in each case in order to obtain or retain business for, direct business to, or secure an improper advantage for, the Counterparty or any of its Affiliates.

(b)    The Counterparty will not engage in any business or other activities, including through agents or subcontractors, that could cause a Capital Provider to be in direct or indirect violation of any applicable Anti-Corruption Rule.

(c)    The Counterparty acknowledges and agrees that, notwithstanding anything to the contrary, the Capital Providers shall have no obligation to make or receive any payment or take any other action if the Capital Providers conclude in good faith that making or receiving such payment or taking such action would violate any applicable Anti-Corruption Rule.

(d)    In connection with the exchange of information under this Agreement, each of the Counterparty and the Capital Providers will comply with all applicable data protection laws, including the General Data Protection Regulation (GDPR), as required, and not process any personal data other than instructed unless processing required by applicable law to which the contracted processor is subject. Each will safeguard all data, including implementing appropriate security measures, as required under applicable data protection laws.

19.    **NOTICES**

**19.1    Effectiveness of Notices**

Any notice or other communication in respect of this Agreement shall be in writing and may be given in any manner described below to the address or number provided for the recipient in <u>Annex I</u> and shall be deemed effective as indicated:

(a)      if delivered in person or by courier, on the date it is received;

(b)      if sent by certified or registered mail or the equivalent (return receipt requested), on the date it is received; or

(c)      if sent by email, on the date sent in the absence of any immediate automated response indicating the message was not received or would not be timely read, and if such an immediate automated response is received by the sender, on the date the sender receives an acknowledgement from the recipient,

unless the date of receipt is not a Business Day or the communication is received after the close of business on a Business Day, in which case such communication shall be deemed given and effective on the first following day that is a Business Day.  Notices to the Counterparty shall be copied to the applicable Nominated Lawyers, and the time of effectiveness of each such notice shall be the effective time of receipt by either the Counterparty or such Nominated Lawyers, whichever occurs earlier.

**19.2    Change of Details**

Either party may by notice to the other in accordance with Section 18.1 change the address or email details at which notices or other communications are to be given to it.

20.    **AMENDMENTS**

No amendment, modification or waiver in respect of this Agreement shall be effective unless in writing and executed by the Counterparty and the Capital Providers.

21.    **ENTIRE AGREEMENT**

This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof and is the final and complete expression of their intent.  The parties represent and warrant that no prior or contemporaneous negotiations, promises, agreements, covenants or representations of any kind or nature, whether made orally or in writing, have been made or relied upon by them, whether in negotiations leading to this Agreement or relating to the subject matter hereof, which are not expressly contained herein, or which have not become merged and finally integrated herein; it being the intention of the parties that in the event of any subsequent litigation, controversy or dispute concerning the terms and provisions of this Agreement, no party shall be permitted to offer or introduce oral or

extrinsic evidence concerning the terms and conditions hereof that are not included or referred to herein and not reflected in writing.

## 22. COUNTERPARTS

This Agreement and the other Transaction Documents (and each amendment, modification and waiver in respect thereof) may be executed and delivered in counterparts (including by facsimile or digital transmission), each of which shall be deemed an original.

## 23. SURVIVAL OF OBLIGATIONS

With respect to each Claim, the rights and obligations of the parties under Sections 3, 4, 6, 7, 8, 9, 10, 11 and 13 through 30 in relation to such Claim shall survive any Claim Resolution or the exercise by the Capital Providers of any remedies with respect to such Claim pursuant to Section 13.

## 24. NO WAIVER

A failure or delay in exercising any right, power or privilege in respect of this Agreement or any other Transaction Document shall not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege shall not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

## 25. SEVERABILITY

If any term of this Agreement or any other Transaction Document, or the application thereof to either party or any circumstance, is held to be unenforceable, invalid or illegal (in whole or in part) for any reason (in any relevant jurisdiction), the remaining terms, modified by the deletion of the unenforceable, invalid or illegal portion, shall continue in full force and effect, and such unenforceability, invalidity, or illegality shall not otherwise affect that of the remaining terms, so long as this Agreement and the other Transaction Documents as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the deletion of such portion of this Agreement or any other Transaction Document shall not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties shall endeavour in good faith negotiations to replace any prohibited or unenforceable provision with a valid provision the economic effect of which comes as close as possible to that of the prohibited or unenforceable provision.

## 26. EXPENSES

(a)     Except as otherwise expressly provided in this Agreement or any other Transaction Document, each party shall bear its own expenses in connection with the

negotiation, execution, delivery and performance of this Agreement and the other Transaction Documents.

(b)     The Counterparty shall, on demand, indemnify and hold harmless the Capital Providers for and against all reasonable out-of-pocket expenses, including legal fees and disbursements, incurred by the Capital Providers by reason of the enforcement and protection of their rights under this Agreement or any other Transaction Document, including costs of collection and of the enforcement of this Section 25(b).

## 27.     RELATIONSHIP OF PARTIES

(a)     The Capital Providers and certain of their Affiliates are engaged in a capital provision and advisory business principally focused on assets connected to litigation, arbitration or mediation; one or more other Affiliates focus on investment in assets connected to litigation, arbitration or mediation. The Capital Providers and their Affiliates are not law firms and are not engaged in the practice of law with respect to any Claim or the Counterparty. The Counterparty may not, and shall not, rely on any of the Capital Providers or their Affiliates for legal advice.

(b)     Nothing in this Agreement or any other Transaction Document shall give rise to or be construed to create a fiduciary, lawyer-client, lender-borrower, agency, or other non-contractual relationship between the Counterparty and any Capital Provider.

(c)     Neither this Agreement nor any other Transaction Document creates any partnership, joint venture, or any other type of affiliation between the Counterparty and any Capital Provider, nor does this Agreement or any other Transaction Document create a joint interest in any Claim for any purpose, including for U.S. federal, state and local income tax purposes. The Capital Providers are not partners, nor are they engaged in any partnership or joint venture with one another.

## 28.     GOVERNING LAW

Except as set forth otherwise in Section 29, this Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York (without reference to any conflict of law principles or choice of law doctrine that would have the effect of causing this Agreement to be construed in accordance with or governed by the law of any other jurisdiction).

## 29.     DISPUTE RESOLUTION

(a)     Any and all of the following shall (to the exclusion of any other forum except as set forth herein) be referred to and finally resolved by arbitration under the LCIA Arbitration Rules (2014) of the London Court of International Arbitration (the "***Rules***" and the "***LCIA***"), which Rules are deemed to be incorporated by reference

into this clause: any dispute, controversy or claim arising out of or in connection with (i) this Agreement (including this Section 29); (ii) any other Transaction Document; (iii) any relationship or interaction between the Counterparty, on the one hand, and any Capital Provider(s), on the other hand; or (iv) a claim or assertion by any other Person of any right arising out of or in connection with this Agreement (including this Section 29) or any other Transaction Document, including, as to all such disputes, claims and controversies, any question regarding (x) the existence, arbitrability, validity or termination of this Agreement (including this Section 29) or any other Transaction Document, (y) any relationship or interaction between the above identified parties, or (z) the obligation of any Person to arbitrate any such dispute.

(b)     Except as otherwise specifically provided in this Agreement (including this Section 29) or any other Transaction Document, (i) the arbitral tribunal (the "***Tribunal***") shall have the exclusive power to grant any remedy or relief that it deems appropriate, whether provisional or final, including but not limited to emergency relief, injunctive relief and/or any other interim or conservatory measures or other relief permitted by the Rules (collectively, "***Conservatory Measures***"), and any such measures ordered by the Tribunal shall, to the extent permitted by applicable law, be deemed to be a final award on the subject matter of such measures and shall be enforceable as such in any court of appropriate jurisdiction; and (ii) prior to the formation or expedited formation of the Tribunal (under Article 5  or 9A  of the Rules), the provisions of Article 9B  of the Rules shall apply to any request for Conservatory Measures.

(c)     The referral of a dispute to arbitration shall not suspend or interfere with the Counterparty's (or the Payment Agent's) obligation to make timely payment to the Capital Providers of the Capital Providers' Entitlement (or any portion thereof); provided that if the Counterparty disputes its (or the Payment Agent's) obligation hereunder to pay any amount to the Capital Providers, the Counterparty must (or, as applicable, cause the Payment Agent to) (i) commence an arbitral proceeding pursuant to  this Section 29 within two (2) Business Days after the date such amount was (but for the dispute) due, (ii) make timely payment to the Capital Providers of any undisputed amounts and (iii) immediately deposit any and all disputed amounts in a dedicated account with the LCIA as fund holder, which amounts shall be released, including any interest thereon, as directed in writing by the Tribunal in any award, order or decision, unless the parties expressly agree otherwise in writing.

(d)     Any request for arbitration or response thereto submitted to the LCIA may be delivered by any means (including email) set forth in Section 18 (Notices) or any other means that is reasonably likely to achieve actual service.

(e)     The number of arbitrators shall be three.  Subject to Article 8  of the Rules, each party to the arbitration shall nominate one arbitrator and the two arbitrators nominated by the parties shall, within ten (10) days of the nomination of the second

party-nominated arbitrator, agree upon and nominate a third arbitrator who shall act as Chairman of the Tribunal. If no agreement is reached within ten days or at all, the LCIA Court shall select and appoint a third arbitrator to act as Chairman of the Tribunal.

(f)  The seat, or legal place, of arbitration shall be New York, New York. Notwithstanding the terms of Section 27 (Governing Law), the U.S. Federal Arbitration Act shall govern the interpretation, application and enforcement of this Section 29 and any arbitration proceedings conducted hereunder. The language to be used in the arbitral proceedings shall be English.

(g)  In addition to the confidentiality requirements imposed on the parties by Article 30 of the Rules, each party is obligated to keep confidential the existence and content of any arbitral proceedings initiated hereunder and any rulings or award except (i) to the extent that disclosure may be required of a party to fulfill a legal duty, protect or pursue a legal right, or enforce or challenge an award in *bona fide* legal proceedings before a state court or other judicial authority, (ii) with the consent of all parties, (iii) where needed for the preparation or presentation of a claim or defense in such arbitral proceedings, (iv) where such information is already in the public domain other than as a result of a breach of this clause (g), or (v) by order of the Tribunal upon application of a party.

(h)  In addition to the authority conferred upon the Tribunal by the Rules, the Tribunal shall have the authority to order production of documents in accordance with the IBA Rules on the Taking of Evidence in International Arbitration as current on the date of the commencement of the arbitration. No other form of disclosure or discovery shall be permitted.

(i)  The judgment of any court of appropriate jurisdiction shall be entered upon any award made pursuant to an arbitration conducted pursuant to the terms of this Section 29.

(j)  Any attempt by the Counterparty, a Capital Provider, or any other Person subject to this Section 29 to seek relief or remedies in any forum that contravenes this Section 29 shall constitute a breach of this Agreement and entitle the non-breaching party to damages, equitable relief, and full indemnification against all costs and expenses incurred in connection therewith.

(k)  The parties, being sophisticated commercial entities with access to counsel, irrevocably waive and forever and unconditionally release, discharge, and quitclaim any claims, counterclaims, defenses, causes of action, remedies and/or rights that they have or may have in the future arising from any doctrine, rule or principle of law or equity that this Agreement or any other Transaction Document, or any of the relationships and transactions contemplated hereby or thereby, (i) are against the public policy of any relevant jurisdiction; (ii) are unconscionable or contravene any laws relating to consumer protection; (iii) are usurious or call for payment of

interest at a usurious rate; (iv) were entered into under duress; (v) were entered into as a result of actions by a Capital Provider that violated its obligations of good faith and/or fair dealing; (vi) constitute illegal gambling or the sale of unregistered securities; (vii) constitute malicious prosecution, abuse of process or wrongful initiation of litigation; or (viii) constitute champerty, maintenance, barratry or any impermissible transfer, assignment or division of property or choses in action. The parties specifically agree that any issues concerning the scope or validity of the foregoing waiver shall be within the exclusive jurisdiction of the Tribunal.

**30.**    **ADMINISTRATIVE AND COLLATERAL AGENT**

(a)    Each of Capital Provider No. 2 and Capital Provider No. 3 hereby appoints Capital Provider No. 1 as administrative and collateral agent for the Capital Providers hereunder. As such, Capital Provider No. 1 is hereby authorized to act on behalf of Capital Provider No. 2 and Capital Provider No. 3 for the purpose of (i) giving and receiving notices, waivers, consents, approvals and instructions; (ii) acquiring, holding and enforcing any and all liens on collateral granted by the Counterparty to secure the Capital Providers' rights hereunder; (iii) enforcing any other rights of the Capital Providers under this Agreement and any other Transaction Document, including filing and proving a claim for the aggregate amount of the Counterparty's obligations to the Capital Providers hereunder in the event of any bankruptcy or insolvency proceeding relating to the Counterparty; and (iv) taking such other actions as Capital Provider No. 1 deems appropriate to administer this Agreement and the other Transaction Documents; in each case together with such powers and discretion as are reasonably incidental thereto.

(b)    The use of the term "agent" or any similar or equivalent term in connection with the foregoing appointment is not intended to imply any fiduciary or other duties arising under legal principles governing agency relationships. Capital Provider No. 1 shall not have any duties or obligations in its capacity as administrative and collateral agent except those expressly set forth herein, and its appointment and all rights and duties of it as an agent hereunder shall be ministerial and administrative in nature. Notwithstanding the appointment of Capital Provider No. 1 as administrative and collateral agent, Capital Provider No. 1 shall have the same rights and powers in its capacity as a Capital Provider hereunder as Capital Provider No. 2 and Capital Provider No. 3, and Capital Provider No. 1 may exercise all such rights and powers as though it were not administrative or collateral agent. The provisions of this Section 29 are for the benefit of the Capital Providers; no other party shall have any rights as a third party beneficiary of any provision of this Section 29, provided that the Counterparty shall be entitled to rely on any notices, waivers, consents, approvals or instructions provided to it by Capital Provider No. 1 as being on behalf of all the Capital Providers.

(c)    Capital Provider No. 1 may perform any and all of its duties and exercise its rights and powers as administrative and collateral agent hereunder by or through any one or more sub-agents or servicing entities appointed by it. The exculpatory provisions

in the following clause (d) shall apply to any such sub-agent or servicing entity.

(d)     Capital Provider No. 1 shall not be liable for any action taken or not taken by it (i) with the consent or at the request of Capital Provider No. 2 and Capital Provider No. 3, (ii) as Capital Provider No. 1 believed in good faith was necessary under the circumstances or (iii) in the absence of its own gross negligence or willful misconduct. In its capacity as administrative and collateral agent, Capital Provider No. 1 shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.

## 31.     RULES OF CONSTRUCTION

Unless the context otherwise clearly requires: (a) the definitions of terms herein shall apply equally to the singular and plural forms of the terms defined; (b) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms; (c) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; (d) the word "shall" shall be construed to have the same meaning and effect as the word "will"; (e) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein); (f) any reference herein to any Person shall be construed to include such Person's successors and assigns; (g) the phrase "to its knowledge" and phrases of similar import shall be construed to mean the best knowledge, after due inquiry, of any director, officer, manager, member, partner, principal or employee of the entity to which the phrase refers; (h) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof; (i) all references herein to Sections, Annexes, Exhibits and Schedules, as applicable, shall be construed to refer to Sections of, and Annexes, Exhibits and Schedules to, this Agreement, and the same are incorporated herein as part of this Agreement; and (j) the headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

*[Remainder of this page intentionally left blank.]*

Signature page to Second Amended and Restated Capital Provision Agreement – 1 of 2

IN WITNESS WHEREOF, the parties have executed and delivered this Amended and Restated Capital Provision Agreement as of the date first written above.

**Capital Provider No. 1**:

ROSLINDALE LLC

By: _____

    Name:
    Title: Authorized Signatory

**Capital Provider No. 2**:

POSEN INVESTMENTS LP

By: Chicago Onshore Funding Limited,
    Its General Partner

    _____
    Name:
    Title: Director

**Capital Provider No. 3**:

KENOSHA INVESTMENTS LP

By: Green Bay GP LLC,
    Its General Partner

    _____
    Name:
    Title: Authorized Signatory

DocuSign Envelope ID: BEB48953-1B0C-4EA6-91DA-DE2EDAB13864

Signature page to Second Amended and Restated Capital Provision Agreement – 2 of 2

IN WITNESS WHEREOF, the parties have executed and delivered this Amended and Restated Capital Provision Agreement as of the date first written above.

**Counterparty**:

SYSCO CORPORATION

By: _Eve M. McFadden_____

Name: Eve M. McFadden

Title: Senior Vice President, General Counsel and Corporate Secretary

## EXHIBIT A

### Defined Terms

"*Additional Payment*" has the meaning set forth in Section 2.1(a)(iii).

"*Advanced Expenses*" means the total amount of reasonable unreimbursed expenses (e.g. experts, court reporters, travel expenses) incurred by the applicable Nominated Lawyers in connection with the Chickens Claim.

"*Adverse Claim*" means, with respect to any Claim or any interest therein or any Proceeds thereof, (i) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or affecting such Claim or any interest therein or any Proceeds thereof, (ii) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such Claim or any interest therein or any Proceeds thereof, (iii) any purchase option, call or similar right of a third party with respect to such Claim or any interest therein or any Proceeds thereof and (iv) any other claim that a claimant has an interest in such Claim or any interest therein or any Proceeds thereof or that it is a violation of the rights of the claimant for another person to hold, transfer or deal with such Claim or any interest therein or any Proceeds thereof.

"*Adverse Party*" means, with respect to any Claim, individually and collectively, the Person(s) named as defendants or counterclaim defendants in such Claim, as set forth on Annex II, and any other Person added or joined to the Claim from time to time as a defendant or indemnitor or against whom proceedings are asserted or threatened even if such Person is not named or served, and in each case their respective Affiliates and successors.

"*Affiliate*" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. For this purpose, "*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*Agreed Confidentiality Order*" means the Agreed Confidentiality Order issued in connection with the Chickens Claim on November 8, 2016.

"*Anti-Corruption Rules*" has the meaning set forth in Section 17.

"*Applicable Proceeds*" has the meaning set forth in Section 2.2(d)(ii).

"*Beef Claim*" has the meaning set forth in the Recitals hereto.

"**Business Day**" means a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in New York.

"**Capital Amounts**" means the amounts set forth as such in Section 2.1.

"**Capital Providers**", "**Capital Provider No. 1**", "**Capital Provider No. 2**" and "**Capital Provider No. 3**" have the meanings set forth in the introductory paragraph of this Agreement.

"**Capital Providers' Entitlement**" has the meaning given thereto in Section 2.2(a).

"**Chickens Claim**" has the meaning set forth in the Recitals hereto.

"**Chickens Invested Amount**" means the sum of all amounts actually paid to the Counterparty by the Capital Providers hereunder in respect of the Chickens Claim.

"**Chickens Multiple**" has the meaning given thereto in Section 2.2(b).

"**Chickens Percentage Return**" has the meaning given thereto in Section 2.2(b).

"**Chickens Preferred Return**" has the meaning given thereto in Section 2.2(b).

"**Chickens Proceeds**" has the meaning given thereto in Section 2.2(b).

"**Claim**" means any of the Chickens Claim, Pork Claim, Beef Claim, ███████████, or ███████████, as applicable; and "**Claims**" means, collectively, the Chickens Claim, Pork Claim, Beef Claim, ███████████, and ███████████.

"**Claim Costs**" has the meaning set forth in Section 5.3(b).

"**Claim Resolution**" means either full and final settlement of a Claim or the entry of a final, non-appealable and enforceable award or judgment, in either case resolving with prejudice all aspects and elements of a Claim. In circumstances where a final, non-appealable and enforceable award or judgment does not automatically come into being upon the rendering of a dispositive decision, a Claim Resolution shall be deemed to have occurred on the date that is sixty (60) days following such dispositive decision in the absence of any subsequent challenge thereto.

"**Confidential Information**" means any non-public, confidential or proprietary information relating to: (i) a Capital Provider and its Affiliates and Representatives, information provided by them about their business and operations or the structures and economic arrangements they use in their business, including the nature, terms and existence of this Agreement and the other Transaction Documents, the existence of any relationship between the Counterparty and a Capital Provider or any of its Affiliates or Representatives, and the discussions and negotiations related thereto; (ii) any Claim, including the names of the parties and potential other parties to such Claim; the factual, legal, technical, economic

and financial background of such Claim; and the procedural status, theories, strategies and tactics for the prosecution or defense of such Claim; (iii) billing arrangements, rates, financial or fee arrangements; (iv) any financial statements, accounts or other similar information or materials; (v) business or financial information, business plans and relationships, marketing or product data; (vi) algorithms, computer databases, computer programs, computer software and systems, intellectual property, trade secrets and trademarks; (vii) research, scientific data, specifications, technical data, techniques and technology; and (viii) other proprietary or non-public information, data or material; in all cases regardless of whether such information is (A) written or oral, irrespective of the form or storage medium, or (B) specifically identified as "Confidential". Notwithstanding the foregoing, Confidential Information does not include information that (x) was or becomes generally available to the public other than as a result of a disclosure by the Recipient; (y) was available to the Recipient on a non-confidential basis prior to its disclosure; or (z) was developed independent of the information derived from the Confidential Information.

"*Conservatory Measures*" has the meaning set forth in Section 29.

"*Counterparty*" has the meaning set forth in the introductory paragraph of this Agreement.

"*Default Rate*" means a rate per calendar month of 2.5%, compounded daily, or the maximum rate permitted by law, whichever is lower.

"*Disclosing Party*" has the meaning set forth in Section 8.1.

"*Engagement Agreement*" means any engagement, retainer or similar agreement between the Counterparty and Nominated Lawyers (including any successor or new Nominated Lawyers designated in accordance with Section 5.3(e)) governing or purporting to govern the terms of the representation of the Counterparty by such legal counsel with respect to a Claim, as provided to the Capital Providers and set forth on Annex II. In the case of any Engagement Agreements amended or entered into after the date hereof, Annex II shall be deemed amended to include such agreements only upon the Capital Providers' approval, respectively, of the relevant amendments in accordance with Section 5.3(d) or of the retention of the successor or new counsel in accordance with Section 5.3(e) or (f).

"*Escrow Agreement*" means an escrow agreement, in form and substance reasonably satisfactory to the Capital Providers in all respects, among the Counterparty, the Capital Providers and a third party escrow agent, pursuant to which the escrow agent agrees to serve as Payment Agent under this Agreement, including the obligations to receive Proceeds of all Claims from the Adverse Parties on the Counterparty's behalf and distribute such Proceeds in accordance with Section 2.2.

"*First Amended Agreement*" has the meaning given thereto in the Recitals hereto.

"*Governmental Authority*" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising

executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"*Initial New Investment Amount*" has the meaning set forth in Section 2.1(a)(iii).

"*Initial New Investment Payment Date*" has the meaning set forth in Section 2.1(a)(iii).

"*Invested Amount*" means the sum of the Chickens Invested Amount and the Pork Invested Amount.

"█████████" has the meaning set forth in the Recitals hereto.

"*LCIA*" has the meaning set forth in Section 29.

"*Material Adverse Effect*" means, with respect to any event or circumstance and either party, one or more of (i) the material impairment of its ability to perform any of its obligations under this Agreement or any other Transaction Document, (ii) the material impairment of the rights or remedies available under this Agreement or any other Transaction Document to the other party and (iii) solely in the case of the Counterparty, an adverse effect on any Claim or the value or collectability thereof.

"*Monthly Report*" has the meaning set forth in Section 5.3(b).

"*New Capital Multiple*" has the meaning given thereto in Section 2.2(d).

"*New Capital Preferred Return*" has the meaning given thereto in Section 2.2(d).

"*New Claim Proceeds*" has the meaning given thereto in Section 2.2(d).

"*New Claims*" means, collectively, the Beef Claim, the ████████ and the ████ ███.

"*New Invested Amount*" means the sum of all amounts actually paid to the Counterparty by the Capital Providers hereunder in respect of the Beef Claim, ████████ and ████ ███.

"*Nominated Lawyers*" means, with respect to any Claim, the Person or Persons identified as such on <u>Annex II</u> and/or any successor or new legal counsel appointed as described herein.

"*Nominated Lawyers Contingency Percentage*" means the percentage of Proceeds that the Nominated Lawyers for the Chickens Claim are entitled to receive pursuant to their Engagement Agreement.

"*Original Agreement*" has the meaning set forth in the Recitals hereto.

"*Payment Agent*" means, with respect to any Claim, the escrow agent under the Escrow Agreement.

"*Person*" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership or other entity or Governmental Authority.

"*Pork Claim*" has the meaning set forth in the Recitals hereto.

"*Pork Invested Amount*" means the sum of all amounts actually paid to the Counterparty by the Capital Providers hereunder in respect of the Pork Claim.

"*Pork Multiple*" has the meaning set forth in Section 2.2(c).

"*Pork Percentage Return*" has the meaning set forth in Section 2.2(c).

"*Pork Preferred Return*" has the meaning set forth in Section 2.2(c).

"*Pork Proceeds*" has the meaning set forth in Section 2.2(c).

"*Potential Remedy Event*" means any event which, with the giving of notice or the lapse of time or both, would constitute a "Remedy Event".

"*Privileges*" has the meaning set forth in the definition of "Protected Material".

"*Proceeds*" means, collectively: (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value awarded to or recovered by or on behalf of (or reduced to a debt owed to) the Counterparty on account or as a result or by virtue (directly or indirectly) of a Claim, whether by negotiation, arbitration, mediation, diplomatic efforts, lawsuit, settlement, or otherwise; and includes all of the Counterparty's legal and/or equitable rights, title and interest in and/or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise; (ii) any consequential, rescissionary, punitive, exemplary or treble damages, pre-judgment interest (including damages comparable to pre-judgment interest), post-judgment interest, penalties, and attorneys' fees and other fees and costs awarded or recovered on account thereof; (iii) any recoveries against attorneys, accountants, experts, directors, officers or other related parties in connection with any of the foregoing or the pursuit of a Claim; (iv) without limiting any of the foregoing, any value conveyed to any Person in connection with a Claim or the resolution or termination thereof; and (v) the amount of any reduction in the amount of any award by reason of a set-off for any reason, including counterclaims and third party claims, or as a result of a costs order against the Counterparty or as result of any other quantifiable order. All of the foregoing constitute Proceeds in any form, including cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds, prospective price reductions, volume purchase commitments, exclusive dealing arrangements and any other rights to payment of cash and/or transfer(s) of things of value or other property (including

property substituted therefor), whether delivered or to be delivered in a lump sum or in installments.

"***Protected Material***" means any Confidential Information that is the work product of qualified legal advisers and/or attorney work product, protected by the attorney-client privilege or any similar privilege in any jurisdiction including, for the avoidance of doubt, legal professional privilege and/or litigation or arbitral privilege, or that is protected by any rules of professional secrecy in any jurisdiction (collectively, "***Privileges***"), including: (i) information prepared by a party to a Claim or any of its Affiliates or their counsel, advisors, consultants or agents; or (ii) information prepared by a Capital Provider or any of its Representatives in connection with the review of a Claim, including legal and factual memoranda, case analyses and evaluations.

"***Recipient***" has the meaning set forth in Section 8.1.

"***Remedy Event***" has the meaning set forth in Section 12.

"***Representation Date***" means (i) the date hereof, (ii) each date on which the parties agree to cause any Claim to become subject to this Agreement, (iii) each date on which the Capital Providers are obligated to or do make any payment of Capital Amounts and (iv) in the case of the Counterparty, each date on which a Monthly Report is delivered (provided that, in the event of a failure to deliver any Monthly Report by its due date, the Representation Date shall instead be such due date); provided that, for the avoidance of doubt, even though an agreement or payment referred to in clause (ii) or (iii) above relates to a specific Claim, a "Representation Date" shall be deemed to occur with respect to each Claim that is then subject to this Agreement.

"***Representatives***" means, with respect to any person or entity, as applicable, its directors, officers, managers, members, partners, principals, employees, shareholders and participants (or potential shareholders and participants), Affiliates, related entities, agents, assignees (or potential assignees), reinsurers, lawyers, accountants, consultants, advisors, auditors, and independent contractors.

"***Rules***" has the meaning set forth in Section 29.

"***Tax***" means any tax, duty, contribution, impost, withholding, levy or other charge or withholding of a similar nature (including use, sales and value added taxes), whether domestic or foreign, and any fine, penalty, surcharge or interest in connection therewith.

"***Tier 1 Capital Providers Percentage***" means ██████████████████████████████████████████████████████

"***Tier 2 Counterparty Percentage***" means ██████████████████████████████████████████████████████

"***Transaction Documents***" means, collectively, this Agreement, the Escrow Agreement and any other agreements, documents, instruments, or certificates entered into or delivered in connection with this Agreement.

"***Tribunal***" has the meaning set forth in Section 29.

"███████████" has the meaning set forth in the Recitals hereto.

**EXHIBIT B**

**Form of Monthly Report**

| Item: | Response: |
|---|---|
| 1. Description of the status of each Claim and any meaningful developments during the preceding calendar month, including copies of any pleadings, court filings or similar documents. | |
| 2. The billings and accrued expenses of the Nominated Lawyers and any Claim-related fees and expenses paid by or on behalf of the Counterparty to any other Person, in each case attributable to the preceding calendar month. | |
| 3. Any noncompliance by the Counterparty with its obligations to the Nominated Lawyers under any Engagement Agreement. | |

**ANNEX I**

**Counterparty: Sysco Corporation**

| | | |
|---|---|---|
| 1. | Type of Entity: | Corporation |
| 2. | Jurisdiction of Organization or Formation: | State of Delaware |
| 3. | Notice Information: | Address: 1390 Enclave Parkway, Houston, TX 77077<br><br>Fax Number: 281-584-2510<br><br>Email Address: eve.mcfadden@corp.sysco.com<br><br>Attn: Eve McFadden |
| 4. | Notice Information for Nominated Lawyers for Chickens and Pork Claims: | Address: 1401 New York Ave., NW, Washington, DC 20005<br><br>Fax Number: 202-237-6131<br><br>Email Address: sgant@bsfllp.com<br><br>Attn: Scott Gant / Boies Schiller Flexner LLP |
| 5. | Notice Information for Nominated Lawyers for Beef, ███████, and ████████: | In each case to be provided by the Counterparty in writing upon designation of Nominated Lawyers in accordance with Section 5.3(f). |

**Capital Provider No. 1: Roslindale LLC**

| | | |
|---|---|---|
| 6. | Type of Entity: | Limited liability company |
| 7. | Jurisdiction of Organization or Formation: | State of Delaware |
| 8. | Notice Information: | Roslindale LLC<br>251 Little Falls Drive<br>Wilmington, DE 19808<br>Email Address: info@litfinsolutions.com<br>Attn: Manager |

|  |  |
|--|--|

**Capital Provider No. 2**: **Posen Investments LP**

| 9.   Type of Entity: | Limited partnership |
|--|--|
| 10. Jurisdiction of Organization or Formation: | Delaware |
| 11. Notice Information: | Posen Investments LP<br>251 Little Falls Drive<br>Wilmington, DE 19808<br>Email Address: info@litfinsolutions.com<br>Attn: Manager |

**Capital Provider No. 3: Kenosha Investments LP**

| 12. Type of Entity: | Limited Partnership |
|--|--|
| 13. Jurisdiction of Organization or Formation: | Delaware |
| 14. Notice Information: | Kenosha Investments LP<br>251 Little Falls Drive<br>Wilmington, DE 19808<br>Email Address: info@litfinsolutions.com<br>Attn: Manager |

**ANNEX II**

| | |
|---|---|
| 1. Description of the Claims: | Each and every claim or counterclaim made or to be made by the Counterparty in, or in any action arising from or related to the facts and claims asserted in,<br><br>(i) the Chickens Claim: the matter captioned *Sysco Corp. v. Tyson Foods, et al.,* Case No. 18cv700 (N.D. Ill.);<br><br>(ii) the Pork Claim: an opt-out direct action to be filed related to the putative class action in *In re Pork Antitrust Litigation,* Case No. 18cv1776 (D. Minn.);<br><br>(iii) the Beef Claim: an opt-out direct action to be filed in *In re DPP Beef Litigation*, Case No. 20-cv-1319 (D. Minn.);<br><br>(iv) <br><br>(v) <br><br>in the event the Counterparty fails to file an opt-out direct action in any of the foregoing class actions, then the Claims include the Counterparty's claims and counterclaims as a class member therein. |
| | Each Claim also includes any variations or expansions of the above claims by the addition of any claims and/or parties from time to time, as well as the following:<br><br>(i) any and all related pre- and post-trial proceedings or processes (or pre- and post-hearing proceedings or processes, where applicable) in or in connection with such claim(s), including the pursuit of costs or post-judgment or post-arbitral award remedies;<br><br>(ii) all proceedings seeking to appeal, challenge, confirm, enforce, modify, correct, vacate, or annul |

| | | | |
|---|---|---|---|
| | | | a judgment or award, as well as proceedings on remand or retrial or rehearing; |
| | | (iii) | all ancillary, parallel, or alternative dispute resolution proceedings and processes arising out of or related to the acts or occurrences alleged in such claim(s) (including conciliation or mediation or court filings seeking discovery for or filed in aid of a contemplated or pending arbitration); |
| | | (iv) | remands, re-filings or parallel filings of such claim(s), and any other legal, diplomatic, or administrative proceedings or processes founded on the same or related underlying facts giving rise to or forming a basis for such claim(s); |
| | | (v) | ancillary or enforcement proceedings related to the facts or claims alleged from time to time or that could have been alleged in such claim(s) at any time; |
| | | (vi) | all arrangements, settlements, negotiations, or compromises made between the Counterparty and any adverse party having the effect of resolving any of the Counterparty's claims against any adverse party that are or could be or could have been brought in such claim(s); and |
| | | (vii) | all rights of the Counterparty to collect any damages or awards or otherwise exercise remedies in connection with any of the foregoing. |
| 2. | Payment account of the Counterparty: | | ███████████████ |
| 3. | Payment accounts of each of Capital Provider Nos. 1, 2 and 3: | | To be provided in writing. |

| 4. Identity of the Adverse Parties: | **Chickens Claim**:<br><br>TYSON FOODS, INC.;<br>TYSON CHICKEN, INC.;<br>TYSON BREEDERS, INC.;<br>TYSON POULTRY, INC.;<br>PILGRIM'S PRIDE CORPORATION;<br>KOCH FOODS, INC.;<br>JCG FOODS OF ALABAMA, LLC;<br>JCG FOODS OF GEORGIA, LLC;<br>KOCH MEAT CO., INC.;<br>SANDERSON FARMS, INC.;<br>SANDERSON FARMS, INC. (FOOD DIVISION);<br>SANDERSON FARMS, INC. (PRODUCTION DIVISION);<br>SANDERSON FARMS, INC. (PROCESSING DIVISION);<br>HOUSE OF RAEFORD FARMS, INC.;<br>MAR-JAC POULTRY, INC.;<br>PERDUE FARMS, INC.;<br>PERDUE FOODS, LLC;<br>WAYNE FARMS, LLC;<br>FIELDALE FARMS CORPORATION;<br>GEORGE'S, INC.;<br>GEORGE'S FARMS, INC.;<br>SIMMONS FOODS, INC.;<br>SIMMONS PREPARED FOODS, INC.;<br>O.K. FOODS, INC.;<br>O.K. FARMS, INC.;<br>O.K. INDUSTRIES, INC.;<br>PECO FOODS, INC.;<br>HARRISON POULTRY, INC.;<br>FOSTER FARMS, LLC;<br>FOSTER POULTRY FARMS;<br>CLAXTON POULTRY FARMS, INC.;<br>MOUNTAIRE FARMS, INC.;<br>MOUNTAIRE FARMS, LLC;<br>MOUNTAIRE FARMS OF DELAWARE, INC.;<br>AGRI STATS, INC.<br><br>**Pork Claim**:<br><br>AGRI STATS, INC.<br>CLEMENS FOOD GROUP, LLC<br>HORMEL FOODS CORPORATION |
|---|---|

INDIANA PACKERS CORPORATION
JBS USA
SEABOARD FOODS, LLC
SMITHFIELD FOODS, INC.
TRIUMPH FOODS, LLC
TYSON FOODS, INC.
THE CLEMENS FAMILY CORPORATION
HORMEL FOODS, LLC
JBS USA FOOD COMPANY
JBS USA FOOD COMPANY HOLDINGS
MITSUBISHI CORPORATION (AMERICAS)
SEABOARD CORPORATION
TYSON FRESH MEATS, INC.
TYSON PREPARED FOODS, INC.
HATFIELD QUALITY MEATS, INC.
ERBERT & GERBERT'S, INC.

**Beef Claim**:

JBS USA FOOD COMPANY HOLDINGS
TYSON FOODS INC.
CARGILL INC.
NATIONAL BEEF PACKING COMPANY



| | |
|---|---|
| | ██████████ ██████████ ███████ ██████████ |
| 5. Identity of the Nominated Lawyers: | **Chickens Claim**:<br><br>Boies Schiller Flexner LLP<br><br>**Pork Claim**:<br><br>Boies Schiller Flexner LLP<br><br>**Beef Claim**:<br><br>To be determined in accordance with Section 5.3(f).<br><br>████████<br><br>To be determined in accordance with Section 5.3(f).<br><br>████████<br><br>To be determined in accordance with Section 5.3(f). |
| 6. Engagement Agreements: | **Chickens Claim**:<br><br>Engagement Letter, dated November 16, 2017, from Nominated Lawyers to Counterparty, as modified by the Addendum to Engagement Letter, dated September 9, 2019, from the Nominated Lawyers to Counterparty<br><br>**Pork Claim**:<br><br>Engagement Letter, dated April 18, 2020, from the Nominated Lawyers to the Counterparty<br><br>**Beef, ████, and ████ Claims**:<br><br>In each case to be provided by the Counterparty upon designation of Nominated Lawyers in accordance with Section 5.3(f). |

**ANNEX III**

(Waterfall Illustrations)

The hypotheticals below are solely for the purposes of demonstrating how the waterfalls described in Section 2.2(b)-(d) would work in practice:

<u>**Scenario 1**</u>:

Assumptions:



| Chicken Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ██████████ | ███████████ | █████████████████ |
| ██████████ | ██████████ | ████████████ |
| ██████████ | ██████████ | ██████████ |
| ██████████ | ██████████ | ███████████ |
| █████████ | █████████ | █████████ |
| ██████████ | █████████ | ██████████ |
| ██████████ | █████████ | ████████████ |
| ██████████ | █████████ | ██████████████ |
|  |  | ████████████ |

---

[1]     Months calculated from anniversary date of the First Amended Agreement, June 9, 2020.

| ██████████ | ██████████ | ██████████████ |
|---|---|---|
| ████████ | | |
| Pork Proceeds Distribution | Recipient | Reference |
| ██████ | ██████ | █████████ |
| ██████ | ██████ | █████ |
| ██████ | ██████ | ████████ |
| ████████ | ██████ | roceeds – 2.2(c)(vi) |
| ████████████ | | |

**Scenario 2**:

Assumptions:



| Chicken Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ██████ | █████████ | █████████████ |
| ██████ | ██████ | ████████ |
| ██████ | ██████ | ████████ |
| ██████ | ██████ | ████████ |
| ██████ | ██████ | ████████ |

| ██████████ | ██████████ | ████████████████ |
|---|---|---|
| ████████████ | | |
| Pork Proceeds Distribution | Recipient | Reference |
| ███████ | █████████ | ██████████████████ |
| ███████ | █████████ | |
| ████████ | █████████ | |
| ███████ | █████████ | ████████████████ |
| ███████ | ██████ | ████████ |
| ████████████ | | |
| Beef, ████ & ████ Proceeds Distribution | Recipient | Reference |
| | ██████████ | ██████████████████ |
| ███████████ | █████████ | ██████████████ |
| █████████████ | | |

**Scenario 3:**

Assumptions:



| Pork Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ███████ | █████████ | ██████████████████ |
| █████████ | █████████ | |
| ████████ | █████████ | |
| █████████████ | | |

| Chicken Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ████████ | ████████████ | ██████████████████ |
| ██████ | ██████████ | ████████████████ |
| ███████ | ██████████ | ███████████████ |
| ███████ | ██████████ | ██████████████████ |
| ███████ | ██████████ | █████████████████ |
| ███████ | ██████████ | ███████████████ |
| ████████ | █████████ | ███████████████ |
| ███████████████ | | |

| Beef, █████ & █████ Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ███████ | █████████ | ██████████████████ |
| ████████ | █████████ | █████████████████ |
| ███████ | █████████ | █████████████ |
| ████████████████ | | |

**Scenario 4**:

Assumptions:



| Chicken Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ███████ | ██████████ | ██████████ |
| ██████ ████ | | |
| Beef, █████ & Proceeds Distribution | Recipient | Reference |
| █████ | ██████ | ████████████ |
| ██████ | ██████ | ███████ |
| ██████ | ██████ | █████████ |
| ██████ | ██████ | ██████ |
| ██████ | ██████ | ████████ |
| ██████ | █████ | ███████ |
| ████████ | | ██████ |

# Exhibit 2

*Execution Copy*

**Glaz LLC**
**Posen Investments LP**
**Kenosha Investments LP**

March 31, 2022

Sysco Corporation
1390 Enclave Parkway
Houston, TX 77077
Attn: Eve McFadden

      Re:  <u>Amendment No. 1 to Second Amended and Restated Capital Provision Agreement</u>

Dear Eve:

      We refer to the Second Amended and Restated Capital Provision Agreement, dated as of December 22, 2020, between Sysco Corporation (the "***Counterparty***" or "***you***") and each of Glaz LLC (fka Roslindale LLC), a Delaware limited liability company ("***Capital Provider No. 1***"), Posen Investments LP, a Delaware limited partnership ("***Capital Provider No. 2***"), and Kenosha Investments LP, a Delaware limited partnership ("***Capital Provider No. 3***") (the "***Existing CPA***"), pursuant to which the Capital Providers provided capital to the Counterparty to finance certain of its food antitrust legal claims. Capitalized terms used herein but not defined have the meanings given thereto in the Existing CPA.

      Capital Provider No. 1 and Capital Provider No. 3 now wish to provide to the Counterparty, and the Counterparty wishes to accept, additional capital to further monetize the Counterparty's food antitrust legal claims. This letter agreement sets forth the terms and conditions of the incremental investment and, upon its due execution and delivery by all parties hereto, constitutes Amendment No. 1 to the Existing CPA ("***Amendment No. 1***"). As amended by this Amendment No. 1, the agreement between the Counterparty and the Capital Providers is referred to herein as the "***2021 Amended CPA***".

      In their capacity as the providers of capital to the Counterparty under the Existing CPA, each of Capital Provider No. 1, Capital Provider No. 2 and Capital Provider No. 3 is referred to herein as an "***Existing Capital Provider***". In their capacity as the providers of capital to the Counterparty under this Amendment No. 1, each of Capital Provider No. 1 and Capital Provider No. 3 is referred to herein as a "***2021 Capital Provider***".

      Pursuant to the Existing CPA, the Existing Capital Providers have provided a total of ▮▮▮▮▮▮▮▮▮▮ allocated as follows: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1.     <u>2021 Capital Amounts</u>.

a. Within 10 Business Days of the execution and delivery of this Amendment No. 1, the 2021 Capital Providers shall provide Capital Amounts to the Counterparty in respect of all Claims in the aggregate amount of ████████████████ ████████████████ (upon provision to the Counterparty, the "*2021 Invested Amount*"), upon which the total amount provided to the Counterparty by all Capital Providers pursuant to the 2021 Amended CPA shall be $137,500,000, allocated as follows: ████████████████████████████████ ████████████████

b. ████████████████████████████ ████████████████████

c. The 2021 Capital Providers shall retain ████████ from the 2021 Invested Amount to cover their closing and other costs in connection with this Amendment No. 1. Such amount shall be deemed included in the Capital Amounts for all purposes under the 2021 Amended CPA.

2. <u>Outstanding Capital Commitment</u>. The Counterparty and the Existing Capital Providers acknowledge that, pursuant to Section 2.1(a)(iii) of the Existing CPA and subject to all terms and conditions thereof, as of the date hereof the Capital Providers are committed to providing up to an additional ████████████████████

3. <u>Amendments to Definitions</u>.

a. References to the term "*Capital Providers' Entitlement*" shall mean the Capital Providers' Entitlement as defined in the Existing Agreement or the sum of all amounts payable to the Capital Providers pursuant to Section 6 of this Amendment No. 1, as the context requires.

b. The following defined term is hereby added to Exhibit A of the Existing Agreement, in alphabetical order: "*Applicable Purchases*" means, in respect of any Claim, the recorded volume of sales between the Counterparty and an Adverse Party of the product at issue in such Claim during the time period of the alleged conspiracy as stated in the operative putative class complaint.

c. Each of the defined terms "*Chickens Claim*", "*Pork Claim*", "*Beef Claim*", "████████████" and "████████████" is hereby amended to exclude from its respective description in item 1 of Annex II any portion of the Counterparty's purchases assigned by the Counterparty for purposes of their assertion under federal antitrust laws to ████████████ ████████████████████████████████

2 of 11

    4.    <u>Hypothetical Illustration.</u>  The hypothetical illustrations set forth in Annex III of the Existing CPA are hereby replaced in their entirety with the hypothetical illustrations set forth in Annex I hereto, which demonstrates, for illustration purposes only, the application of the waterfall set forth in Section 6 of this Amendment No. 1.  Section 2.2(e) of the Existing CPA is hereby deemed amended accordingly.

    5.    <u>Continuing Interest in Litigation.</u>  The Counterparty intends by this Amendment No. 1 to preserve and maintain its economic and business interests in the Claims, including but not limited to its economic interest in the Claims and its business interest in the vigorous enforcement of antitrust laws.



    7.    <u>Maximization of Litigation Outcome; Non-circumvention</u>.

    a.    In addition to and without limiting the obligations of the Counterparty to the Capital Providers pursuant to Section 5.3(b) of the Existing Agreement, the Counterparty shall take such actions as are reasonable and appropriate to maximize the Proceeds received from each Claim, giving priority to cash Proceeds.

DocuSign Envelope ID: 6A79969F-280D-4345-844A-AE1908B012FE

b.      Section 5.3(b)(v) of the Existing CPA shall be amended and restated in its entirety as follows:

(v)     shall provide immediate notice by email to the Capital Providers of any settlement offer made by the Adverse Party and shall not accept a settlement offer without the Capital Providers' prior written consent, which shall not be unreasonably withheld, provided however, that the Capital Providers (and their respective Affiliates) shall have no right to exercise control over the independent professional judgment of its Nominated Lawyers and shall not seek to impose a commercially unreasonable result with respect to settlement;

c.      The Counterparty shall not, directly or indirectly, by any acts or omissions circumvent, or attempt to circumvent, the obligations set forth in this paragraph 5 or in Section 5.3(b) of the Existing CPA or the intent of the transactions contemplated by the 2021 Amended CPA.

8.      <u>Reversion to Existing CPA</u>. In the event a court or tribunal of competent jurisdiction holds or decides (as applicable) that this Amendment No. 1 deprives the Counterparty of standing in a Claim against any Adverse Party or otherwise forecloses the Counterparty from prosecuting a Claim against any Adverse Party, this Amendment No. 1 shall be null and void ab initio and the Existing CPA shall immediately be deemed in full force and effect, without any action by any party, as if this Amendment No. 1 had never taken effect; <u>provided</u>, however, that the 2021 Invested Amount shall become part of the New Invested Amount for purposes of calculating the Capital Providers' Entitlement thereunder.

9.      <u>Reaffirmation, etc</u>. Each Capital Provider, on the one hand, and the Counterparty, on the other hand, hereby (i) reaffirms to the other(s), as of the date hereof, the representations and warranties, covenants and agreements made by it in each Transaction Document; and (ii) forever waives and releases any claims they may have against the other(s), to the extent based on conduct or omissions predating the date of execution of this Amendment No. 1, whether known or unknown, suspect or unsuspected, including but not limited to any claims related to the 2021 Amended CPA and all other claims arising under state, federal or other law.   Except to the limited extent amended hereby, all provisions of the Transaction Documents remain in full force and effect, and continue to be the legal, valid, and binding obligations of the parties thereto.

*[Signature page follows.]*

*Signature page to Amendment No. 1 to*
*Second Amended and Restated Capital Provision Agreement*

      If you agree with the terms set forth above, kindly execute this Amendment No. 1 in the spaces provided below and return a copy to us.  Please retain a copy for your records.

      Very truly yours,

**Capital Provider No. 1**:

GLAZ LLC

By: _____
     Name:
     Title: Authorized Signatory

**Capital Provider No. 2**:

POSEN INVESTMENTS LP

By: Chicago Onshore Funding Limited,
its General Partner

By: _____
     Name:
     Title: Director

**Capital Provider No. 3**:

KENOSHA INVESTMENTS LP

By: Green Bay GP LLC,
its General Partner

By: _____
     Name:
     Title: Authorized Signatory

*Acknowledged and agreed*,

**Counterparty**:

SYSCO CORPORATION

By: _____
     Name:  Eve M. McFadden
     Title:  Senior Vice President,
            General Counsel and
            Corporate Secretary

**ANNEX I**

(Waterfall Illustrations)

The hypotheticals below are solely for the purposes of demonstrating how the waterfall described in Section 6 of Amendment No. 1 would work in practice:

**Scenario 1**:

Assumptions:



| Chicken Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ██████ | ██████████ | ████████████ |
| ████████ | ████████ | ███████████ |
| ██████ | ██████ | ██████████████ |
| ██████ | ██████ | ██████████████ |
| █████ | ██████ | █████████████ |
| █████ | ██████ | █████████████ |
| ██████ | ██████ | ████████████ |
| ██████ | ██████ | ██████████████ |
| ████ | ██████ | ████████████ |

---

[1]    Months calculated from anniversary date of the First Amended Agreement, June 9, 2020.

DocuSign Envelope ID: 6A79069E-280D-43d5-844A-AE1908B012FE

| | | |
|---|---|---|
| ██████ | ██████ | ███████████ |
| ███ | █████ | ████████ |
| ████████ | | |
| Pork Proceeds Distribution | Recipient | Reference |
| ██████ | | ██████████ |
| ██████ | ██████ | █████████████ |
| ██████ | ██████ | ██████████ |
| ███ | ██████ | █████████ |
| ███████ | ██████ | ███████████ |
| ██████ | █████ | ███████████ |
| █████████ | | |

**Scenario 2**:

Assumptions:



| Chicken Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ██████ | ████████ | ██████████ |
| ██████ | ██████ | ██████████ |
| ██████ | ██████ | █████████ |
| ██████ | ██████ | ██████████ |



| Pork Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |

| Beef & ▮ Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ |
| ▮ | | |

**Scenario 3**:

Assumptions:



DocuSign Envelope ID: 6A79069E-280D-434F-844A-AE1908B012FE



| Pork Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ████ | ████ | █████████ |
| ██████ | ████ | █████████ |
| ██████ | ████ | █████████ |
| ████████ | | |

| Chicken Proceeds Distribution | Recipient | Reference |
|---|---|---|
| █████ | ████████ | █████████ |
| ████ | █████ | ████████ |
| █████ | █████ | █████████ |
| █████ | █████ | ███████ |
| █████ | █████ | ███████ |
| █████ | █████ | █████████ |
| ███ | █████ | ██████ |
| ██████ | █████ | ████████ |
| █████ | ████ | █████████ |

| Beef & ████ Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ██████ | █████ | ████████ |
| ██████ | █████ | █████████ |

| | | |
|---|---|---|
| ███ | ███ | ██████████ ██ |
| ███ | ███ | ██████████ █ |
| █████ | █████ | ██████████ █ |
| ████ | █████ | ██████████ |
| ████████ | | ██████████ |

**Scenario 4**:

Assumptions:



| Chicken Proceeds Distribution | Recipient | Reference |
|---|---|---|
| ██████ | ████ | █████ |
| Beef & ████ Proceeds Distribution | Recipient | Reference |
| ████ | ████ | █████████ █ |
| █████ | ████ | █████████ █ |
| █████ | ████ | █ |
| █████ | ████ | ████████ █ |
| █████ | ████ | █████████ █ |
| ███ | ████ | █████████ █ |
| ████ | ████ | █████████ █ |

DocuSign Envelope ID: 6A79969F-280D-43d5-844A-AE1908B012FE

| | | | |
|---|---|---|---|
| ████ | | ████ | ███████████ ████ |
| ███ | | ████ | ███████████ ██ |
| ██████ | | | |

# Exhibit 3

# IN THE LONDON COURT OF
# INTERNATIONAL ARBITRATION

---

**GLAZ LLC, POSEN INVESTMENTS LP, and KENOSHA INVESTMENTS LP,**

**Claimants,**

**v.**

**SYSCO CORPORATION,**

**Respondents.**

---

## REQUEST FOR ARBITRATION

---

Derek T. Ho
KELLOGG, HANSEN, TODD,
 FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900 (Telephone)
(202) 326-7999 (Facsimile)
dho@kellogghansen.com

*Attorney for Claimants*                          September 9, 2022

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES TO THIS ARBITRATION ................................................................. 3

        A.      Claimants.................................................................................................. 3

        B.      Respondent .............................................................................................. 4

III.    THE DISPUTE RESOLUTION AGREEMENT, THE PLACE AND SEAT OF THE
        ARBITRATION, THE GOVERNING LAW, AND THE LANGUAGE OF THE
        ARBITRATION ................................................................................................... 4

        A.      The Arbitration Agreement ..................................................................... 4

        B.      The Seat of the Arbitration ...................................................................... 6

        C.      Governing Law ........................................................................................ 6

        D.      The Language of Arbitration ................................................................... 6

IV.     THE ARBITRAL TRIBUNAL .......................................................................... 6

V.      FACTUAL AND LEGAL ALLEGATIONS ...................................................... 7

        A.      Sysco's Food Antitrust Claims................................................................ 7

        B.      Claimants' Investments in Sysco's Claims ............................................. 9

        C.      Sysco's First Violation of Claimants' Consent Rights.......................... 10

        D.      ███████████████ Settlement Proposals ......................................... 11

        E.      Sysco's Threatened Breach of Claimants' Consent Rights................... 12

VI.     CLAIMS FOR RELIEF ................................................................................... 13

        A.      Request for Declaratory Judgment........................................................ 13

        B.      Request for Permanent Injunction......................................................... 13

        C.      Breach of Contract ................................................................................ 14

VII.    PRAYER FOR RELIEF ................................................................................... 14

VIII.   PAYMENT OF REGISTRATION FEES ......................................................... 15

IX.     CONFIRMATION OF DELIVERY OF THE REQUEST TO ALL OTHER
        PARTIES ........................................................................................................... 16

EXHIBITS.................................................................................................................... 17

Claimants Glaz LLC (f/k/a Roslindale LLC) ("Glaz"), Posen Investments LP ("Posen"), and Kenosha Investments LP ("Kenosha") (collectively, the "Claimants"), hereby submit this Request for Arbitration against Respondent Sysco Corporation ("Sysco") pursuant to Article 1 of the Arbitration Rules of the London Court of International Arbitration effective as of October 1, 2014 ("LCIA Rules").

## I.        INTRODUCTION

1.        This arbitration stems from Sysco's threat to deprive Claimants of their express contractual right to consent before Sysco settles any of its U.S. antitrust claims against suppliers of chicken, beef, and pork.  Sysco has once before admitted to breaching Claimants' contractual rights.  In 2021, after taking nearly $150 million in cash from Claimants to finance its antitrust claims, Sysco assigned away a large portion of Claimants' collateral to third parties in a flagrant breach of its contractual obligations.  To resolve that earlier dispute, the Claimants and Sysco amended their agreement to alter the economic entitlements and provide Claimants with the consent right that is the subject of this current dispute.  The consent right was uniquely designed to protect Claimants' substantial investment in Sysco's food antitrust claims going forward. However, Sysco now says that it intends imminently to execute settlements without Claimants' consent.

2.        The issue is straightforward.  According to Section 5.3(b)(v) of the litigation funding agreement that governs the parties' relationship, Sysco "shall not accept a settlement offer without the Capital Providers' prior written consent, which shall not be unreasonably withheld" (the Claimants are referred to in the agreement as the "Capital Providers").  Ex. 1 (Amendment No. 1 to Second Amended and Restated Capital Provision Agreement (Mar. 31, 2022)) § 5.3(b)(v); *see also* Ex. 2 (Second Amended and Restated Capital Provision Agreement (Dec. 22, 2020)) ("Original CPA") (collectively, "Amended CPA").

3.        Last week, Sysco informed Claimants that they had received settlement offers from two suppliers – ██████████████████████████ and ███████████████████

██ .  In each case, the proposed settlement amount was a pittance:  less than one percent of Sysco's total purchases.  Sysco told Claimants that it was inclined to accept the proposed settlements, even though they were far below what other plaintiffs had been able to obtain on a volume-adjusted basis.

4.      Through outside counsel, on September 7, Claimants sent Sysco a letter asking for Sysco's agreement that it would not settle without their consent.  They also sought additional information from Sysco necessary for them to evaluate the settlements.  Claimants requested a response by 5:00 p.m. on September 8, 2022.  *See* Ex. 3 (Letter from D. Ho to B. Flynn (Sept. 7, 2022)).  On the afternoon of September 8, Sysco notified Claimants that it had retained outside litigation counsel.  Ex. 4 (Email from B. Flynn to D. Ho (Sept. 8, 2022)).  Later on September 8, Claimants' outside counsel asked Sysco's outside counsel for a time to discuss the issue.  Sysco's outside counsel indicated that they were unavailable until 4:00 p.m. the next day, September 9, 2022. Ex. 5 (Email from L. Bensman to D. Ho (Sept. 8, 2022)).  Claimants' outside counsel accepted the invitation for a telephone call on 4:00 p.m. but asked for assurance that Sysco would not execute the settlements in the meantime; Sysco did not respond.  Ex. 6 (Email from D. Ho to L. Bensman (Sept. 8, 2022)).  In a final effort to defuse the situation, Claimants' outside counsel called Sysco's outside counsel on the evening of September 8 asking for a substantive response by no later than that evening, but none was forthcoming.

5.      Pursuant to the arbitration agreement in the Amended CPA, Claimants now bring this request for arbitration – and the accompanying applications for emergency and interim measures – to prevent Sysco from entering into the proposed settlements without Claimants' consent and from irreparably harming Claimants' interests.  Claimants ask that this Arbitral Tribunal declare Sysco's attempt to force these settlements through without Claimants' approval in violation of their contractual rights, and to permanently enjoin Sysco from executing any settlement without following the rights and procedures established in Section 5.3(b)(v) of the Amended CPA.

## II. PARTIES TO THIS ARBITRATION

### A. Claimants

6.     Glaz is a limited liability company organized under the laws of Delaware.  Glaz is an indirect subsidiary of Burford Capital Limited, a Guernsey corporation that is publicly traded on the London Stock Exchange and the New York Stock Exchange and focuses on litigation finance.

7.     Glaz's address is:

Glaz LLC
251 Little Falls Drive
Wilmington, DE 19808
Attn:  Manager
Telephone:  (302) 636-5400
Email Address:  info@litfinsolutions.com

8.     Posen is a limited partnership organized under the laws of Delaware.  Posen is an indirect subsidiary of Burford Capital Limited.

9.     Posen's address is:

Posen Investments LP
251 Little Falls Drive
Wilmington, DE 19808
Attn:  Manager
Telephone:  (302) 636-5400
Email Address:  info@litfinsolutions.com

10.     Kenosha is a limited partnership organized under the laws of Delaware.  Kenosha is an indirect subsidiary of Burford Capital Limited.

11.     Kenosha's address is:

Kenosha Investments LP
251 Little Falls Drive
Wilmington, DE 19808
Attn:  Manager
Telephone:  (302) 636-5400
Email Address:  info@litfinsolutions.com

12.     Claimants are here represented by the law firm of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.  All correspondence in this arbitration should be addressed to:

Derek T. Ho
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7931
Email: dho@kellogghansen.com

**B.      Respondent**

13.      Sysco is a corporation organized under the laws of Delaware.

14.      Sysco's address is:

1390 Enclave Parkway
Houston, TX 77077
Attn: Eve McFadden
Telephone: (281) 584-1390
Email Address: eve.mcfadden@corp.sysco.com

## III.    THE DISPUTE RESOLUTION AGREEMENT, THE PLACE AND SEAT OF THE ARBITRATION, THE GOVERNING LAW, AND THE LANGUAGE OF THE ARBITRATION

**A.      The Arbitration Agreement**

15.      This arbitration is initiated pursuant to the arbitration agreement found at Section

29 of the Original CPA (entered into by and among Sysco and Claimants), which provides as

follows:

(a) Any and all of the following shall (to the exclusion of any other forum except as set forth herein) be referred to and finally resolved by arbitration under the LCIA Arbitration Rules (2014) of the London Court of International Arbitration (the "Rules" and the "LCIA"), which Rules are deemed to be incorporated by reference into this clause: any dispute, controversy or claim arising out of or in connection with (i) this Agreement (including this Section 29); (ii) any other Transaction Document; (iii) any relationship or interaction between the Counterparty, on the one hand, and any Capital Provider(s), on the other hand; or (iv) a claim or assertion by any other Person of any right arising out of or in connection with this Agreement (including this Section 29) or any other Transaction Document, including, as to all such disputes, claims and controversies, any question regarding (x) the existence, arbitrability, validity or termination of this Agreement (including this Section 29) or any other Transaction Document, (y) any relationship or interaction between the above identified parties, or (z) the obligation of any Person to arbitrate any such dispute.

(b) Except as otherwise specifically provided in this Agreement (including this Section 29) or any other Transaction Document, (i) the arbitral tribunal (the "Tribunal") shall have the exclusive power to grant any remedy or relief that it deems appropriate, whether provisional or final, including but not limited

4

to emergency relief, injunctive relief and/or any other interim or conservatory measures or other relief permitted by the Rules (collectively, "Conservatory Measures"), and any such measures ordered by the Tribunal shall, to the extent permitted by applicable law, be deemed to be a final award on the subject matter of such measures and shall be enforceable as such in any court of appropriate jurisdiction; and (ii) prior to the formation or expedited formation of the Tribunal (under Article 5 or 9A of the Rules), the provisions of Article 9B of the Rules shall apply to any request for Conservatory Measures.

. . .

(d) Any request for arbitration or response thereto submitted to the LCIA may be delivered by any means (including email) set forth in Section 18 (Notices) or any other means that is reasonably likely to achieve actual service.

(e) The number of arbitrators shall be three. Subject to Article 8 of the Rules, each party to the arbitration shall nominate one arbitrator and the two arbitrators nominated by the parties shall, within ten (10) days of the nomination of the second party-nominated arbitrator, agree upon and nominate a third arbitrator who shall act as Chairman of the Tribunal. If no agreement is reached within ten days or at all, the LCIA Court shall select and appoint a third arbitrator to act as Chairman of the Tribunal.

(f) The seat, or legal place, of arbitration shall be New York, New York. Notwithstanding the terms of Section 27 (Governing Law), the U.S. Federal Arbitration Act shall govern the interpretation, application and enforcement of this Section 29 and any arbitration proceedings conducted hereunder. The language to be used in the arbitral proceedings shall be English.

(g) In addition to the confidentiality requirements imposed on the parties by Article 30 of the Rules, each party is obligated to keep confidential the existence and content of any arbitral proceedings initiated hereunder and any rulings or award except (i) to the extent that disclosure may be required of a party to fulfill a legal duty, protect or pursue a legal right, or enforce or challenge an award in bona fide legal proceedings before a state court or other judicial authority, (ii) with the consent of all parties, (iii) where needed for the preparation or presentation of a claim or defense in such arbitral proceedings, (iv) where such information is already in the public domain other than as a result of a breach of this clause (g), or (v) by order of the Tribunal upon application of a party.

Ex. 2 (Original CPA) § 29.

16.     The claims herein fall within the scope of the arbitration agreement because they involve a dispute "arising out of or in connection with" the Amended CPA. *Id.* § 29(a). Specifically, Claimants' request for declaratory relief concerning Claimants' right to consent to any settlement agreement fall squarely within the scope of the Amended CPA, which explicitly

provides that Sysco "shall not accept a settlement offer without the Capital Providers' prior written consent, which shall not be unreasonably withheld." *Id.* § 5.3(b)(v). Similarly, the Claimants' request for a permanent injunction barring Sysco from entering into settlement agreements with either ███████████ arises out of the same provision.

### B.    The Seat of the Arbitration

17.    Pursuant to Section 29 of the Original CPA, as set out above, the legal seat of arbitration is New York, New York.

### C.    Governing Law

18.    Section 28 of the Original CPA provides that:

Except as set forth otherwise in Section 29, this Agreement shall be construed in accordance with, and this Agreement and all matters arising out of or relating in any way whatsoever to this Agreement (whether in contract, tort or otherwise) shall be governed by, the law of the State of New York (without reference to any conflict of law principles or choice of law doctrine that would have the effect of causing this Agreement to be construed in accordance with or governed by the law of any other jurisdiction).

19.    Section 29 of the Original CPA provides that, "[n]otwithstanding the terms of Section 2[8] (Governing Law), the U.S. Federal Arbitration Act shall govern the interpretation, application and enforcement of this Section 29 and any arbitration proceedings conducted hereunder."

### D.    The Language of Arbitration

20.    Under Section 29 of the Original CPA, the language of the arbitration shall be English.

## IV.    THE ARBITRAL TRIBUNAL

21.    Section 29(e) of the Original CPA provides for three arbitrators. Following Article 8 of the LCIA Rules, "each party to the arbitration shall nominate one arbitrator and the two arbitrators nominated by the parties shall, within ten (10) days of the nomination of the second party-nominated arbitrator, agree upon and nominate a third arbitrator who shall act as

Chairman of the Tribunal." If there is no agreement within ten days, "the LCIA Court shall select and appoint a third arbitrator to act as Chairman of the Tribunal." *Id.*

22.     Pursuant to Section 17, Claimants nominate Gary Born as arbitrator. To the best of Claimants' knowledge, Mr. Born is independent of the parties involved in this arbitration. Mr. Born's contact details are as follows:

> Gary Born
> 49 Park Lane
> London W1K 1PS
> United Kingdom
> Telephone: +44(0)20 78721020
> Facsimile: +44 (0)20 7645 2424
> Email Address: gary.born@wilmerhale.com

## V.     FACTUAL AND LEGAL ALLEGATIONS

### A.     Sysco's Food Antitrust Claims

23.     Respondent Sysco is a broadline wholesale distributor. A core component of its business is purchasing various food products from suppliers – including animal proteins like chicken, beef, and pork – and then reselling them to customers such as restaurants, schools, healthcare facilities, and hospitality businesses.

24.     Over the past decade, numerous antitrust lawsuits have been filed against suppliers of chicken, beef, and pork, alleging that the suppliers in each of these industries conspired to raise the prices of those products.

25.     In 2016, a class action complaint was filed against dozens of chicken supply companies, including ███████████████. *See In re Broiler Chicken Antitrust Litigation*, Case No. 1:16-cv-8637 (N.D. Ill.). Plaintiffs allege that chicken suppliers conspired to restrict the collective output of the chicken industry for nearly a decade, agreed to manipulate multiple chicken price indices, and worked to rig bids and fix prices over many contract negotiations with restaurants, purchasing cooperatives, and distributors – all in violation of Section 1 of the Sherman Act. Sysco eventually filed its own "direct action" complaint in the litigation. *See*

*Sysco Corp. v. Tyson Foods, Inc., et al.*, Case No. 1:18-cv-700 (N.D. Ill.). Defendants' motions to dismiss the plaintiffs' claims have been denied.

26. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

27. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████.

28. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████.

29.     ███████████ has entered into multiple class-wide settlements in the chicken antitrust multidistrict litigation, including the direct purchasers, end-user consumers, and commercial and institutional indirect purchasers. Similarly, ███████ has entered into class settlements with the commercial and institutional indirect purchasers, direct purchasers, and end-user consumers.

8

30.     In addition to the broiler chicken litigation, Sysco has claims against suppliers of beef and pork, ██████████████████████████████████ for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. *See In re Pork Antitrust Litigation*, Case No. 18-cv-1776 (D. Minn.); *In re Cattle & Beef Antitrust Litigation*, Case No. 20-cv-1319 (D. Minn.).

31.     In the beef litigation, the court last year granted in part and denied in part the defendants' motion to dismiss, finding that the Plaintiffs plausibly pleaded that Defendants conspired to suppress the price of fed cattle and drive up the price of beef in order to realize sky-high margins. ████████████████████████████████████████ ██████████████████████████████. Similarly, in the pork litigation, while several defendant groups succeeded on a motion to dismiss, the majority of claims survived because plaintiffs' amended complaints adequately plead parallel conduct, and because Plaintiffs adequately plead a continuing violation such that the claims are not time barred. Several defendants and classes have begun to receive final approval of settlements – including Smithfield Foods with commercial and institutional indirect purchasers and direct purchasers, and the JBS defendants with the consumer indirect purchasers.

**B.     Claimants' Investments in Sysco's Claims**

32.     Between 2019 and 2021, Claimants provided millions of dollars to Sysco to finance its antitrust claims relating to its purchases of broiler chickens, pork products, beef products, ████ products, and ██████████████████████. ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████. In return, Sysco agreed to provide the Capital Providers an entitlement to a certain percentage of the return on these claims.

### C.    Sysco's First Violation of Claimants' Consent Rights

33.    In return for Claimants' agreement to invest in its claims, Sysco agreed not to assign those claims to third parties without Claimants' consent.  Specifically, Section 5.3(b)(viii) of the Amended CPA provides that Sysco "shall not dispose of, transfer, encumber or assign, nor otherwise create, incur, assume, or permit to exist any Adverse Claim with respect to, all or any portion of such Claim (or any interest therein) or any Proceeds thereof (or any right to such Proceeds)" "*other than with the prior written consent of the Capital Providers*."  Ex. 2 (Amended CPA) § 5.3(b)(viii) (emphasis added).  That provision was critical to Claimants, as any assignment would diminish the value of Sysco's claims and, in turn, the collateral for Claimants' investment.

34.    Over the course of the following year, in clear breach of that provision, Sysco repeatedly assigned away claims representing nearly 30% of the value of its claims in the chicken cases, in addition to significant portions of its beef and pork claims.  Sysco neither notified the Claimants of its intent to enter into the assignment agreements nor sought Claimants' consent to these assignments. These assignments gave away a substantial portion of the collateral for the Claimants' investment, with the Capital Providers getting nothing of value in return.   The Claimants did not find out about Sysco's actions until after the fact, in late 2021.

35.    Upon being confronted with its plainly unlawful assignments, Sysco conceded that it had violated the CPA and agreed to amend the CPA to provide economic restitution for Sysco's breaches.  First, to compensate the Claimants for the reduction in Sysco's claims caused by these unlawful assignments, Sysco agreed to increase the percentage of the proceeds from the remaining claims to which Claimants are entitled.

36.    Second, Sysco agreed to give Claimants a right to consent to any settlement between Sysco and the defendants.  Specifically, the Amended CPA provides that Sysco "shall not accept a settlement offer without the Capital Providers' prior written consent, which shall not be unreasonably withheld."  Ex. 1 (Amended CPA) § 5.3(b)(v).  Claimants' right to consent

is subject to the further proviso that Claimants shall not exercise control over the independent judgment of any outside counsel, and that they will not "seek to impose a commercially unreasonable result with respect to settlement." *Id.*

37.     The new right to consent to any settlement was specifically bargained-for in light of Sysco's breach and was, therefore, critical to Claimants.  Because the Amended CPA drastically reduced Sysco's economic stake in the relevant litigation claims in order to compensate Claimants for Sysco's unlawful assignments, Claimants were concerned that Sysco would lack adequate incentive to pursue the litigation vigorously.  That concern was especially acute given that Sysco has ongoing commercial relationships with the defendants in these cases and would be tempted to prioritize its commercial interests over the parties' joint interest in obtaining the best possible litigation result.

**D.     ███████████████     Settlement Proposals**

38.     Claimants concerns were well founded.  In late August, 2022, Sysco notified Claimants that it had received settlement offers from ████████████ that it intended to accept.  Sysco has only provided Claimants with limited information about the settlements' terms, but what it has provided paints a compelling picture that the proposed settlements significantly undervalue Sysco's chicken, pork, and beef claims.

39.     The proposed settlement with ██████ would release all of Sysco's broiler chicken-related claims at issue in the litigation for ██████.  This amounts to a recovery of ████████████████ of Sysco's broiler chicken purchases from ██████ during the relevant period.

40.     The proposed settlement with ██████ would release all of Sysco's chicken-, beef-, and pork-related claims for a total of ██████.  Sysco has represented to Claimants that this breaks down into ██████ for broiler chicken-related claims against ██████ and ██████ for Sysco's beef and pork claims against ████████████.  Like with ██████, the ██████ allocated to the broiler chicken claims amount to ██████

████ Sysco's ██████ in unassigned broiler chicken purchases during the relevant period.  The amount allocated to beef and pork would also release Sysco's pork and beef claims against ██ for a very low percentage of purchases.

41.    In pure economic terms, a recovery of ████████████████ is minuscule for antitrust claims that have survived a motion to dismiss, that are supported by substantial evidence and likely to survive summary judgment, and that have spawned multiple criminal indictments by the Department of Justice ████████████.  Indeed, ██ ████████████████████████████████████ ████████████████

42.    Moreover, the proposed settlements will significantly reduce the value of Sysco's claims against the remaining defendants, because Sysco intends to agree that the settlements will be "Qualified Settlements" under the Judgment Sharing Agreement ("JSA") that most suppliers (including ██████████) have entered into in connection with the *Broilers* litigation. By agreeing to a Qualified Settlement, Sysco would be giving up the right to joint and several liability – a key feature of federal antitrust law – against the remaining signatory defendants and would have to reduce any future court judgment against any of those pursuant to a formula set forth in the JSA.

43.    Moreover, under the JSA, the signatories (including both ██████████) are required to promptly provide each other with full copies of all settlement agreements with any plaintiff.  As a result, other signatory defendants will be aware of the terms of Sysco's settlements, which will impair Sysco's negotiating leverage with those remaining defendants and potentially create a very low ceiling for future settlements.

E.    **Sysco's Threatened Breach of Claimants' Consent Rights**

44.    For these and other reasons, Claimants promptly raised serious concerns with the proposed settlements with Sysco's in-house counsel.  In telephone calls on Friday, September 2, and Tuesday, September 6, 2022, Sysco asserted that Claimants were *required* to give their

consent to any settlement that Sysco believed to be reasonable, and that Sysco could enter into a settlement without Claimants' consent if Claimants refused to provide it. Sysco also stated that it was nearing the end of its negotiations with ███████████, and that it would be ready to execute the settlements imminently.

45.     On September 7, 2022, Claimants sent a formal letter to Sysco notifying it that they objected to the settlements and requesting that Sysco confirm by September 8 at 5:00 p.m. Eastern that Sysco would not execute either of the proposed settlements without Claimants' consent. Claimants also requested additional information from Sysco relevant to their ongoing evaluation of the settlements. After Sysco failed to respond by that deadline, Claimants filed this arbitration.

## VI.     CLAIMS FOR RELIEF

### A.     Request for Declaratory Judgment

46.     Claimants repeat, re-allege, and incorporate herein by reference each of the allegations set forth in paragraphs 1 through 45 as if set forth in full herein.

47.     An actual, justiciable controversy has arisen and now exists between Plaintiffs and Defendant concerning Claimants' right to consent to any settlement agreement pursuant to Section 5.3(b)(v) of the Amended CPA.

48.     Claimants seek a declaration that Sysco's execution of the proposed settlements with ███████████ without Claimants' consent would constitute a violation of the Amended CPA.

49.     Such a declaration is necessary and appropriate at this time so that the parties can determine their rights and duties under the Amended CPA.

### B.     Request for Permanent Injunction

50.     Claimants repeat, re-allege, and incorporate herein by reference each of the allegations set forth in paragraphs 1 through 45 as if set forth in full herein.

51.     Section 5.3(b)(v) of the Amended CPA provides that Sysco "shall not accept a settlement offer without the Capital Providers' prior written consent, which shall not be unreasonably withheld."  Sysco's execution of the proposed settlements without Claimants' consent would constitute a material breach of Section 5.3(b)(v).  Claimants thus seek an injunction prohibiting Sysco from executing the proposed settlements with ███████████ ██ without the Capital Providers' consent, in violation of the Amended CPA.

### C.      Breach of Contract

52.     Claimants repeat, re-allege, and incorporate herein by reference each of the allegations set forth in paragraphs 1 through 45 as if set forth in full herein.

53.     Claimants and Respondent are parties to the Amended CPA.

54.     Section 5.3(b)(v) of the Amended CPA provides that Sysco "shall not accept a settlement offer without the Capital Providers' prior written consent, which shall not be unreasonably withheld."  The Amended CPA further provides:  "In addition to and without limiting the obligations of the Counterparty to the Capital Providers pursuant to Section 5.3(b) of the Existing Agreement, the Counterparty shall take such actions as are reasonable and appropriate to maximize the Proceeds received from each Claim, giving priority to cash Proceeds."  Amended CPA § 7(a).

55.     In the event that Sysco has already executed the proposed settlements, its execution of those settlements constitutes a breach of the Amended CPA.  That breach will cause Claimants damages, including but not limited to the compensation Sysco would have received had its claims against ███████████████ been prosecuted to their fullest extent and/or settled at a rate that more accurately values the claims.

## VII.    PRAYER FOR RELIEF

56.     Claimants respectfully request an award granting the following relief:

        A.      A declaration that Sysco's execution of the proposed settlements with ███████████████ without Claimants' consent would constitute a

violation of the Amended CPA.

B.    An injunction prohibiting Sysco from executing the proposed settlement

agreements with ████████████████████████████ without

Claimants' consent;

C.    An award of all legal costs and fees that Claimants incurred in this

arbitration and related proceedings; and

D.    Such other and further relief as the Arbitral Tribunal may deem just and

proper.

57.    For the avoidance of any doubt, and subject to Article 22.1(i) of the LCIA Rules,

Claimants reserve their right to:

A.    Raise any and all further claims arising out of or in connection with the

disputed matters described in this Request or otherwise arising between

Claimants and Respondents;

B.    Amend and/or supplement the relief sought herein;

C.    Produce such factual or legal arguments or evidence (including witness

testimony, expert testimony, and other documents) as may be necessary

to present its case or rebut any case which may be put forward by

Respondents; and

D.    Seek emergency, interim, and provisional measures before this Arbitral

Tribunal or any competent national court.

## VIII.   PAYMENT OF REGISTRATION FEES

58.    Pursuant to the Schedule of Costs and in accordance with Article 1.1(vi) of the

LCIA Rules, Claimants are sending an advance payment of UK £1,950 with the current Request

for Arbitration to the Registrar.  Claimants acknowledge that this payment is non-refundable and

shall be credited to its portion of the advance on costs.

## IX. CONFIRMATION OF DELIVERY OF THE REQUEST TO ALL OTHER PARTIES

59.     Pursuant to Article 1.1(vii) of the LCIA Rules, Claimants are delivering copies of the request (including all accompanying documents) to all other parties to the arbitration at the postal and email addresses set out in Section II above.

Respectfully submitted,

Derek T. Ho
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900 (Telephone)
(202) 326-7999 (Facsimile)
dho@kellogghansen.com

*Attorney for Claimants*                                    September 9, 2022

**EXHIBITS SUBMITTED WITH THE REQUEST FOR ARBITRATION**

| Exhibit | Exhibit number |
|---|---|
| Amendment No. 1 to Second Amended and Restated Capital Provision Agreement (Mar. 31, 2022) | 1 |
| Second Amended and Restated Capital Provision Agreement (Dec. 22, 2020) | 2 |
| Letter from D. Ho to B. Flynn (Sept. 7, 2022) | 3 |
| Email from B. Flynn to D. Ho (Sept. 8, 2022) | 4 |
| Email from L. Bensman to D. Ho (Sept. 8, 2022) | 5 |
| Email from D. Ho to L. Bensman (Sept. 8, 2022) | 6 |
| ███████████████████████ | 7 |

# Exhibit 4

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

| AMERICAS | ASIA | EUROPE & MIDDLE EAST | |
|---|---|---|---|
| NEW YORK | BEIJING | ABU DHABI | LONDON |
| SAN FRANCISCO | HONG KONG | BRUSSELS | MILAN |
| SÃO PAULO | SEOUL | COLOGNE | PARIS |
| SILICON VALLEY | | FRANKFURT | ROME |
| WASHINGTON, D.C. | | | |

CRAIG B. BROD
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEV L. DASSIN
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO

MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
LILLIAN TSU
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
RISHI ZUTSHI
JANE VANLARE
AUDRY X. CASUSOL
ELIZABETH DYER
DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOHN A. KUPIEC
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI

ELANA S. BRONSON
MANUEL SILVA
KYLE A. HARRIS
LINA BENSMAN
AROM M. ZUCKERMAN
KENNETH S. BLAZEJEWSKI
MARK E. MCDONALD
F. JAMAL FULTON
PAUL V. IMPERATORE
CLAYTON SIMMONS
CHARLES W. ALLEN
JULIA L. PETTY
RESIDENT PARTNERS

JUDITH KASSEL
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
HEIDE H. ILGENFRITZ
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
MATTHEW BRIGHAM
EMILIO MINVIELLE
LAURA BAGARELLA
JONATHAN D.W. GIFFORD
SUSANNA E. PARKER
DAVID W.S. YUDIN
KAILA A. HAILEY
ANNA KOGAN
BRANDON M. HAMMER
RESIDENT COUNSEL

D: +1 212 225 2086
jrosenthal@cgsh.com

12 December 2022

BY EMAIL

Mr. Laurence Shore
*Bonelli Erede Pappalardo*
*Studio Legale*
Via Barozzi 1
20122 Milan – ITALY

Mr. J. William Rowley KC
*Twenty Essex*
20 Essex Street
London WC2R 3AL – UK

Mr. John Kerr Jr.
*Simpson Thacher & Bartlett LLP*
425 Lexington Avenue
New York, NY 10017 – USA

Re:     Glaz LLC, Posen Investments LP, and Kenosha Investments LP vs. Sysco Corporation
        (LCIA No. 225609)

Dear Members of the Tribunal:

We write on behalf of Respondent Sysco Corporation ("Sysco") regarding the so-called "renewed" Application for Interim and Conservatory Measures submitted today by Claimants Glaz LLC, Posen Investments LP, and Kenosha Investments LP (collectively "Burford"), seeking to enjoin Sysco from entering into any settlement agreements (the "Third Application"). Burford also requests that the Tribunal issue an immediate temporary injunction ("TRO") *ex parte*, without providing Sysco a full and fair opportunity to respond on the merits of the extensive Third Application.

Burford's request for an *ex parte* order would contravene the LCIA Rules and principles of fairness as LCIA Tribunals are only empowered to order interim measures "upon the application of any party, *after giving all other parties a reasonable opportunity to respond to such an application.*"[1]  As one commentator observes, the language of Articles 25.1 and 25.2

---

[1]     *See* Arbitration Rules of the London Court of International Arbitration, effective as of October 1, 2014 ("LCIA Rules"), Art. 25.1 (emphasis added).

Members of the Tribunal, p. 2

"leaves no doubt that interim measures on the basis of *ex parte* applications are not permitted under the 2014 LCIA Rules."[2] The fact that Burford's three-month delay will soon result in the Third Application being moot is of no moment.[3] As discussed below, it is Burford which has elected to abandon both of its prior applications and, in any event, it seeks relief the LCIA Rules do not allow regardless of its lengthy delays.

This is now the *third* time Burford is seeking to enjoin Sysco from entering into settlement agreements, because Burford has repeatedly abandoned prior such applications which, had they proceeded, could have been submitted and resolved on a reasonable schedule that did not compromise Sysco's rights. That is no longer possible.

Burford first filed an Application for Interim and Conservatory Measures (the "First Application") on 9 September 2022. It was seven pages long and not accompanied by any witness statements or expert reports. Over the next month, Sysco worked diligently in preparation of a response to the First Application so as to be in a position to file such response immediately upon constitution of the Tribunal, given the importance of a prompt resolution of Burford's request. The Tribunal was constituted on 6 October 2022, but the very next day, Friday, 7 October 2022 (the eve of a holiday weekend), Burford withdrew the First Application and filed an entirely new Application for Interim and Conservatory Measures (the "Second Application"). The Second Application bore absolutely no resemblance to the First Application. It was five times longer and was accompanied by witness and expert declarations absent from the First Application.

Just two business days later, on 12 October 2022 (before Sysco had a meaningful opportunity even to begin to prepare its response to the Second Application), Burford advised the Tribunal that it had decided to hold the Second Application in abeyance. Sysco therefore did not proceed to prepare a response. Although Burford explicitly exhibits "without prejudice" communications to, *inter alia*, falsely claim that it was led to believe that Sysco would effectively stand down the "threatened" settlements,[4] Sysco in fact repeatedly and transparently

---

[2]    Maxi Scherer, Lisa Richman, et al., Interim and Conservatory Measures, *Arbitrating under the 2014 LCIA Rules: A User's Guide*, dated 2015, at 264 (Exhibit 1). *See also* Hans van Houtte, *Ten Reasons Against A Proposal for Ex Parte Interim Measures of Protection in Arbitration*, 20 Arb. Int'l 85 (2004), at 90-91 (Exhibit 2) (arguing against *ex parte* TROs in arbitration because they are, among other problems, incompatible with the consensual nature of arbitration and the respect for the rights of defense); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 18, 20 (2d Cir. 1997) (Exhibit 3) (an arbitrator "must give each of the parties to the dispute an adequate opportunity to present its evidence and argument").

[3]    This is because if Burford withholds consent from the final settlement agreement with ▮▮▮▮, Sysco will either voluntarily elect not to execute that agreement or will execute it if it concludes that Burford's consent was unreasonably withheld. In either circumstance, there will be no live controversy with respect to the Third Application.

[4]    *See, e.g.*, Third Application ¶ 48. *Compare* Email from J. Rosenthal to L. Snodgrass, dated 12 Oct. 2022 (Exhibit C-54), *with* Email from J. Rosenthal to L. Snodgrass, dated 12 Oct. 2022 (Exhibit 10). This was no oversight as Ms. Snodgrass herself quoted Exhibit 10 back to Mr. Rosenthal in a 31 October 2022 email when Mr. Rosenthal questioned whether the parties' communications had been off the record. Sysco refrains at this time from exhibiting without prejudice communications with this letter to rebut Burford's false assertions (including Ms.

communicated to Burford throughout the past two months that it intended to continue to work diligently with ██████ to finalize a settlement agreement to be presented for Burford's approval. Indeed, as the correspondence will indisputably show (both without prejudice and on-the-record communications), not only did Burford know that Sysco was proceeding with documenting an agreement with ██████, but back in *October*, Sysco advised Burford that it already had a draft settlement agreement in hand that it proposed to share with Burford as soon as Burford was willing to help resolve confidentiality issues, following which Burford restarted the arbitration and required Sysco to file its Response but did not renew its Second Application.

Even though two months passed since the withdrawal of the Second Application during which Sysco exchanged draft agreements with ██████ and so advised Burford, at no time before the Case Management Conference (the "CMC") on 7 December 2022 did Burford even suggest that it would, for a third time, seek to preliminarily enjoin Sysco from entering into any settlements. Indeed, even during the CMC itself, Burford was not consistently clear about its intentions; for example, in response to a question from Mr. Kerr as to whether it is "the case that Claimant is not requesting a preliminary injunction, and you are simply looking for a permanent injunction," Burford's counsel responded "[s]ubject to my comments about the pending application for interim—or that they be suspended, the application interim relief, that is the case."[5] Burford's counsel later intimated that it might revive the Second Application; it never even remotely suggested that it was planning a different, Third Application.[6]

The following night, Burford advised us that it was contemplating, for the third time, seeking to preliminarily enjoin Sysco from entering into any settlement, and that it would additionally seek to enjoin Sysco from seeking consent from parties to the antitrust cases to use their confidential information in this arbitration, including the request to include a provision in the ██████ settlement agreement providing for such consent (discussed below). Until three minutes before it filed its Third Application and request for a TRO this morning, Burford neither sought Sysco's consent not to execute a settlement before its Third Application could be heard nor ever disclosed that it would seek a TRO, particularly *ex parte* before Sysco would have a full and fair opportunity to be heard.

The delayed timing of Burford's Third Application (submitted with notice of a forthcoming "further interim measures application") is extremely prejudicial to Sysco. Contrary to Burford's mischaracterization, the Third Application is far from a "renewed Application," which was the most it suggested to Sysco and the Tribunal last Wednesday. The Third Application is a full 50% longer than the Second Application (and *seven times* the length of its First Application) and contains 16 new fact exhibits and 11 new legal exhibits not cited in the

---

Snodgrass's 31 October 2022 email), but considers itself free to do so in the future, including when it provides its substantive response to the Third Application.

[5]     Transcript of Case Management Conference, dated 7 December 2022 ("CMC Tr.") at 24:18-21 (Exhibit 4).

[6]     *See* CMC Tr. 15:7-8 (counsel referring to "the suspended application for interim relief"), 46:18-22 (counsel stating "we have to put the application for interim measures back into play"), 47:5-11 (counsel stating "that application is going to need to come back on the table").

Members of the Tribunal, p. 4

Second Application. And to our surprise, without any notice or attempt to negotiate an "OAEO" agreement (which is highly uncommon in our arbitration experience), Burford demanded that we be prohibited from furnishing portions of its Third Application for our client to review.[7]

Critically, while both the First Application in early September and the Second Application in early October afforded Sysco a reasonable amount of time to prepare its response before any settlement agreement would be fully negotiated and executed, two months later, that is no longer the case. Sysco is close to finalizing its settlement agreement with ███████, and has compelling business reasons to execute that agreement by year-end (which, practically speaking, likely means before Christmas in less than two weeks). We shared a draft of the settlement agreement with Burford ten days ago; most critically, *the material terms of that draft agreement are the same as what was disclosed to Burford more than three months ago* (leading it to commence this arbitration).

Burford's feigned surprise as to the terms of the proposed settlement agreement in order to manufacture exigency is demonstrably false.[8] One such "materially worse" term necessitating the Third Application, according to Burford, is ████████████████████████████████ ██████████████████.[9] But not only did Sysco discuss this limitation with Burford more than three months ago during their September 6 call, but Burford's CEO described this very term in the witness statement he submitted in connection with the Second Application.[10] And while Burford likewise claims it has just "learned that the settlement ██████████████," [11] Burford's Second Application filed on 7 October stated that "it appears that the proposed settlements ████████████████████████████████." [12] As for Burford's complaint that the dollar amount of the Chicken settlement dropped by ██ million,[13] the Second Application complained about the ████████████ settlement amount with ███████, which Sysco has advised Burford in writing remains unchanged.[14] Thus the *only* "new"

---

[7]    Burford unilaterally demands that we be restrained from sharing its full submission with our client on the basis that the Third Application "makes reference to commercially sensitive information at paragraphs 11 and 96 of the brief," which may "reveal information that ████ could use to its commercial advantage," despite the information being "cumulative, anonymized and averaged." Email from D. Ho to Tribunal, dated 12 December 2022. Absent a persuasive explanation from Claimants or an injunction issued by the Tribunal barring us from doing so, we intend to share the full and unredacted version of Burford's Third Application with our client tomorrow.

[8]    Third Application ¶ 57.

[9]    Third Application ¶ 57(b).

[10]    *See* Witness Statement of Christopher Bogart ("Bogart WS") ¶ 42 ███████████████████████ ██████████████████████████████.

[11]    *See* Third Application ¶ 57(c).

[12]    Second Application ¶ 47.

[13]    Third Application ¶ 57(a).

[14]    *See* Letter from L. Bensman to D. Ho, dated 12 December 2022 (Exhibit 11) at 4.

development whatsoever is that Sysco informed Burford ten days ago of its intent ████ ██████████,[15] which Burford claims will be the subject of a separate application.

The bottom line is that Burford's Third Application demonstrates that it did not learn anything new from this draft that gives rise to a need for provisional relief now when it acknowledged none existed previously in electing not to pursue provisional relief. All that has happened as a result of Burford's abandonment of its First and Second Applications is that the clock has ticked three months closer to finalization of the settlement agreements.[16]

Burford's conscious delay during this time has, respectfully, run out its own clock. The withdrawal of its First Application and the suspension of its Second Application two business days after filing induced Sysco to stand down work on a response for the past two months (which, with respect to the Second Application, Sysco had barely even commenced). We need to perform legal research, obtain documentary evidence (which will require us to immediately seek consents that Burford has suggested it will seek to enjoin "in the coming days"), expert report(s) and witness statement(s), and synthesize that in a substantive memorial—all during the holiday season when necessary persons may be unavailable or have limited capacity.

Permitting Burford to prejudice Sysco in such a significant manner and, thereby, gain a strategic advantage through its own delay would be in complete disregard of Sysco's rights and, indeed, no court of law would likely entertain an expedited request for injunctive relief under such circumstances. Preliminary injunctive relief is premised upon "the theory that there is an urgent need to protect a party's right."[17] "By sleeping on its rights," a party "demonstrates the lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues."[18]

The proper approach, therefore, is for the Tribunal to set a reasonable schedule for Sysco's response—we propose six weeks due to the upcoming holidays—and, should the contemplated settlements not be entered into by then, the Tribunal can proceed with its consideration. Any shorter period of time would be unreasonable; it would be manifestly unfair and prejudicial to Sysco to reward Burford's decision not to pursue its First or Second Application only to have it wait until 12 December to proclaim such urgency as to require an *ex parte* temporary restraining order and presumably demand an expedited schedule that compromises Sysco's right to put on a full defense when it has been necessitated by nothing

---

[15]     Third Application ¶ 57(d).

[16]     In this regard, we have invited Burford to comment on the draft agreements, offered to meet and confer with them concerning the agreements and intend to seek Burford's approval prior to entry into them (and Sysco will consider any objections raised by Burford). Regrettably, Burford responded with a letter designed more for use in this arbitration than providing substantive comments, to which we have responded further. Sysco does not intend to enter into any settlement without Burford's consent, unless such consent is unreasonably withheld.

[17]     *Gillette Co. v. Ed Pinaud, Inc.*, 178 F. Supp. 618, 622 (S.D.N.Y. 1959) (Exhibit 5).

[18]     *Id.*; *see also Nat'l Council of Arab Ams. v. City of N. Y.*, 331 F. Supp. 2d 258, 265–266 (S.D.N.Y. 2004) (Exhibit 6) (denying a preliminary injunction because a party's unreasonable delays in seeking the injunction prejudiced the other party); *Bray v. City of N.Y.*, 346 F. Supp. 2d 480, 492 (S.D.N.Y. 2004) (Exhibit 7) (same).

Members of the Tribunal, p. 6

other than Burford's delay until the 11th hour and 59th minute. We certainly would have had at least a full month (without the loss of two weeks for the holidays) to respond to the Second Application had it not been withdrawn by Burford two business days later, causing us to cease all work.

Separately, Burford has indicated that it will "file a further interim measures application concerning Sysco's threatened breaches of its confidentiality obligations under the parties' agreement as soon as possible in the coming days,"[19] seeking to enjoin Sysco from obtaining consents to use evidence necessary to Sysco's defenses.[20] Respectfully, most likely by the time that application will have been filed, and certainly by the time this Tribunal can consider it after Sysco has a fair opportunity to respond, it will have been mooted.

Burford's suggestion that it will soon request to enjoin Sysco from seeking consents necessary to use evidence available to Sysco but subject to court-ordered confidentiality restrictions flies in the face of much of the discussion at the CMC last week in which Sysco was encouraged to seek those consents rapidly so that a deadline could be set now for the submission of the Statement of Defense. We unambiguously advised Burford *ten days ago* that we intended to seek these consents, including through the addition of a clause to the proposed settlement agreement with ███████, and no request for injunctive relief was made in response. What was Burford waiting for? More fundamentally, any injunction with respect to seeking consents — including on a temporary basis—will impair our ability to prepare a response to Burford's Third Application, since we hope to use confidential documents to defend against the relief sought therein.[21] And, critically, if we do not seek ███████ consent now as part of the settlement process (which we intend to do imminently with Sysco's next round of proposed edits to the draft agreement), ███████ may be less incentivized to consent later, and its material evidence could become unavailable to us or, at a minimum, far more difficult to obtain. ███████ documents, of course, are the most important among all of the antitrust defendants with respect to this arbitration challenging Sysco's settlement with ███████. We simply cannot delay seeking its consent without risking substantial prejudice to Sysco's right to defend itself in this arbitration, and thus unless and until Burford finally does file an application and this Tribunal grants it, we do not intend to delay.

---

[19]     Email from D. Ho to Tribunal, dated 12 December 2022.

[20]     Burford advised Sysco last Thursday night that it "intends to make a separate application for interim measures enjoining Sysco from disclosing the existence of the CPA or this arbitration to any Adverse Party as defined in the CPA." Email from D. Ho to J. Rosenthal, dated 7 December 2022 (Exhibit 8).

[21]     In seeking a preliminary injunction, Burford bears the burden to "demonstrate, by clear and convincing evidence, (1) *a likelihood of success on the merits*, (2) irreparable injury absent the granting of the preliminary injunction, and (3) a balancing of the equities in the movant's favor." *Uber Techs., Inc. v. Am. Arb. Ass'n, Inc.*, 204 A.D.3d 506, 508 (N.Y. App. Div. 1st Dep't 2022) (Exhibit 9) (emphasis added). While Burford therefore bears the burden to demonstrate the substantive merits of its claims, Sysco is entitled to assert its defense, which will include that Burford's assertions about the value of Sysco's claims are baseless and that in fact, the value of Sysco's claims has deteriorated since the time of Burford's initial investment. *See, e.g.,* Respondent's Response and Request for Arbitration, dated 7 November 2022 ¶¶ 2-3 (discussing the federal government's multiple failures to prove related price-fixing allegations); ¶ 40 (same).

Members of the Tribunal, p. 7

Thank you for your consideration.

Respectfully,

Jeffrey A. Rosenthal
Lina Bensman

c.c.:  Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
       dho@kellogghansen.com

       Three Crowns LLP
       liz.snodgrass@threecrownsllp.com